**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DOMINIQUE FREEMAN, individually and on behalf of all others similarly situated, | CASE NO. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| MAM USA CORPORATION, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Dominique Freeman ("Plaintiff Freeman"), by her undersigned counsel, brings this class action complaint against Defendant MAM USA Corporation ("Defendant" or "MAM"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to her own acts and experiences, and as to all other matters, upon information and belief, including the investigation conducted by Plaintiff's attorneys.

**NATURE OF THIS ACTION**

1.     This is a consumer protection class action arising out of Defendant's false and misleading advertising of its pacifiers. Defendant's deceptive marketing practices include: (1) the deceptive misrepresentation that its pacifiers are "orthodontic" or have "orthodontic nipples," which is deceptive and misleading to reasonable consumers; and (2) the omission of material facts concerning the risks associated with pacifier use by children over the age of 24 months.

2.     As more fully described below, prolonged pacifier use by children over the age of 24 months can cause significant harm by interfering with the proper development of their teeth and orofacial structures. Children who use pacifiers to continue non-nutritive sucking habits past the age of 24 months have an increased risk of dental malocclusions—deviations from the ideal

occlusion (the relation between the upper jaw and teeth and lower jaw and teeth)—of primary teeth, which, in turn, may interfere with a child's chewing, swallowing, speech, and jaw development and function. Dental malocclusions and teeth misalignment may also have a significant adverse effect on a child's psychosocial development, self-image, and social well-being.

3. Defendant manufactures, markets, distributes, and sells pacifiers throughout Illinois and nationwide. Defendant's pacifiers come in a variety of styles, colors, and sizes. All of Defendant's pacifiers at issue have product packaging prominently advertising "orthodontic" qualities, including, but not limited to, an "orthodontic nipple" that "promotes proper oral development." The product packaging also prominently displays an age range or age minimum for each size. According to the product packaging and labeling, the largest of Defendant's pacifiers are for children 16 months and older.

4. "Orthodontics" is the branch of dentistry that corrects teeth and jaws that are positioned improperly. Through marketing, advertising statements, and misleading use of the term "orthodontic," Defendant affirmatively represents to reasonable consumers that its pacifiers promote proper oral development and are beneficial for dental health or alignment of the teeth and jaws. In addition, Defendant represents that its pacifiers are (1) safe for children over the age of 24 months, and (2) beneficial to children over the age of 24 months.

5. There is no FDA-approved or widely accepted definition of an "orthodontic" pacifier or nipple. Defendant's advertisement and use of the term "orthodontic" and promise of the promotion of "proper oral development" are misleading to a reasonable consumer and are affirmative representations that the products promote healthy oral and orofacial development in children, including children over the age of 24 months. Defendant's use of the term "orthodontic"

is designed to induce consumers to pay a premium price and to buy products that do not perform as promised for their children while wrongly believing that those products are not only harmless, but that they enhance their child's oral and orofacial health. Despite its false and misleading marketing practices, Defendant's pacifiers with purported "orthodontic" qualities do not eliminate the various dental malocclusions caused by prolonged pacifier use. Defendant's pacifiers cannot and do not support the healthy oral and orofacial development of children 24 months or older. Indeed, they do not provide any material orthodontic benefit for children of any age.

6.      On its product packaging and in its marketing and advertising, Defendant fails to disclose the material fact that prolonged pacifier use by children 24 months or older is detrimental to oral and orofacial health and development, or that such use increases the risk of developing numerous forms of dental malocclusions and teeth misalignment.

7.      Defendant's pacifiers put children at an increased risk of numerous types of dental malocclusions, are harmful to children over the age of 24 months, and do not support or improve children's oral or orofacial health and development.

8.      Through false, misleading and deceptive advertisements, Defendant has violated Illinois' consumer protection statute by: (1) representing that its pacifiers are "orthodontic" or have "orthodontic nipples" that promote healthy oral and orofacial development in children, and (2) failing to clearly and conspicuously disclose the material fact that use of Defendant's pacifiers by children 24 months or older increases the risk of malocclusions and misalignment of primary teeth. Through its advertising statements, Defendant induced Plaintiff to purchase MAM "orthodontic" pacifiers for use by her child over the age of 24 months. Plaintiff reasonably believed that Defendant's "orthodontic" pacifiers were safe and beneficial for her child. Plaintiff and putative class members were injured at the time of purchase because they would not have paid a premium

price of purchased Defendant's "orthodontic" pacifiers had Defendant made truthful advertising statements and disclosed material information concerning risks associated with prolonged pacifier use.

9.      Plaintiff asserts claims for injunctive relief and restitution arising from Defendant's false, misleading, and deceptive advertising and Defendant's failure to disclose the material risks of use of its products by children over the age of 24 months. Plaintiff alleges violations of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 502/1, *et seq.* ("Illinois Consumer Fraud Act") and Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2, *et seq*.

10.      Plaintiff brings this action on behalf of herself and Classes of similarly situated consumers who purchased a pacifier with purported "orthodontic" qualities manufactured by Defendant, as well as Subclasses of consumers who purchased a pacifier with purported "orthodontic" qualities manufactured by Defendant that was labeled for use by children 24 months or older and used by a child aged 24 months or older, during the class period. (The Classes and Subclasses are defined below.)

11.      Plaintiff, for herself and for the Class, bring this suit to halt Defendant's dissemination of false and misleading representations, to correct the false and misleading perception that Defendant's representations have created in the minds of reasonable consumers, to ensure that appropriate disclosures and warnings are placed on Defendant's products in the future, and to obtain redress for those who have purchased Defendant's pacifiers.

12.      Plaintiff, for herself and for the Class, seeks injunctive and other equitable relief, damages, restitution, and costs of suit and reasonable attorneys' fees.

## JURISDICTION AND VENUE

13.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant conducts business in Illinois. Defendant has marketed, promoted, distributed, and sold the pacifiers at issue in Illinois, rendering exercise of jurisdiction by courts in Illinois permissible.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

16.     Dominique Freeman is a citizen of Illinois and, at all relevant times to this action, resided in Flossmoor, Illinois, which is in Cook County.

17.     On approximately September 3, 2019, and on multiple occasions in the two preceding years, Plaintiff Freeman purchased a two-pack of Defendant's pacifiers for her child at the Target store located at 17605 South Halsted Street in Homewood, Illinois for approximately $8.99. The packaging on the pacifiers purchased by Plaintiff Freeman prominently displayed in the top right corner of the packaging the statement "16+ months," clearly indicating that the pacifiers were intended for use by a child over the age of 16 months. The product packaging also prominently advertised an "orthodontic nipple" that "promotes proper oral development." Plaintiff Freeman purchased the "orthodontic" pacifiers for her child who was approximately 23 months at the time of purchase, and she intended for her child to continue using the pacifier beyond 24

months. Defendant failed to disclose clearly and conspicuously the material facts that, contrary to Defendant's advertising and marketing statements, the pacifiers were not orthodontic products and that prolonged pacifier use by children aged 24 months or older is associated with an increased risk of various malocclusions of children's primary teeth. Plaintiff Freeman would not have purchased Defendant's pacifiers for use by her child at age 24 months or would have paid less for the pacifiers but for Defendant's misrepresentations and omissions of material facts. By purchasing the falsely advertised product without any warning about risks associated with the use of that product by children over the age of 24 months, Plaintiff Freeman suffered injury-in-fact and lost money.

18. Prior to her purchase in September 2019, Plaintiff Freeman had been purchasing MAM-branded "orthodontic" pacifiers regularly for her child since his birth, typically every few weeks or months. Plaintiff Freeman bought MAM "orthodontic" pacifiers according to the age ranges displayed on the packaging, and she would buy the incrementally larger sized pacifiers as her child grew.

19. Plaintiff Freeman's child exclusively used the MAM "orthodontic" pacifiers nearly every day, up to a few hours per day, until Plaintiff Freeman began weening him off pacifiers shortly after he turned 24 months. Plaintiff Freeman's child would typically use the MAM "orthodontic" pacifiers for comfort at rest times such as naps and before bed.

20. The MAM pacifiers Plaintiff Freeman purchased, like all of Defendant's pacifiers at issue, are neither orthodontic products nor safe for use by children over the age of 24 months. Plaintiff Freeman purchased the MAM pacifiers because she believed, based on the representations made by Defendant, that the "orthodontic nipple" would improve dental health outcomes, including oral and orofacial health and development. Plaintiff Freeman understood Defendant's

use of the term "orthodontic" to mean that pacifiers labeled as such were safe and beneficial to her child. Plaintiff Freeman further understood the age range labeling on the pacifier that she purchased to mean that it was safe for use by her child past the age of 24 months. Had Plaintiff Freeman known the truth about Defendant's misrepresentations and omissions at the time of purchase, Plaintiff would not have purchased Defendant's pacifiers for her child who was 23 months old at the time of the purchase or would have paid less for the pacifiers.

21.     Defendant MAM USA Corporation is a Delaware corporation with its principal place of business located at 2700 Westchester Ave., Suite 315, Purchase, NY 10577.

22.     Defendant MAM USA Corporation has marketed, advertised, and sold MAM pacifiers in Illinois, this district, and throughout the United States.

## FACTUAL ALLEGATIONS

### I.     Defendant's "Orthodontic" Pacifiers

23.     MAM manufactures, markets, distributes, and sells a variety of styles, colors, and sizes of pacifiers, all of which have purported "orthodontic" qualities, including, but not limited to, an "orthodontic nipple" according to the product packaging. The "orthodontic" pacifiers at issue are sold at various brick-and-mortar retail and grocery stores, including Target, Walgreens, CVS, Walmart, buybuyBaby, and Safeway. Defendant's "orthodontic" pacifiers are also sold online through the websites of the same retailers, as well as on Amazon and other online retailers.

24.     Defendant's pacifiers at issue are sold under the MAM® brand name (collectively, the "Orthodontic Pacifiers") and include the following products, as well as any other MAM® branded pacifiers with purported "orthodontic nipples" or other "orthodontic" qualities:

- MAM® Original Collection Pacifiers

- MAM® Trends Collection Pacifiers

- MAM® Camo Collection Pacifiers

- MAM® Perfect Collection Pacifiers

- MAM® Air Collection Pacifiers

- MAM® Love & Affection Collection Pacifiers

- MAM® Night Collection Pacifiers

- MAM® Perfect Night Collection Pacifiers

- MAM® Pearl Collection Pacifiers

II.     **Defendant's False and Deceptive Advertising**

25.     Defendant, through its advertisements, including on the Orthodontic Pacifiers' packaging and labeling, has consistently conveyed to consumers in Illinois and throughout the United States that its Orthodontic Pacifiers are safe for use by children 24 months and older and that they promote healthy oral and orofacial development for children of all ages.

26.     Defendant's use of the word "orthodontic" conveys to reasonable consumers that the Orthodontic Pacifiers improve dental health outcomes by positioning teeth and jaws for proper development. This representation is false and misleading because the Orthodontic Pacifiers do not benefit dental health in this manner compared to not using a pacifier at all; rather, using the Orthodontic Pacifiers worsens dental health. Further, this representation falsely indicates and misleads consumers to believe that the Orthodontic Pacifiers provide better dental health outcomes than conventional pacifiers; however, they do not.

27.     Defendant displays an age range or minimum age on the packaging of each Orthodontic Pacifier. The age range ("0-6 months") or minimum age ("0+ months," "6+ months," or "16+ months") is prominently displayed on the top right corner of each pacifier package. Age limits are not displayed on the packaging of any of Defendant's pacifiers where the age minimum

is followed by a plus sign ("+"). According to the product packaging and labeling, the largest of Defendant's Orthodontic Pacifiers are for children 16 months and older (labeled as "16+ months"). These minimum ages (with no maximum age) are intended to induce consumers to purchase MAM's Orthodontic Pacifiers for children 24 months or older. Defendant's advertising statements on the product packaging falsely convey to consumers that the Orthodontic Pacifiers are safe for use by children 24 months and older.

28.     In addition to the misleading age ranges or minimum ages, the packaging for some of MAM's Orthodontic Pacifiers at issue here, including but not limited to those labeled for use by children 16 months and older, include the following statements:

- "Orthodontic"

- "Orthodontic nipple"

- "Orthodontic symmetrical nipple"

- "Orthodontic nipple promotes proper oral development"

- "Specially sized for toddlers"

- "Nipple adapts to baby's mouth"

29.     The product packaging for all of MAM's Orthodontic Pacifiers refers consumers to Defendant MAM USA Corporation's website: www.mambaby.com. Defendant's online advertising statements on that website confirm and reinforce the misleading nature of the product packaging. Product webpages for MAM's Orthodontic Pacifiers are available on the website. The product webpages for some of the Orthodontic Pacifier at issue here, labeled for use by children older than 16 months and identified as such on the website, include the following statements:

- "Specially sized for toddlers"

- "Orthodontic"

- "Largest nipple to ensure maximum comfort and proper oral development as baby grows"

- "16+ nipple ensures proper development of baby's palate, teeth and gums as baby grows"

- "Symmetrical nipple ideal for baby's jaw development"

30.     Defendant makes additional, similar misrepresentations in the Frequently Asked Questions section of its website: "**[O]nly orthodontic soothers support baby's healthy jaw and tooth development**. MAM collaborates with medical experts . . . to help develop and design innovative, orthodontic soothers that suit baby's various developmental stages." Defendant further claims that its pacifiers are "orthodontically safe" and, because of the "symmetrical nipples," Defendant's pacifiers "**will not cause any harm to [a baby's] oral cavity development**." *See* https://mambaby.com/en-us/faq/pacifiers/ ("Is the shape of the pacifier and nipple important?" (emphasis in original)). In addition, Defendant claims: "The orthodontic MAM pacifiers support healthy development so you do not need to worry about them harming your baby's oral cavity development." *See* https://mambaby.com/en-us/faq/pacifiers/ ("How often and for how long during the day should children be allowed to use a pacifier?").

31.     This website marketing confirms Defendant's intent to mislead reasonable consumers regarding the orthodontic nature of its pacifiers.

32.     In its advertising statements on the product packaging and labeling of its Orthodontic Pacifiers, Defendant fails to disclose the well-documented risks associated with prolonged pacifier use by children over the age of 24 months.

33.     Defendant is well aware of the risks of prolonged pacifier use to children's oral and orofacial health, most notably the risk of various dental malocclusions. Given that Defendant

clearly markets and labels its Orthodontic Pacifiers for children over the age of 24 months, Defendant misleads reasonable consumers by failing to prominently and conspicuously disclose these well-known risks on its Orthodontic Pacifier product packaging and advertising materials that would otherwise not be known to reasonable consumers given Defendant's labeling and marketing of the Orthodontic Pacifiers as "orthodontic."

34.     Based on these representations, it is clear that Defendant intends to induce in consumers a common belief that MAM's Orthodontic Pacifiers do not pose any risk to the oral or orofacial health of children over the age of 24 months and, further, that the Orthodontic Pacifiers enhance children's oral and orofacial health and development.

## III.  Scientific Studies Confirm That Defendant's Representations Are False, Deceptive, and Misleading

35.     Despite Defendant's statements and representations, its Orthodontic Pacifiers pose significant health risks to children over the age of 24 months and do not provide orthodontic benefits to children even under the age of 24 months. Decades of research studies have established the relationship between prolonged non-nutritive oral habits like pacifier sucking and the development of malocclusion traits as well as alterations to oral myofunctional structures. More significant, however, are the numerous studies that consistently demonstrate that there is no scientific evidence "to support the concept that the usage of orthodontic pacifiers is able to prevent malocclusion traits when compared to the usage of conventional pacifiers."[1] As a result, children who use a pacifier, regardless of the pacifier's shape, will have higher rates of, and an increased risk for, malocclusion traits and other oral-health related issues than children with no pacifier

---

[1] R. Medeiros et al., *Malocclusion Prevention Through the Usage of an Orthodontic Pacifier Compared to a Conventional Pacifier: a Systematic Review*, 19:5 Eur. Arch. Paediatr. Dent. 287, 287 (2018).

sucking habits. *Id.* at 294.

36.     The scientific literature identified and discussed below illustrates the well-documented risks of pacifier usage by children over the age of 24 months and establishes the misleading nature of Defendant's advertising statements—specifically Defendant's use of the term "orthodontic" and its age-related labeling. Defendant's advertising statements are false and misleading against the backdrop of this expansive body of scientific literature. Given the literature and studies below, Defendant knew or should have known that its health representations were false and misleading, and that by omitting and failing to disclosure in its advertising the risks associated with prolonged pacifier use by children over the age of 24 months, most notably the risk of developing various forms of dental malocclusions, it was omitting material facts that would alter any reasonable consumer's decision to purchase Orthodontic Pacifiers for children over the age of 24 months.

## DENTAL AND ORTHODONTIC LITERATURE AND STUDIES

### A.     Early Studies Linking Pacifier Usage to Dental Malocclusions

37.     The use of objects to satisfy infants' natural sucking instincts is a historically well-established practice, but the modern pacifier, in particular the so-called "orthodontic" pacifier, is a fairly recent innovation, dating back to the late 1950s when the first orthodontic pacifier was introduced in the United States and marketed to the public.[2]

38.     Pacifiers are useful for infants during the first three months of life when their sucking needs are greatest because, if their natural "sucking urge is not completely satisfied by breast or bottle feeding, the infant will have a surplus of sucking urge which may lead either to

---

[2] S. Adair et al., *Effects of Current and Former Pacifier Use on the Dentition of 24- to 59-Month Old Children*, 17:7 Pediatr. Dent. 437, 437 (1995).

frustration or to satisfaction."[3] However, "[a]t approximately the seventh month, [the sucking urge] decreases and can be considered unnecessary in the neurophysiological perspective. This occurs because the neuromuscular structures at this stage are being matured and prepared for coordinated eating and drinking activities. Thus, from this age onwards, sucking must gradually be substituted by mastication." *Id.*

39. Studies dating back to as early as the 1870s have consistently demonstrated the link between non-nutritive sucking habits and abnormalities in dental development and occlusion.[4] By the time the first "functional/orthodontic" pacifier was introduced in the 1950s, it was well understood that non-nutritive sucking "leads to reduced overbite, as well as increased overjet, protrusion of the maxillary incisors and a narrowing of maxillary posterior arch width." *Id.* (internal citation omitted).

40. Since the 1960s, hundreds of studies have evaluated the effects of prolonged pacifier usage on children's oral development, affirming the findings of earlier research, and establishing the link between prolonged non-nutritive sucking in the form of pacifier usage and the development of malocclusions and impaired development of orofacial structures.[5]

B. **"Orthodontic" Versus Conventional Pacifiers**

41. Adair et al. were among the first to conduct clinical studies directly examining the effects of using an "orthodontic" pacifier as compared to using a conventional pacifier. *See* Adair,

---

[3] C. Zardetto et al., *Effects of Different Pacifiers on the Primary Dentition and Oral Myofunctional Structures of Preschool Children*, 24 Pediatr. Dent. 552, 552-53 (2002).

[4] *See* J. Warren et al., *Effects of Oral Habits' Duration on Dental Characteristics in the Primary Dentition*, 132:12 J. Am. Dent. Assoc. 1685, 1685 (2001) *citing* Campbell M., *Fruitless Sucking*, 13 Brit. J. Dent. Sci. 371 (1870), Chandler TH, *Thumb-Sucking*, 20 Dent. Cosmos 440 (1878).

[5] *See* K. Schmid et al., *The Effect of Pacifier Sucking on Orofacial Structures: a Systematic Literature Review*, 19:8 Prog. Orthod. 1 (2018).

*supra* note 2. Adair's 1995 study evaluated the occlusions of 24- to 59-month-old current and former pacifier users and compared them to children of the same age with no non-nutritive sucking habit. *Id.* The study confirmed the findings of previous studies that, when compared to habit-free children, "children with a history of pacifier use have a significantly higher occurrence of increased overjet, a greater mean overjet, [] reduced overbite . . . [and] the prevalences [sic] of posterior crossbites and openbites were also higher." *Id.* at 442 (internal citations omitted).

42.     With respect to whether there were any differences in the occurrence of dental malocclusions between children who used an "orthodontic" pacifier versus a conventional pacifier, Adair et al. found that "[c]omparison of the two pacifier groups does not support the purported advantages of functional exercisers over conventional pacifiers. No significant differences were found for mean overjet, mean openbite, occurrence of openbite, or occurrence of posterior crossbite." *Id.*[6]

43.     In 2002, Zardetto et al. conducted a study to evaluate and compare dental arch characteristics and oral myofunctional structures of 36 to 60-month-old children who: (1) exclusively used an "orthodontic" pacifier; (2) exclusively used a conventional pacifier; or (3) were habit free. *See* Zardetto et al., *supra* note 3. "In agreement with many studies performed earlier, children with a pacifier sucking habit in this study showed greater alterations on primary occlusion, such as anterior open bite, posterior crossbite, Class II primary canine relationship, decrease of upper intercanine width, [] increased overjet . . . [and] alterations on the shape of hard palate and tonicity of lips and tongue" when compared to habit-free children. *Id.* at 558.

44.     Zardetto, like Adair, found no substantial differences in the occurrence of dental

---

[6] Adair et al. refer to "orthodontic" pacifiers as "functional exercisers," in reference to the original Nuk™ branding from the first line of orthodontic pacifiers.

malocclusions between children who used an "orthodontic" pacifier versus a conventional pacifier. "Children who were pacifier users (physiological and conventional) were significantly more likely to show open bite, posterior crossbite, increased overjet, and alteration in cheek mobility than habit free children." *Id.* at 559.[7]

45.    More recently, in 2016, Lima et al. examined the effects of conventional and "orthodontic" pacifiers on the dental occlusions of children between the ages of 24 and 36 months.[8] The study found that: "prolonged pacifier use was associated with various types of [malocclusion] in the primary dentition, corroborating results of previous studies. The most prevalent types of [malocclusion] in the primary dentition were [anterior overjet], [anterior overbite], and [posterior crossbite]. The prevalence and intensity of [malocclusion] were much lower among the children who did not use pacifiers, which confirms the results of previous studies." *Id.* at 8–9 (internal citations omitted). These outcomes were observed regardless of the type of pacifier used. *Id.* at 10–11.

46.    Consistent with the Adair, Zardetto, and Lima studies described above, nearly every clinical study examining the effects of the prolonged use of orthodontic pacifiers has found that there is no advantage or benefit to using an orthodontic pacifier over a conventional pacifier, and that prolonged use of an "orthodontic" pacifier results in the same risks and harms as would occur with a prolonged non-nutritive sucking habit. *See* Medeiros et al., *supra* note 1.

47.    In their 2018 systematic literature review, Medeiros et al. reviewed currently

---

[7] Zardetto and many dental and orthodontic researchers advocate that a more appropriate term for "orthodontic" pacifiers is "physiological" pacifiers, due to their shape, and argue that "the terminology 'orthodontic' is misleading, since it implies that this type of pacifier may perform some type of dental correction." *Id.* at 555.

[8] A. Lima et al., *Effects of Conventional and Orthodontic Pacifiers on the Dental Occlusion of Children Aged 24-36 Months Old*, 27:2 Int. J. Paediatr. Dent. 108 (2016).

available studies that examined and compared the effects of using conventional or "orthodontic" pacifiers, seeking to answer the following: "In children between 6-60 months, is there a difference in the occurrence of malocclusion between the types of the pacifiers (conventional or orthodontic) used?" Medeiros et al., *supra* note 1, at 288.

48. Medeiros et al. concluded that there is no difference in the occurrence of malocclusion between users of "orthodontic" and conventional pacifiers, and further, that there is no evidence "to support the concept that the usage of orthodontic pacifiers is able to prevent malocclusion traits when compared to the usage of conventional pacifiers." *Id.* at 287, 294.

49. Medeiros et al. also concluded that "factors such as duration and frequency of use of any type of pacifier shape were more associated with the development of malocclusion" and "the anatomy of the pacifiers is not a determinate to protect the occlusion compared to frequency and duration." *Id.* at 293–94.

**C.     Impact of Prolonged Pacifier Use on Oral Development**

50. As described above, the prolonged use of "orthodontic" pacifiers, including the Orthodontic Pacifiers at issue here, results in the same risks as would occur with the use of conventional pacifiers. These risks include development of the following conditions and dental malocclusions:

- Anterior open bite;

- Posterior crossbite;

- Class II malocclusion;

- Excessive overjet;

- Decreased upper intercanine width;

- Increased mandibular canine arch width;

16

- Diastema;

- Oral myofunctional alterations; and,

- Negative impacts on psychosocial development.

*See* Medeiros et al., *supra* note 1; Schmid, *supra* note 5.

51.     Each of these conditions is a serious disturbance to a child's oral and/or orofacial development. And each may result in the need for interceptive treatments, such as orthodontic appliances, and in some cases surgical intervention.

### 1. Anterior Open Bite

52.     An anterior open bite ("AOB") is a condition where the front teeth fail to touch, and there is no overlap between the upper and lower incisors, as depicted in the image below:



*Figure 1 – Pacifier-Induced Anterior Open Bite*[9]

53.     Adair et al. found that a "significantly higher percentage of children with a history of pacifier use had openbites, compared with those with no habit." Adair et al., *supra* note 2, at 440. For children who developed open bites, "the mean pacifier use time in months was

---

[9] A.X. Graciano Parra et al., *Two-Phase Treatment of Anterior Open Bite*, 51:12 J. Clin. Orthod. 801, 802 (2017) (overviewing diagnoses of malocclusions in a five-year old child with pacifier habit, and treatment required for correction).

significantly higher" than for children who did not develop open bites, with an average mean of 26.8 months. *Id.* at 440-41. This led Adair et al. to conclude that "[l]onger pacifier use time in months was associated with anterior openbite." *Id.* at 443.

54.     Affirming Adair's findings, Zardetto et al. found that "[a]nterior open bite was present only in children with pacifier sucking habits, and no statistically significant difference was found between the 2 pacifier-sucking groups." Zardetto et al., *supra* note 3, at 556. Additionally, "[w]ith respect to degree of open bite in millimeters . . . there was no significant difference between children who used the conventional pacifier and those who used the physiological one." *Id.* at 556-57.

55.     Lima et al. found that "[u]se of either conventional or orthodontic pacifiers was a risk factor for AOB" and that a "strong positive correlation was detected between habit duration and AOB ($R = 0.782$; $P < 0.01$); 61.6% of the AOB size was determined based on the duration of pacifier use." Lima et al., *supra* note 8, at 5.

56.     In their 2018 meta-analysis, Schmid et al. found that "[f]ifteen out of the reviewed 17 articles showed a strong association between AOB and the use of a pacifier when compared with the [sic] children not using a pacifier," and duration of pacifier use played an "important role." Schmid et al., *supra* note 5, at 3. Indeed, "[t]wo studies showed that children who used a pacifier for more than 2 years were more likely to develop an AOB than children who used it for less than 2 years." *Id.*

57.     In addition to the above research, a wealth of other studies performed over the years reflect the same finding that prolonged use of a pacifier results in a greater likelihood and

prevalence of AOB.[10]

### 2. Posterior Crossbite

58.     Posterior crossbite ("PCB") is a condition where the posterior top teeth are inside

---

[10] *See, e.g.*, L. Kohler and K. Holst, *Malocclusion and Sucking Habits of Four-Year-Old Children*, 62 Acta. Paediat. Scand. 373 (1973); E. Larsson, *Dummy- and Finger-Sucking Habits in 4-Year-Olds*, 68:2 Swed. Dent. J. 219 (1975); B. Melson et al., *Sucking Habits and Their Influence on Swallowing Pattern and Prevalence of Malocclusion*, 1:4 Eur. J. Orthod. 271 (1979); S. Adair et al., *Evaluation of the Effects of Orthodontic Pacifiers on the Primary Dentitions of 24- to 59-Month-Old Children: Preliminary Study*, 14 Pediatr. Dent. 13 (1992); P. Paunio et al., *The Finnish Family Competence Study: The Effects of Living Conditions on Sucking Habits in 3-Years-Old Finnish Children and the Association Between These Habits and Dental Occlusion*, 51 Acta. Odontol. Scand. 23 (1993); E. Larsson, *Artificial Sucking Habits: Etiology, Prevalence, and Effect on Occlusion*, 20 Int. J. Orofac. Myol. 10 (1994); Adair, *supra* note 2; N. Farsi et al., *Sucking Habits in Saudi Children: Prevalence, Contributing Factors, and Effects on the Primary Dentition*, 19 Pediatr. Dent. 28 (1997); J. Warren and S. Bishara, *Duration of Nonnutritive Sucking Behaviors and Their Effects on the Dental Arches in the Primary Dentition*, 121:4 Am. J. Ortho. Dentofac. Orthop. 347 (2002); C. Zardetto et al., *Effects of Different Pacifiers on the Primary Dentition and Oral Myofunctional Structures of Preschool Children*, 24 Pediatr. Dent. 552 (2002); C. Katz et al., *Nonnutritive Sucking Habits and Anterior Open Bite in Brazilian Children: a Longitudinal Study*, 27:5 Pedaitr. Dent. 369 (2005); K. Duncan et al., *Sucking Habits in Childhood and the Effects on the Primary Dentition: Findings of the Avon Longitudinal Study of Pregnancy and Childhood*, 18:3 Int. J. Paediatr. Dent. 178 (2008); S. Facciolli Hebling et al., *Relationship Between Malocclusion and Behavioral, Demographic and Socioeconomic Variables: a Cross-Sectional Study of 5-Year-Olds*, 33 J. Clin. Pediatr. Dent. 75 (2008); E. Oliveira Góis et al., *Influence of Nonnutritive Sucking Habits, Breathing Pattern and Adenoid Size on the Development of Malocclusion*, 78:4 Angle Orthod. 647 (2008); L. Dimberg et al., *Prevalence of Malocclusion Traits and Sucking Habits Among 3-Year-Old Children*, 34 Swed. Dent. J. 35 (2010); S. Zimmer et al., *Efficacy of a Novel Pacifier in the Prevention of Anterior Open Bite*, 33 Pediatr. Dent. 52 (2011); C. Tibolla et al., *Association Between Anterior Open Bite and Pacifier Sucking Habit in Schoolchildren in a City of Southern Brazil*, 17 Dent. Press J. Orthod. 89 (2012); R. de Sousa et al., *Prevalence and Associated Factors for the Development of Anterior Open Bite and Posterior Crossbite in the Primary Dentition*, 4:25 Braz. Dent. J. 336 (2014); S. Moimaz et al., *Longitudinal Study of Habits Leading to Malocclusion Development in Childhood*, 14 BMC Oral Health 96 (2014); S. Zimmer et al., *Anterior Open Bite in 27 Months Old Children After Use of Novel Pacifier – a Cohort Study*, 40:4 J. Clin. Pediatr. Dent. 28 (2016); A. Germa et al., *Early Risk Factors for Posterior Crossbite and Anterior Open Bite in the Primary Dentition*, 86:5 Angle Orthod. 832 (2016); A. Lima et al., *Effects of Conventional and Orthodontic Pacifiers on the Dental Occlusion of Children Aged 24-36 Months Old*, 27:2 Int. J. Paediatr. Dent. 108 (2016); C. Cardozo Amaral et al., *Perinatal Health and Malocclusions in Preschool Children: Findings from a Cohort of Adolescent Mothers in Southern Brazil*, 152:5 Am. J. Orthod. Dentofac. Orthop. 613 (2017); Medeiros, *supra* note 1.

the posterior bottom teeth when touching, as depicted below:



*Figure 2 – Posterior Crossbite*[11]

59.     Both Adair et al. and Zardetto et al. found increased rates of posterior crossbites among children with pacifier sucking habits. *See* Zardetto et al., *supra* note 3, at 556; Adair et al., *supra* note 1, at 441. Notably, with respect to duration of pacifier use, Adair et al. found that pacifier users, of either conventional or "orthodontic" pacifiers, had "a significantly higher percentage of posterior crossbites (26.1 months[]) . . . compared with those whose habits ended [less than] 15.5 months." Adair et al., *supra* note 1, at 441.

60.     Warren and Bishara's 2002 study on the duration of pacifier sucking habits and their effect on primary dentition found that, "[p]rolonged pacifier habits resulted in significant changes to dental arch parameters and occlusal traits (e.g., increased mandibular arch width and greater prevalence of posterior crossbite and anterior open bite)" and that "pacifier habits were strongly associated with the development of posterior crossbite." Warren and Bishara, *supra* note 10, at 351. Specifically, the study found that "there was a statistically significant increase in the prevalence of posterior crossbite with pacifier habits longer than 24 months." *Id.* at 349.

61.     The study also accounted for differences between children who sucked on a digit, as opposed to a pacifier, and found that "children with pacifier habits of 24 to 36 months and 48

---

[11] Warren and Bishara, *supra* note 10, at 354.

months or longer had significantly (P=.034 and .044 respectively, chi-square) higher prevalence of posterior crossbite than did children with the same duration of digit habits." *Id.* at 350–51.

62.     "The increase in the prevalence of posterior crossbites with pacifier habits is the result of the combination of a significant increase in mandibular arch width. Some of these changes persisted well beyond the cessation of the pacifier habits." *Id.* "Perhaps more importantly, the study found that pacifiers habits 24 to 36 months long resulted in an increased prevalence of posterior crossbite at age 5 compared with shorter pacifier habits or no nonnutritive sucking." *Id.* Consequently, Warren and Bishara concluded that "even though nonnutritive sucking fulfills physiological needs during infancy and may comfort toddlers, persistence of these habits beyond 2 or 3 years of age significantly increases the probability of developing undesirable dental arch and occlusal traits at the end of the primary dentition stage." *Id.* at 355.

63.     According to the 2018 meta-analysis of Schmid et al., no less than nine studies concluded that pacifier use can lead to posterior crossbite. Schmid et al., *supra* note 5, at 3. And, notably, one study that considered the duration of pacifier use found that "children who discontinued pacifier sucking by 2 years of age presented a lower prevalence of posterior crossbite (17.2%) than the ones that continued the pacifier sucking until 4 to 6 years of age (27.3%)." *Id.*; *see also* Scavone et al., *Prevalence of Posterior Crossbite Among Pacifier Users: a Study in the Deciduous Dentition*, Braz. 21:2 Oral Res. 153 (2007).[12]

---

[12] *See also* Kohler and Holst, Larsson, Melsen, Paunio, Adair, Warren, Zardetto, Duncan, Facciolli Hebling, Oliveira Góis, Zimmer, Dimberg, de Sousa, Moimaz, Germa, Lima, and Cardozo Amaral, *supra* note 10; T. Modéer et al., *Sucking Habits and Their Relation to Posterior Cross-Bite in 4-Year-Old Children*, 90 Scand. J. Dent. Res. 323 (1982); B. Ogaard et al., *The Effect of Sucking Habits, Cohort, Sex, Intercanine Arch Widths, and Breast or Bottle Feeding on Posterior Crossbite in Norwegian and Swedish 3-Year-Old Children*, 106:2 Am. J. Orthod. Dentofac. Orthop. 161 (1994); E. Larsson, *Sucking, Chewing, and Feeding Habits and the Development of Crossbite: a Longitudinal Study of Girls From Birth to 3 Years of Age*, 71:2 Angle Orthod. 116 (2001); S. (footnote continued)

### 3. Excessive Overjet

64.     Overjet refers to the horizontal extension of the upper front teeth over the lower front teeth. Excessive overjet is another form of malocclusion that is more prevalent in children who use pacifiers, and is a condition where the upper front teeth are significantly further forward than the lower front teeth, as depicted below:



*Figure 3 – Excessive Overjet*

65.     Adair et al. found that children "with a history of pacifier use had a mean overjet that was significantly greater than that of habit-free children." Adair et al., *supra* note 2, at 439. Between children who used conventional pacifiers and those who use orthodontic pacifiers, Adair et al. found "[t]here was no difference in mean overjet, nor in the percentage of children in each group with overjets [greater than] 4 mm." *Id.* at 440. Similarly, Zardetto et al. found, with respect to the amount of overjet, that "a statistically significant difference was found among those who had no sucking habits (control group) and those who sucked pacifiers, be they conventional or

---

Bishara et al., *Changes in the Prevalence of Nonnutritive Sucking Patterns in the First 8 Years of Life*, 130:1 Am. J. Orthod. Dentofac. Orthop. 31 (2006); H. Scavone et al., *Prevalence of Posterior Crossbite Among Pacifier Users: a Study in the Deciduous Dentition*, 21:2 Braz. Oral Res. 153 (2007); S. Melink et al., *Posterior Crossbite in the Deciduous Dentition Period, its Relation with Sucking Habits, Irregular Orofacial Functions, and Otolaryngological Findings*, 138:1 Am. J. Orthod. Dentofac. Orthop. 32 (2010).

physiological ones. There was no difference in mean overjet (mm) among the children who sucked the conventional pacifier and those who sucked the orthodontic ones." Zardetto et al., *supra* note 3, at 556.

66.     Lima et al. found that "[p]acifier use is significantly associated with [accentuated overjet] and mainly with AOB, the prevalence rates of which were 96.3% among the pacifier users and just 3.7% in the [control group]." Lima et al., *supra* note 8, at 9. Lima et al. also found that "habit duration is a relevant factor in the determination of the size of AOB and [accentuated overjet]. In this study, duration exhibited positive correlations with both [accentuated overjet and AOB]," leading Lima to conclude that "habit duration was a strong predictor of MO occurrence and severity." *Id.* at 11.

67.     In their meta-analysis, Schmid et al. noted that numerous studies have shown "that the prevalence of overjet is increased in children using a pacifier when compared with children who do not use a pacifier." Schmid et al., *supra* note 5, at 7. Moreover, with respect to duration, a "higher prevalence of overjet was associated with a pacifier sucking habit at 12, 18, and 30 months after birth." *Id.*[13]

### 4. Class II Canine Relationship

68.     A class II canine relationship or class II malocclusion refers to a common orthodontic classification of a distal molar and canine relationship, in other words, a misalignment of the upper and lower molars, as depicted below:

---

[13] *See also* Adair, Melsen, Warren, Zardetto, Zimmer, Dimberg, Lima *supra* note 13; J. Ravn, *Sucking Habits and Occlusion in 3-Year-Old Children*, 84 Scan. J. Dent. Rev. 204 (1976); B. Bowden, *The Effects of Digital and Dummy Sucking on Arch Widths, Overbite, and Overjet: a Longitudinal Study*, 11 Aust. Dent. J. 396 (1966).



*Figure 4 – Class II Malocclusion*

69.    Adair et al. found that "[c]lass II primary canine relationships on one or both sides were significantly more common among the pacifier group," regardless of pacifier type, as compared to habit-free children. Adair et al., *supra* note 2, at 439. Among users of "orthodontic" pacifiers, Adair found that the "occurrences of Class II primary canines and distal step molars were statistically significantly greater among the users of functional exercisers." *Id.* at 440. Dimberg et al. similarly showed that there was a statistically significant higher rate of Class II malocclusions in pacifier users.[14]

### 5. Dental Arch Alterations

70.    Dental arches are the two arches of teeth, one on each jaw, that together constitute the dentition. Prolonged pacifier usage has been demonstrated to lead to a significant increase in mandibular arch width and decrease of upper intercanine width, resulting in a narrowed and constricted palate that reduces the spacing needed for adult teeth to erupt (*see* Figure 5 below),

---

[14] *See also* Farsi, Zardetto, Lima, Melsen, *supra* note 13; Ravn, *supra* note 14; Schmid et al., *supra* note 5.

among other harmful changes to dental arch parameters and oral development.[15]



*Figure 5 – Narrowed Palate*

71.     Warren and Bishara's examination of the effect of the duration of pacifier use on different aspects of dental arch "found a statistically significant increased mandibular canine arch width and a statistically significant decrease in palatal depths" among prolonged pacifier users. *See* Schmid et al., *supra* note 5, at 8; *see also* Warren and Bishara, *supra* note 11, at 350–51.

72.     Specifically, Warren and Bishara found "children with pacifier habits of 36 to 48 months duration had significantly greater mandibular arch widths." Warren and Bishara, *supra* note 11, at 349. Compared to children with digit-sucking habits of the same duration: "Children with pacifier habits of 36 to 48 months had significantly (P=.013, *t* test) greater mandibular arch widths than did children with digit habits of the same length . . . ." *Id.* at 350. "[P]acifier habits were strongly associated with the development of posterior crossbite, increased mandibular arch widths, and shallower palatal depths." *Id.* at 351. Prolonged pacifier usage results in "a significant

---

[15] *See, e.g.*, Adair, Warren and Bishara, Zardetto, Ogaard, Larsson, *supra* note 13; Bowden, *supra* note 14; S. Bishara et al., *Influence of Feeding and Non-Nutritive Sucking Methods on the Development of the Dental Arches: Longitudinal Study of the First 18 Months of Life*, 9 Pediatr. Dent. 13 (1987).

increase in mandibular arch width and a tendency for a decrease in maxillary arch width" which results in an "increase in the prevalence of posterior crossbites." *Id.* at 351.

73.     Zardetto et al. also found that "there is an association between a narrow and high hard palate and children with sucking habits," which "can be explained by the fact that the tongue is forced and remains in an inferior position when the child is sucking a pacifier. Furthermore, the pacifier nipple is pressed against the hard palate by the tongue and the upper teeth in the canine and the molar area lack palatal support from the tongue during sucking exercise, decreasing arch width. It is clear that the shape of the hard palate depends on the width of the upper arch. Therefore, if this width decreases, the hard palate becomes narrower and there is less space for the tongue. When the child inserts the nipple of a pacifier into his or her mouth, it occupies the functional space of the mouth, displaces the tongue to a lower position, and separates the lips." *See* Zardetto et al., *supra* note 3, at 559.

### 6.  Other Conditions and Psychosocial Development

74.     In addition to the above conditions, prolonged pacifier usage is also associated with a range of other secondary conditions, including diastema, increased oral myofunctional alterations, such as lip incompetence, lip entrapment, and a decrease in muscular tonicity of the tongue and lips.[16] While the impact of these conditions on a child's physiological oral development varies, studies have confirmed that the development of abnormal oral conditions such as these can have a severe impact on a child's psychosocial development, self-image, and social well-being.

---

[16] *See, e.g.*, Zardetto, *supra* note 3; Bowden, *supra* note 14; B. Black et al., *Harmful Oral Habits*, 23 Ortodon. 40 (1990); S. Adair, *Nonnutritive Sucking Habits in Infants and Preschool Children: a Review and Recommendations for Anticipatory Guidance*, 4 Master Clin. Pediatr. Dent. 14 (1996); M. Camargo et al., *Rational use of the Pacifier*, 1 J. Bras. Odontopediatr. Odontol. Bebe 44 (1998); Schmid et al., *supra* note 5.

75.     For example, diastema is a condition marked by increased spacing between the teeth, as depicted below:



*Figure 6 – Diastema*[17]

76.     Lima et al. and others have demonstrated a link between prolonged pacifier use and the development of increased spacing between the teeth.[18] While diastema by itself is typically considered more of a cosmetic issue, as discussed below, the impact of dental aesthetics on subjective self-perception can have considerable and lasting effects into adolescence and adulthood.

77.     Oral myofunctional alterations can also develop from prolonged pacifier usage (*see, e.g.*, Zardetto et al., *supra* note 3) and, in addition to impacting oral development and oral health, can also impact a child's psychosocial development. Lip incompetence, for example, is a condition marked by the inability of the lips to stay together when the mouth is in a closed posture, as depicted the comparative image below:

---

[17] *See also* Figure 2.
[18] *See, e.g.*, Lima, and Kohler and Holst, *supra* note 11.



*Figure 7 – Lip Incompetence (right)*

78.　　Paula et al. evaluated adolescent's self-perception of dental aesthetics and found that severity of malocclusion and oral health directly correlated to quality of life and body-image.[19] "[D]entofacial esthetics plays an important role in social interaction and psychological well-being. The impact of oral health conditions on quality of life, especially in items of satisfaction with appearance, may result in feelings of shame in social contacts and those who are psycho-socially disadvantaged." *Id.* at 1192. Numerous studies that have examined dissatisfaction with dental appearance and negative psychosocial impacts have made similar conclusions.[20]

---

[19] Paula et al., *Psychosocial Impact of Dental Esthetics on Quality of Life in Adolescents: Association with Malocclusion, Self-Image, and Oral Health–Related Issues*, 79:6 Angle Orthod. 1188 (2009).

[20] *See, e.g.*, N.A. Mandall et al., *Perceived Aesthetic Impact of Malocclusion Andoral Self-Perceptions in 14- to 15-Year-Old Asian and Caucasian Children in Greater Manchester*, 21 Eur. J. Orthod. 175 (1999); M. Al-Sarheed et al., *Orthodontic Treatment Need and Self-Perception of 11- to 16-Year-Old Saudi Arabian Children with a Sensory Impairment Attending Special Schools*, 30 J. Orthod. 39 (2003); I. Grzywacz, *The Value of the Aesthetic Component of the Index of Orthodontic Treatment Need in the Assessment of Subjective Orthodontic Treatment Need*, 25 Eur. J. Orthod 57 (2003); U. Klages et al., *Dental Aesthetics, Self-Awareness, and Oral Health-Related Quality of Life in Young Adults*, 26 Eur. J. Orthod. 507 (2004); E. Bernabe and C. Flores-Mir, *Orthodontic Treatment Need in Peruvian Young Adults Evaluated through Dental Aesthetic Index*, 76 Angle Orthod. 417 (2006); L.S. Marques et al., *Malocclusion: Esthetic Impact and Quality of Life among Brazilian School Children*, 129 Am J. Orthod. Dentofacial Orthop. 424 (2006); P. Van Der Geld et al., *Smile Attractiveness: Self-Perception and Influence on Personality*, 77 Angle Orthod. 759 (2007); P.M. Kenealy et al., *The Cardiff Dental Study: a 20-Year Critical Evaluation* (footnote continued)

79.     Negative self-perception resulting from malocclusions and dental appearance can also last into adulthood. In a longitudinal fifteen-year study, Helm et al. "concluded that certain malocclusions, especially conspicuous occlusal and space anomalies, may adversely affect body image and self-concept, not only at adolescence but also in adulthood."[21] Thus while the physiological effects of prolonged pacifier usage have a demonstrable and often visible impact on a child's oral development, as discussed above, prolonged pacifier usage also can result in secondary psychosocial effects that can impact a child's self-image and social well-being throughout his or her life.

## IV.     Impact of Defendant's Wrongful Conduct

80.     Despite ample dental and orthodontic studies and literature demonstrating the contrary, Defendant consistently conveys to reasonable consumers, through its advertising statements and omissions, that its Orthodontic Pacifiers are safe for use by children 24 months and older, and that its Orthodontic Pacifiers promote healthy oral and orofacial development. Defendant's misleading use of the term "orthodontic" and deceptive age ranges and minimums on its product packaging constitute illegal conduct. As a result of Defendant's wrongful and misleading advertising statements, Plaintiff and class members are injured at the point of purchase.

81.     As a prominent, longtime, and iconic manufacturer and distributor of baby

---

of the Psychological Health Gain from Orthodontic Treatment, 13 Br. J. Health Psychol. 17 (2007); E.S. Traebert and M.A. Peres, Do Malocclusion Affect the Individual's Oral Health Related to Quality of Life?, 5 Oral Health Prev. Dent. 3 (2007); U. Klages et al., Perception of Occlusion, Psychological Impact of Dental Esthetics, History of Orthodontic Treatment and Their Relation to Oral Health in Naval Recruits, 77 Angle Orthod. 675 (2007); X. Dahong et al., Effect of Incisor Position on the Self-Perceived Psychosocial Impacts of Malocclusion Among Chinese Young Adults, 83:4 Angle Orthod. 617 (2013).

[21] S. Helm et al., Psychosocial Implications of Malocclusion: A 15-year Follow-Up Study in 30-Year-Old Danes, 87:2 Am. J. Orthod. 110 (1985).

products, including pacifiers, Defendant possesses specialized knowledge regarding the safety and efficacy of its products, and are in a superior position to know the risks associated with their use. Indeed, any company in the baby product industry is well aware of the need for hyperawareness of product safety—from a legal, regulatory, and ethical standpoint—and the concomitant duty to disclose potential risks of product use.

82. Defendant knew or should have known, but failed to disclose, that children who use pacifiers, including Defendant's Orthodontic Pacifiers, to continue non-nutritive sucking habits past the age of 24 months have an increased risk of various forms of dental malocclusions. Defendant also knew or should have known, but failed to disclose, that its Orthodontic Pacifiers pose risks to children over the age of 24 months, and that those products do not promote the healthy oral and orofacial development of children, nor do they prevent teeth misalignment.

83. Defendant knew or should have known that its Orthodontic Pacifiers do not promote healthy dental occlusion or provide orthodontic benefit for children of any age (including those under the age of 24 months) as compared to the use of conventional pacifiers or not using pacifiers at all.

84. Defendant's material misrepresentations and omissions set forth in this Complaint were disseminated uniformly to Plaintiff and all Class members through product packaging and labeling, exposing Plaintiff and all Class members to Defendant's false, deceptive, and misleading advertising and unfair, unlawful, and fraudulent business practices that deceived Plaintiff and are likely to deceive reasonable consumers, including Plaintiffs and Class members.

85. When purchasing Defendant's Orthodontic Pacifiers, Plaintiff relied upon Defendant's misrepresentations and omissions, including Defendant's failure to disclose the material fact that prolonged pacifier use by children over the age of 24 months increases the risk

of developing various dental malocclusions.

86.     Plaintiff was injured at the time of purchase, as she would not have paid a premium price or purchased the Orthodontic Pacifiers marketed for use by children over the age of 24 months had Defendant made truthful advertising statements and disclosed material information concerning risks associated with prolonged pacifier use.

87.     Plaintiff would not have purchased, or would have paid less for, Defendant's Orthodontic Pacifiers had Defendant made truthful advertising statements concerning the impact on oral and orofacial health of its Orthodontic Pacifiers.

88.     Defendant's material misrepresentations and omissions set forth in this Complaint induced Plaintiff to purchase Defendant's Orthodontic Pacifiers and resulted in the payment of money by Plaintiff to or for the benefit of Defendant that Plaintiff would not have paid had Defendant truthfully advertised its pacifiers.

89.     Plaintiff and Class members have been and will continue to be deceived or misled by Defendant's false and misleading misrepresentations and omissions concerning Defendant's Orthodontic Pacifiers.

90.     Plaintiff and Class members are reasonable consumers who have been injured by purchasing Defendant's Orthodontic Pacifiers. Because of Defendant's material misrepresentations and omissions in its statements and advertisements concerning its Orthodontic Pacifiers, including on product packaging and labeling, Plaintiff and Class members were harmed at the time of purchase.

91.     Defendant's misrepresentations and omissions were a material factor in influencing Plaintiff's and Class members' decision to purchase Orthodontic Pacifiers.

92.     Defendant's conduct has injured Plaintiff and Class members because Defendant's

Orthodontic Pacifiers are not safe for use by children over the age of 24 months, do not promote healthy oral and orofacial development, and do not prevent teeth misalignment. Rather, Defendant's Orthodontic Pacifiers have known, substantial risks when used by children over the age of 24 months, and Defendant failed to conspicuously disclose those risks to Plaintiff and Class members.

93.     Defendant continues to engage in the unlawful acts and practices set forth in this Complaint.

94.     Unless enjoined, Defendant's unlawful acts and practices described in this Complaint will continue.

## CLASS DEFINITION AND ALLEGATIONS

95.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings this action on behalf of herself and the proposed Classes[22]: Plaintiff brings this action on behalf of herself and the proposed Nationwide Class:

> All persons who purchased in the United States any of the MAM® branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated.

96.     Pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (b)(3), Plaintiff brings this action on behalf of herself and the proposed Nationwide Subclass:

> All persons who purchased in the United States any of the MAM® branded Orthodontic Pacifiers, within the applicable statute of limitations, for use by a child 24 months or older until the date notice is disseminated.

97.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings

---

[22] Unless otherwise specified, all references in this Complaint to the "Classes" or the "Class" refer collectively to the Nationwide Class, the Nationwide Subclass, the Multi-State Consumer Protection Class, the Multi-State Consumer Protection Subclass, the Illinois Class, and the Illinois Subclass.

this action on behalf of herself and the proposed Multi-State Consumer Protection Class:

> All persons who purchased in the State of Illinois or any state with similar laws[23] any of the MAM® branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated.

98.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings

this action on behalf of herself and the proposed Multi-State Consumer Protection Subclass:

> All persons who purchased in the State of Illinois or any state with similar laws[24] any of the MAM® branded Orthodontic Pacifiers, within the applicable statute of limitations, for use by a child 24 months or older until the date notice is disseminated.

99.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings

this action on behalf of herself and the proposed Illinois Class:

> All persons who purchased in the State of Illinois any of the MAM® branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated.

---

[23] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code § 4-88-101, et seq.); Colorado (Colo. Rev. Stat. § 6-1-101, et seq.); Connecticut (Conn. Gen. Stat. § 42-110, et seq.); Delaware (Del. Code tit. 6, § 2511, et seq.); District of Columbia (D.C. Code § 28-3901, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Hawaii (Haw. Rev. Stat. § 480-1, et seq.); Idaho (Idaho Code § 48-601, et seq.); Illinois (815 ICLS § 505/1, et seq.); Maine (Me. Rev. Stat. tit. 5 § 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Montana (Mo. Code. § 30-14-101, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); Nevada (Nev. Rev. Stat. § 598.0915, et seq,); New Hampshire (N.H. Rev. Stat. § 358-A:1, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New Mexico (N.M. Stat. § 57-12-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); North Dakota (N.D. Cent. Code § 51-15-01, et seq.); Oklahoma (Okla. Stat. tit. 15, § 751, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.); South Dakota (S.D. Code Laws § 37-24-1, et seq.); Texas (Tex. Bus. & Com. Code § 17.41, et seq.); Virginia (VA Code § 59.1-196, et seq.); Vermont (Vt. Stat. tit. 9, § 2451, et seq.); Washington (Wash. Rev. Code § 19.86.010, et seq.); West Virginia (W. Va. Code § 46A-6- 101, et seq.); and Wisconsin (Wis. Stat. § 100.18, et seq. See Mullins v. Direct Digital, LLC, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), aff'd, 795 F.3d 654 (7th Cir. 2015).

[24] *Id.*, *supra* note 23.

100.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings

this action on behalf of herself and the proposed Illinois Subclass:

> All persons who purchased in the State of Illinois any of the MAM® branded
> Orthodontic Pacifiers, within the applicable statute of limitations, for use by a child
> 24 months or older until the date notice is disseminated.

101.     Pursuant to Federal Rules of Civil Procedure, Plaintiff brings this action on behalf

of herself and the proposed Multi-State Express Warranty Class:

> All persons who purchased any of the MAM® branded Orthodontic Pacifiers in
> Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District
> of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine,
> Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada,
> New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio,
> Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota,
> Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, or
> Wyoming, within the applicable statute of limitations, until the date notice is
> disseminated.

102.     Excluded from the Classes are: (i) Defendant, any entity in which Defendant has a

controlling interest or which has a controlling interest in Defendant, and Defendant's legal

representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendant's

employees, officers, directors, agents, and representatives and their family members; (iv) all

persons who make a timely election to be excluded from the class; and (v) the Judge and staff to

whom this case is assigned, and any member of the Judge's immediate family.

103.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

104.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Members of the

proposed Classes are so numerous that the individual joinder of all absent Class members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time and

is in the exclusive control of Defendant, it is ascertainable by appropriate discovery. Plaintiff is

informed and believes, based upon the nature of the trade and commerce involved, that the proposed Classes include many thousands of Class members who are geographically diverse so that joinder of all Class members is impracticable.

105. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. Among the questions of law or fact common to the proposed Classes are: (1) whether Defendant's representations regarding its Orthodontic Pacifiers are misleading and deceptive; (2) whether Defendant failed to disclose material information concerning risks associated with prolonged pacifier use by children over the age of 24 months; (3) whether Defendant's representations and omissions concerning its Orthodontic Pacifiers involved representations and omissions of material facts; (4) whether Defendant's Orthodontic Pacifiers promote or benefit the oral and orofacial health of children of any age, including those 24 months and under; (5) whether Defendant's Orthodontic Pacifiers are safe for use in children over 24 months; (6) whether Defendant's conduct, as set forth in this Complaint, violates the Illinois Consumer Fraud Act and Illinois Uniform Deceptive Trade Practices Act; (7) whether Defendant should be enjoined from continuing to make false, deceptive, and misleading statements regarding its Orthodontic Pacifiers; (8) whether Defendant's conduct was unjust and in violation of principles of justice, equity, and good conscience; (9) whether Plaintiff and Class members confer financial benefits on Defendant by purchasing Defendant's Orthodontic Pacifiers; (10) whether it is unjust for Defendant to retain the benefits conferred by Plaintiff's and Class members' overpayments for Orthodontic Pacifiers; (11) whether Defendant's profits resulting from Plaintiff's and Class members' overpayments are subject to equitable disgorgement; and (12) whether Defendant should pay damages or restitution, and in what amount. These questions and

others are common to the class and predominate over individual issues. Further, the issues of fact and law applicable to the Class are identical to the issues of fact and law applicable to each individual member of the proposed Class.

106. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform, prohibited conduct described above. Plaintiff and Class members all suffered the same harm as a result of Defendant's common, false, deceptive, and misleading acts and practices in the sale of its Orthodontic Pacifiers. By advancing her claims, Plaintiff will also advance the claims of all Class members because Defendant's unlawful conduct caused and continues to cause all Class members to suffer similar harm.

107. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Classes because Plaintiff has no interest adverse to the interests of the members of the proposed Classes, and Plaintiff has retained counsel competent and experienced in complex commercial and consumer class action litigation. And Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel.

108. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

109. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. There is

no special interest in the members of the Classes individually controlling the prosecution of separate actions. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Furthermore, Defendant transacts substantial business in Illinois, and will not be prejudiced or inconvenienced by the maintenance of this class action in this forum.

## CLAIMS ALLEGED

### FIRST CAUSE OF ACTION
### VIOLATION OF THE ILLINOIS
### CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
**(On Behalf of the Illinois Class and Illinois Subclass)**

110.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

111.    Plaintiff brings this action individually and on behalf of the Illinois Class and Illinois Subclass.

112.    In Illinois, the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false

pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

113.    Plaintiff and the Class members were injured by Defendant's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Class. Because Plaintiff and Class members relied on Defendant's misrepresentations, concealments and omissions when purchasing Defendant's Orthodontic Pacifiers, they were injured at the time of purchase.

114.    Defendant does business in Illinois, sells and distributes its Orthodontic Pacifiers in Illinois, and engaged in deceptive acts and practices in connection with the sale of Orthodontic Pacifiers in Illinois and elsewhere in the United States.

115.    The Orthodontic Pacifiers purchased by Plaintiff and the Class members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

116.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning its Orthodontic Pacifiers, which has caused damage and injury to Plaintiff and the Class members at the time of purchase.

117.    Defendant represented, directly or indirectly, that its Orthodontic Pacifiers promote healthy oral development and prevent teeth and jaw misalignment, when, in reality, they result in worse outcomes for children of any age than not using a pacifier and result in oral and orofacial health outcomes that are no better than the use of conventional pacifiers.

118.    Defendant represented, directly or indirectly, that its Orthodontic Pacifiers are

beneficial to the oral and orofacial health of children over the age of 24 months when, in reality, Defendant's Orthodontic Pacifiers are harmful to children over the age of 24 months and do not contribute to their healthy oral and orofacial development.

119. Defendant failed to disclose in its advertising statements the material fact that prolonged pacifier use by children over the age of 24 months significantly increases the risk of developing various dental malocclusions.

120. Defendant knew or should have known that its health representations were false and misleading, and that by omitting and failing to disclose in their advertising the risks associated with prolonged pacifier use by children over the age of 24 months, most notably the risk of developing various forms of dental malocclusions, Defendant was omitting material facts that would alter any reasonable consumer's decision to purchase Orthodontic Pacifiers for children over the age of 24 months.

121. Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

122. Defendant intended Plaintiff and all Class members to rely on their deceptive acts when purchasing Defendant's Orthodontic Pacifiers.

123. Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the Class members at the time of purchase.

124. Plaintiff and Class members would not have purchased, or would have paid less for, Defendant's Orthodontic Pacifiers marketed for use by children under 24 months but for Defendant's material misrepresentations as described in this Complaint.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of the Illinois Class and Illinois Subclass)**

125.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

126.    Plaintiff brings this action individually and on behalf of the Illinois Class and Illinois Subclass.

127.    The Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

128.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

129.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning its Orthodontic Pacifiers, which has caused damage and injury to Plaintiff and the Class members. Plaintiff and Class members were injured by Defendant's unfair and deceptive conduct at the time of purchasing Defendants' Orthodontic Pacifiers.

130.     Defendant represented, directly or indirectly, that its Orthodontic Pacifiers promote healthy oral development and prevent teeth and jaw misalignment, when, in reality, they result in worse outcomes for children of any age than not using a pacifier and result in oral and orofacial health outcomes that are no better than the use of conventional pacifiers.

131.     Defendant represented, directly or indirectly, that its Orthodontic Pacifiers are beneficial to the oral and orofacial health of children over the age of 24 months when, in reality, Defendant's Orthodontic Pacifiers are harmful to children over the age of 24 months and do not contribute to their healthy oral and orofacial development.

132.     Defendant failed to disclose in its advertising statements the material fact that prolonged pacifier use by children over the age of 24 months significantly increases the risk of developing various dental malocclusions.

133.     Defendant knew or should have known that its health representations were false and misleading, and that by omitting and failing to disclose in its advertising the risks associated with prolonged pacifier use by children over the age of 24 months, most notably the risk of developing various forms of dental malocclusions, Defendant was omitting material facts that would alter any reasonable consumer's decision to purchase Orthodontic Pacifiers for children over the age of 24 months.

134.     Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

135.     Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the Class members at the point of purchase.

136.     Plaintiff and Class members would not have purchased, or would have paid less for, Defendant's Orthodontic Pacifiers marketed for use by children under 24 months but for

Defendant's material misrepresentations as described in this Complaint. Defendant intended Plaintiff and all Class members to rely on their deceptive acts when purchasing Defendants' Orthodontic Pacifiers.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES
### (On Behalf of Plaintiff and the Multi-State Consumer Protection Class
### and Multi-State Consumer Protection Subclass)

137.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

138.    Plaintiff and Class members have been injured as a result of Defendant's violations of the state consumer protection statutes listed above in paragraph 97 and footnote 23, which also provide a basis for redress to Plaintiff and Class members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

139.    Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class and Multi-State Consumer Protection Subclass.

140.    Defendant violated the Multi-State Consumer Protection Class and Subclass' states' unfair and deceptive acts and practices laws by representing that its Orthodontic Pacifiers promote healthy oral development and prevent teeth and jaw misalignment, when, in reality, they result in worse outcomes for children of any age than not using a pacifier and result in oral and orofacial health outcomes that are no better than the use of conventional pacifiers.

141.    Defendant further represented, directly or indirectly, that its Orthodontic Pacifiers are beneficial to the oral and orofacial health of children over the age of 24 months when, in reality, Defendant's Orthodontic Pacifiers are harmful to children over the age of 24 months and in no way contribute to their healthy oral and orofacial development.

142.    Defendant's misrepresentations were material to Plaintiff's and Class members'

42

decision to purchase the Orthodontic Pacifiers or pay a premium for the Orthodontic Pacifiers.

143. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

144. As a result of Defendant's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Class members paid a premium for the Orthodontic Pacifiers and were injured at the point of purchase.

145. As a result of Defendant's violations, Defendant has been unjustly enriched.

146. Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Class members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Multi-State Express Warranty Class)**

147. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

148. Plaintiff and the Multi-State Express Warranty Class members formed a contract with Defendant at the time they purchased its MAM® branded Orthodontic Pacifiers. As part of that contract, Defendant represents that the Orthodontic Pacifiers are "orthodontic," as described above. This representation constitutes an express warranty and became part of the basis of the bargain between Plaintiff and the Multi-State Express Warranty Class members, on the one hand, and Defendant, on the other.

149. Defendant made the above-described representations to induce Plaintiff and the Multi-State Express Warranty Class members to purchase the Orthodontic Pacifiers, and Plaintiff and the Multi-State Express Warranty Class members relied on the representations in purchasing

the Orthodontic Pacifiers.

150. All conditions precedent to Defendant's liability under the above-referenced contract have been performed by Plaintiff and the other Multi-State Express Warranty Class members.

151. Defendant breached the express warranties about the Orthodontic Pacifiers because, as alleged above, the Orthodontic Pacifiers are not "orthodontic," as warranted. In particular, by warranting that the Orthodontic Pacifiers are "orthodontic," Defendant was representing that its Orthodontic Pacifiers promote healthy oral development and prevent teeth and jaw misalignment. But in reality, they result in worse outcomes for children of any age than not using a pacifier and result in oral and orofacial health outcomes that are no better than the use of conventional pacifiers, and thus are not "orthodontic" products.

152. Defendant breached the following state warranty laws:

    a. Alaska Stat. section 45.02.313;

    b. A.R.S. section 47-2313;

    c. A.C.A. section 4-2-313;

    d. Cal. Comm. Code section 2313;

    e. Colo. Rev. Stat. section 4-2-313;

    f. Conn. Gen. Stat. section 42a-2-313;

    g. 6 Del. C. section 2-313;

    h. D.C. Code section 28:2-313;

    i. O.C.G.A. section 11-2-313;

    j. HRS section 490:2-313;

    k. Idaho Code section 28-2-313;

    l. 810 ILCS 5/2-313;

    m. Ind. Code section 26-1-2-313;

n.       K.S.A. section 84-2-313;

o.       KRS section 355.2-313;

p.       11 M.R.S. section 2-313;

q.       Mass. Gen. Laws Ann. ch. 106 section 2-313;

r.       Minn. Stat. section 336.2-313;

s.       Miss. Code Ann. section 75-2-313;

t.       R.S. Mo. Section 400.2-313;

u.       Mont. Code Anno. Section 30-2-313;

v.       Neb. Rev. Stat. section 2-313;

w.       Nev. Rev. Stat. Ann. section 104.2313;

x.       RSA 382-A:2-313;

y.       N.J. Stat. Ann. section 12A:2-313;

z.       N.M. Stat. Ann. section 55-2-313;

aa.     N.Y. U.C.C. Law section 2-313;

bb.     N.C. Gen. Stat. section 25-2-313;

cc.     N.D. Cent. Code section 41-02-30;

dd.     ORC Ann. section 1302.26;

ee.     12A Okl. St. section 2-313;

ff.      Or. Rev. Stat. section 72-3130;

gg.     13 Pa.C.S. section 2313;

hh.     R.I. Gen. Laws section 6A-2-313;

ii.      S.C. Code Ann. section 36-2-313;

jj.      S.D. Codified Laws, section 57A-2-313;

kk.     Tenn. Code Ann. section 47-2-313;

ll.      Tex. Bus. & Com. Code section 2.313;

mm.   Utah Code Ann. section 70A-2-313;

nn.     9A V.S.A. section 2-313;

oo.  Va. Code Ann. section 59.1-504.2;

pp.  Wash. Rev. Code Ann. section 62A.2-313;

qq.  W. Va. Code section 46-2-313;

rr.  Wyo. Stat. section 34.1-2-313.

153.  As a result of Defendant's breaches of express warranty, Plaintiff and the other members of the Multi-State Express Warranty Class were damaged in the amount of the premium price they paid for the Orthodontic Pacifiers, in amounts to be proven at trial.

154.  On January 27, 2020, Plaintiff, on behalf of herself and the other members of the Multi-State Express Warranty Class, sent a notice letter to Defendant which provided notice of Defendant's breach and demanded that it correct, repair, replace, or otherwise rectify the breach complained of herein. The letter also stated that if Defendant refused to do so, a complaint would be filed seeking damages. Defendant failed to comply with the letter.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class and Nationwide Subclass)**

155.  Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

156.  Plaintiff brings this action individually and on behalf of the Nationwide Class and Nationwide Subclass.

157.  Defendant's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. Defendant's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiff and Class members were harmed at the point of purchase, Defendant was unjustly enriched by its misrepresentations and omissions.

158.  Plaintiff and Class members were harmed when purchasing Defendant's

Orthodontic Pacifiers as a result of Defendant's material representations and omissions, as described in this Complaint. Each Plaintiff and Class member purchased Defendant's Orthodontic Pacifiers. Plaintiff and Class members have suffered injury in fact and lost money as a result of paying a premium price for the Orthodontic Pacifiers and by purchasing the Orthodontic Pacifiers at all for use by children 24 months or older, and as a result of Defendant's unlawful, unfair, and fraudulent business practices.

159.    Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling its Orthodontic Pacifiers at the expense of, and to the detriment of, Plaintiff and Class members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

160.    Plaintiff and Class members confer significant financial benefits and pay substantial compensation to Defendant for its Orthodontic Pacifiers, which are not as Defendant represents them to be.

161.    Under common law principles of unjust enrichment, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class members' overpayments.

162.    Plaintiff and Class members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**JURY DEMAND**

163.    Plaintiff demands a trial by jury of all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant

as follows:

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.      Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.      Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

D.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes;

E.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

F.      Ordering such other and further relief as may be just and proper.

Dated: March 17, 2020                     Respectfully submitted,

**CARLSON LYNCH, LLP**

*/s/ Katrina Carroll*
KATRINA CARROLL
  kcarroll@carlsonlynch.com
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 750-1265
Facsimile: (312) 750-1591

R. BRUCE CARLSON
  bcarlson@carlsonlynch.com
EDWIN J. KILPELA
  ekilpela@carlsonlynch.com
BRYAN A. FOX
  bfox@carlsonlynch.com
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 253-4996
Facsimile: (412) 231-0346

MELISSA S. WEINER
  mweiner@pswlaw.com
JOSEPH C. BOURNE
  jbourne@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

PATRICK W. MICHENFELDER*
  pat@throndsetlaw.com
**THRONDSET MICHENFELDER LAW OFFICE**
One Central Avenue, Suite 203
St. Michael, Minnesota 55376
Telephone: (763) 515-6110

*Attorneys for Plaintiffs*

*Application for *Pro Hac Vice* Forthcoming