**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DOMINIQUE FREEMAN, individually | ) | |
| And on behalf of all other similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:20-cv-01834 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MAM USA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In an effort to do what parents do—provide comfort and care to their children—Dominique Freeman bought "orthodontic" pacifiers made by child-products company MAM USA. R. 1, Compl. ¶¶ 17–19.[1] Based on MAM's representations, Freeman believed that the pacifiers would benefit her son's dental and oral health. *Id.* ¶¶ 17, 20. Recently, however, Freeman learned that many studies allegedly show that extended pacifier use, including "orthodontic" pacifier use, is harmful to children's health. *Id.* ¶¶ 37–79. She brought this proposed class action against MAM, alleging that MAM's false advertising of its orthodontic pacifiers—especially for children over 24 months of age—violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS

---

[1]Citations to the docket are denoted as "R." followed by the docket entry number.

510/1, *et seq.*, and many other states' consumer protection laws. She also brings claims for breach of warranty and unjust enrichment.[2]

MAM now moves to dismiss the claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). R. 21, Defendant's Motion to Dismiss (Def.'s Mot.). MAM argues that Freeman lacks standing to sue for injunctive relief, and that she has failed to allege the fraud necessary to state a claim. As explained in this Opinion, the Court agrees that Freeman lacks standing to sue for injunctive relief. Aside from that problem with injunctive relief, however, Freeman has adequately pled the elements of each of her claims, even under the heightened-pleading standard demanded by Civil Rule 9(b). MAM's challenges are largely fact-based and premature.

MAM also argues that Freeman cannot bring claims on behalf of out-of-state class members. MAM frames this as a standing argument, though it is really a challenge to the Court's personal jurisdiction over out-of-state plaintiffs (which means it is really a dismissal motion under Civil Rule 12(b)(2)). As detailed in the Opinion, the Court concludes that it may exercise jurisdiction over out-of-state class members in this proposed nationwide class action. It is true that Freeman's eventual class-

---

[2]This Court has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), which grants federal jurisdiction over class actions in which any member of the proposed class is a citizen of a different state than the defendant and the matter in controversy exceeds $5,000,000. MAM is a citizen of Delaware, where it is incorporated, as well as New York, home to its corporate headquarters. Compl. ¶ 21. Freeman is a citizen of Illinois. Compl. ¶ 16. The amount in controversy could exceed $5,000,000, given the likely large size of the class and the pacifier buying habits alleged in the Complaint. Freeman purchased a two-pack of pacifiers, for $8.99, "every few weeks or months" for at least two years. Compl. ¶¶ 17–18. Extrapolating these spending habits to a large class, it is legally possible that the amount in controversy could exceed $5,000,000.

certification motion will require close scrutiny, but that is a different problem that does not bear on personal jurisdiction.

## I. Background

In evaluating this motion to dismiss, the Court accepts as true the complaint's factual allegations and draws reasonable inferences in Freeman's favor. *Ashcroft v. Al–Kidd,* 563 U.S. 731, 734 (2011). MAM USA manufactures, distributes, and sells several different styles and colors of pacifiers, all of which are labeled "orthodontic" and purport to have an "orthodontic" nipple. Compl. ¶¶ 23–24. MAM sells its products online and through brick-and-mortar retailers such as Wal-Mart and Target. *Id*. ¶ 23. MAM pacifiers are labeled for different age groups, the last of which is "16+ months" with no upper age limit given. *Id*. ¶ 27. MAM's packaging and advertising emphasize the "orthodontic" nature of its products and extol the following benefits:

- "Specially sized for toddlers"
- "Orthodontic nipple promotes proper oral development"
- "Nipple adapts to baby's mouth"
- "Largest nipple to ensure maximum comfort and proper oral development as baby grows"
- "16+ nipple ensures proper development of baby's palate, teeth and gums as baby grows"
- "Symmetrical nipple ideal for baby's jaw development."

*Id*. ¶¶ 28–29. On its website, MAM also says it "collaborates with medical experts … to help develop and design innovative, orthodontic soothers [pacifiers] that suit baby's various developmental stages." *Id*. ¶ 30.

Against the backdrop of that advertising, Freeman alleges that, in September 2019—and many other times over the previous two years—she bought a two-pack of MAM orthodontic pacifiers. Compl. ¶¶ 16–18. She paid about $8.99 for the pacifiers. *Id*. ¶ 17. Freeman's son was about 23 months old at the time, so she bought the pacifiers labeled for children ages "16+," intending to let him use them beyond the age of 24 months. *Id*. She had been buying MAM orthodontic pacifiers regularly for her son since birth. *Id*. ¶ 18.

Freeman now asserts that MAM's pacifiers in fact do not promote proper oral development or provide any other benefit to children. Compl. ¶¶ 17–20, 26, 35–79. She cites numerous studies allegedly showing that orthodontic pacifiers are no better than conventional pacifiers; extended use of any pacifier can harm children's orofacial development; and pacifier use past the age of 24 months is particularly harmful. *Id*. ¶¶ 35–79. According to Freeman, MAM knew of the risks that the pacifiers pose to children but failed to disclose those risks to her and other consumers. *Id*. ¶ 33. She also alleges that she paid a premium price for MAM pacifiers because of their purported orthodontic benefits. *Id*. ¶¶ 8, 86. If Freeman had known that these benefits did not exist, she says, then she would either not have bought MAM pacifiers or would not have paid a premium for them. *Id*. ¶¶ 86–87.

As a result, Freeman filed this lawsuit against MAM, claiming that its pacifier advertisements are fraudulent, misleading, and deceptive in violation of the Illinois Consumer Fraud and Deceptive Businesses Act (the Fraud Act), 815 ILCS 505/1, *et seq*., the Illinois Uniform Deceptive Trade Practices Act (IDTPA), 815 ILCS 510/1, *et*

4

*seq.*, and the consumer-protection laws of 30 other States. Compl. ¶¶ 110–146. She also brings claims for breach of warranty and unjust enrichment. *Id.* ¶¶ 147–162. Along with the claims on her own behalf, Freeman also seeks certification of nation-wide, multi-state, and Illinois subclasses. *Id.* ¶¶ 95–103. In seeking dismissal of the Complaint, MAM's arguments present issues of standing, personal jurisdiction, and the adequacy of the pleading. Before evaluating the merits of each argument, the Court sets forth the governing standards of review.

## II. Standards of Review

### A. Standing / Rule 12(b)(1)

"Standing is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). The plaintiff bears the burden of establishing subject matter jurisdiction, which includes the requirement of standing. *Id.*; *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). Civil Rule 12(b)(1) is the vehicle by which a defendant can challenge subject matter jurisdiction in a motion to dismiss. When evaluating a dismissal motion under this Rule, the district court "must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). Having said that, when a key jurisdictional fact is disputed, the Court can also examine the record, beyond the allegations contained in the pleadings, to determine whether jurisdiction is proper. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999).

## B. Personal Jurisdiction / Rule 12(b)(2)

The plaintiff bears the burden of establishing that personal jurisdiction is proper when jurisdiction is challenged by the defendant. *Purdue Research Found v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). For personal-jurisdiction challenges, the operative rule is Federal Rule of Civil Procedure 12(b)(2). If material facts are disputed, then the Court must consider the need for discovery and perhaps an evidentiary hearing to resolve the disputes. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Then, "the plaintiff must establish jurisdiction by a preponderance of the evidence," *Purdue Research Found.*, 338 F.3d at 782, and "prove what it alleged," *Hyatt Int'l Corp.*, 302 F.3d at 713. This is in contrast to the normal rule for a motion to dismiss, under which "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

## C. Adequacy of Claim: Rule 12(b)(6) and Rule 9(b)

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94. A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are

entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). And Rule 9(b)'s heightened pleading standard applies to fraud claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (citation omitted). Thus, generally speaking, Rule 9(b) requires a complaint to "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (cleaned up).[3] Put differently, a complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (internal quotation marks and citation omitted). Having said that, context—that is, the overall factual setting of a claim—is important in evaluating what level of detail is required under Rule 9(b).

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

With the standards of review in place, it is time to turn to the merits of MAM's dismissal motion. MAM first challenges Freeman's standing to pursue injunctive relief. Next, MAM insists that the Court does not have personal jurisdiction over out-of-state class members' claims. Third, MAM argues that Freeman has failed to adequately state a claim for relief. The Court will address each argument in turn.

### A. Standing for Injunctive Relief

No one doubts that Freeman has standing to pursue monetary damages. But she also seeks injunctive relief against MAM's allegedly false advertising. The problem is that Article III standing for one does not automatically cover the other: "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), and describing the holding of that case as "notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief"). To have standing to pursue injunctive relief, Freeman must show that she faces—going *forward*—a "real and immediate threat of future injury" from MAM's actions. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (cleaned up) (citing *Lyons*, 461 U.S. at 102). The equitable remedy of injunctive relief "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again …." *Lyons*, 461 U.S. at 111. Here,

Freeman seeks injunctive relief against MAM's advertising practices under various state consumer-protection laws. Compl. ¶¶ 9, 12, 146.

In challenging Freeman's standing to pursue injunctive relief, MAM argues that Freeman has not adequately alleged a risk of *future* harm to *her*. MAM points out that Freeman now knows all about the allegedly deceptive advertising, so she cannot be harmed by them in the future. Def.'s Mot. at 6–7. This is true—Freeman does not suggest that she *herself* is at risk of future harm. Instead, she counters that other members of the proposed class remain unaware of MAM's practices and *they* are at risk of future harm. R. 23, Pl.'s Resp. at 4. Freeman offers this proposition: that the risk of future harm to proposed class members allows her to pursue the claim for injunctive relief.[4]

To support this proposition, Freeman cites two district-court cases. First is *Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1110 (E.D. Wisc. 2016). But *Le* is different from this case. In *Le*, the plaintiff alleged that department store Kohls engaged in "company-wide, pervasive, and continuous" false advertising via the publication of deceptive prices. *Id.* at 1110. The district court concluded that the plaintiff himself could again suffer harm from Kohls' advertising, because the plaintiff did not know with precision—as to both product line or time of year—the extent of the deceptive pricing. *Id.* ( "Should Le be 'aware' that housewares are deceptively priced, while

---

[4]In a footnote, Freeman makes a one-sentence argument relying on the standing doctrine that allows otherwise moot cases to satisfy the case-or-controversy requirement. Pl.'s Resp. at 5 n.2 (citing *Roe v. Wade*, 410 U.S. 113, 125 (1973)). But the "capable of repetition, yet evading review" avenue to keep moot cases alive applies only to cases in which the plaintiff is at risk of being repeatedly subjected to the defendant's alleged misconduct. *See id*. That is not the case here, because Freeman already knows about the allegedly false advertising.

men's apparel is not? Should Le be 'aware' that Kohls' holiday sales are more egre-
giously deceptive than their day-to-day offers?"). In contrast, here Freeman does not
allege that sort of widespread false advertising across products or time, instead spe-
cifically targeting the "orthodontic" labelling on MAM's pacifiers.

The second district-court case cited by Freeman is *Leiner v. Johnson & John-
son Consumer Cos., Inc.*, 215 F. Supp. 3d 670, 673 (N.D. Ill. 2016). In *Leiner*, the
plaintiff sought to represent a class of consumers, alleging that a baby-products
maker falsely advertised its products as "clinically proven" to help babies sleep. *Id.*
at 672. *Leiner* held that, even though the plaintiff was unlikely to buy the products
again, she had standing to pursue injunctive relief. *Id.* at 672–73. The district court
relied on two grounds. First, *Leiner* pointed to *Arreola v. Godinez*, 546 F.3d 788, 791,
795 (7th Cir. 2008), in which the Seventh Circuit held that a former jail detainee still
maintained Article III standing to challenge the jail's policy on crutches despite the
fact that he had been released. But *Arreola* only warned that courts must preserve
the dividing line between Article III standing and entitlement to relief, which are two
separate concepts. *Id.* at 794–95. That is precisely the problem with Freeman's stand-
ing argument here: as the Supreme Court emphasized in *Lyons*, Article III requires
an actual "case or controversy," and "standing to seek an injunction … depend[s] on
whether" Freeman is "likely to suffer future injury." *Lyons*, 461 U.S. at 105. Absent
the likelihood of future injury, there is no actual case or controversy between Free-
man and MAM when it comes to injunctive relief. It is worth repeating here that the
Supreme Court has declared that "a plaintiff must demonstrate standing separately

for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185.[5] Freeman has not demonstrated standing to pursue injunctive relief.

The second justification relied on by *Leiner* is a public-policy concern, specifically that injunctive-relief provisions for consumer-protection statutes "could never be invoked to enjoin deceptive practices if the complaining consumer's standing dissipated" right when she discovered the deception. 215 F. Supp. 3d at 673. There is some force to this view, but it is probably overstated. Article III standing is a requirement for *federal*-court subject matter jurisdiction; it does not constrain *state*-court jurisdiction. *Lyons*, 461 U.S. at 113 ("the state courts need not impose the same standing or remedial requirements that govern federal court proceedings"). So a no-longer-fooled consumer could seek injunctive relief in state court. On top of that, the Fraud Act explicitly authorizes the Illinois Attorney General to seek injunctive relief against deceptive practices, 815 ILCS 505/7(a), and Illinois could (and probably would) bring the suit in state court. *See Mednick v. Precor, Inc.*, No. 14 C 3624, 2016 WL 5390955, at *9 (N.D. Ill. Sept. 27, 2016). Plus, if a company is harmed by the deceptive practices of a competitor, then the harmed company can seek injunctive relief under the Illinois Deceptive Trade Practices Act, 815 ILCS 510/3. Last but not least, as a practical matter, if a consumer-products maker like MAM is held liable on the merits for past harm

---

[5]It might very well be that, at some later point, the Supreme Court will draw a sharper distinction between Article III standing requirements and the merits of the underlying claim for injunctive relief, *see Lyons*, 461 U.S. at 103 (explaining that, in *O'Shea v. Littleton*, 414 U.S. 488, (1974), "we further observed that case or controversy considerations obviously shade into those determining whether the complaint states a sound basis for equitable relief") (cleaned up), but for now a straightforward application of Article III standing requirements requires dismissal of the injunctive-relief claims.

(that is, via monetary damages), then almost surely the company would stop the challenged practice lest suit after suit be brought against it for more and more monetary damages. In any event, the bottom line is that public-policy concerns, no matter how compelling, cannot trump the Article III standing requirement. The claims for injunctive relief are dismissed for lack of subject matter jurisdiction.

## B. Personal Jurisdiction for Out-of-State Class Claims

Moving on from the claims for injunctive relief, Freeman proposes a nationwide class of plaintiffs, as well as nationwide, multi-state, and Illinois subclasses, who have been harmed by MAM's allegedly false advertising. Compl. ¶¶ 95–103. MAM argues that Freeman cannot bring claims on behalf of out-of-state class members, framing this as a purported problem of Article III standing. Def.'s Mot. at 7–8. To MAM's way of thinking, Freeman—as an Illinois resident who did not buy any MAM pacifiers out-of-state—has no "standing" to pursue the claims of non-Illinois residents. It is true that MAM cites a few cases that do seem to characterize the issue as one of Article III "standing." *Id.* at 7–8 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *25 (N.D. Ill. June 29, 2015); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022, at *5-6 (N.D. Ill. Feb. 26, 2019)). But Freeman's Article III standing on the damages claims is secure: she alleges that she suffered an injury in fact; the injury is fairly traceable to the allegedly false advertising; and the Court can redress the injury with money damages.[6] For everyone else in the proposed

---

[6]MAM's challenge to Freeman's standing on *injunctive* relief, discussed earlier in this Opinion, really is a standing-based objection because Freeman *herself* does not have Article III standing to bring the claims for injunctive relief. In contrast, she does have standing to bring the claims for money damages.

class, she is proposing to serve as a class *representative*, not seeking to redress an injury specific to her—of course she herself did not pay for the pacifiers bought by each proposed class member. That is the whole point of a class action: to represent the interests of class members, *not* just the representative's *own* interests. If MAM is right about how Article III standing applies to proposed class actions—that is, that a plaintiff can only raise claims under her own State's laws—then no multi-state or nationwide class can ever be certified without a representative from each and every State in the proposed class. That ban would apply even against a products-liability class action based on common-law negligence or strict liability principles, and even if the case involved applying the same legal principles uniformly throughout the Nation.

What MAM is really challenging is whether Freeman (or, actually, any Illinois resident who bought pacifiers only in Illinois) can satisfy the Civil Rule 23 class-certification requirements as applied to a nationwide and multi-state class. *See Halperin v. Int'l Web Servs.*, 123 F. Supp. 3d 999, 1009 (N.D. Ill. June 5, 2015) (holding that the defense's challenge to non-Illinois class claims is really based on Rule 23, not Article III); *cf. Liston v. King.com*, 254 F. Supp. 3d 989, 1000–01 (N.D. Ill. May 23, 2017) (questioning whether the issue is properly characterized as Article III standing). Indeed, when this case reaches the class-certification decisional stage, it might very well be that MAM will have solid arguments against certifying nationwide or multi-state classes, especially if the state laws have different substantive legal standards. Adequacy, commonality, and predominance can be tough questions in deciding

whether to certify a multi-state class. So close scrutiny is warranted. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 396 (7th Cir. 2010) (*per curiam*) (approvingly noting that the district court "carefully considered how the case would proceed, explicitly finding that the consumer protection acts of these six states have nearly identical elements and declining to certify a seventh state subclass that would have required a subjective analysis"). But that is a question to be answered after discovery on the propriety of class certification—not right out of the box by an overbroad application of Article III standing to proposed class actions.

MAM presents another version of its challenge against out-of-state claims, this one premised on personal jurisdiction. Def.'s Mot. at 9. On this score, MAM argues that a relatively recent Supreme Court decision on personal jurisdiction prevents Freeman from representing out-of-state class members. *Id.* (citing *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1783 (2017)). In *Bristol-Myers*, over 600 plaintiffs joined together into a single products-liability lawsuit in California state court against a pharmaceutical company that was not based in California. *Id.* at 1778. But most of the plaintiffs did *not* live in California. *Id.* The Supreme Court held that the California state court lacked specific personal jurisdiction over the out-of-state plaintiffs' claims. *Id.* at 1781–82. The Fourteenth Amendment's Due Process Clause demanded some "connection" between the forum state and the underlying controversy. *Id.* at 1781. Given the lack of a connection, the California state court could not exercise personal jurisdiction over the claims. *Id.* at 1781–82.

14

*Bristol-Myers* does not thwart the exercise of personal jurisdiction over the proposed out-of-state claims in this case. The first difference is that *Bristol-Myers* addressed the Due Process standard that applies to *state* courts. Given that the case arose in a state court, the Supreme Court naturally applied the Due Process Clause of the Fourteenth Amendment as "an instrument of interstate federalism" and expressed concern over requiring defendants to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers*, 137 S. Ct. at 1780–81. Not surprisingly, the Supreme Court explicitly announced that it was *not* addressing "the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784. So *Bristol-Myers* does not apply here in federal court.

Beyond that, at least in a proposed class action premised on a *federal* statute, the Seventh Circuit recently held that "the principles announced in *Bristol-Myers* do not apply to the case of a nationwide class action filed in federal court under a federal statute." *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 443 (7th Cir. 2020). It is true that *Mussat* involved a proposed class's claims under a federal statute, but the underlying reasoning applies just as well to state law claims. To start, *Mussat* reasoned that, before *Bristol-Myers*, "there was a general consensus that due process principles did not prohibit a plaintiff from seeking to represent a nationwide class in federal court, even if the federal court did not have general jurisdiction over the defendant." *Mussat*, 953 F.3d at 445 (cleaned up). As part of that consensus, federal courts routinely limited the personal-jurisdiction requirement only to the claims of the named plaintiffs.

15

*Id.* The Supreme Court too considered class-action cases without commenting on personal-jurisdiction concerns of non-class-members. *Id.* This focus on the named plaintiffs would just as readily justify limiting the personal-jurisdiction requirement to named plaintiffs in state-law-based class actions too, like the one that Freeman proposes.

*Mussat* also reasoned that *Bristol-Myers* did nothing to upend the long line of precedent in which no personal-jurisdiction requirement was applied to the claims of the entire class. The Seventh Circuit explained that *Bristol-Myers* was actually a so-called "mass" action, a California-specific litigation device that allowed the consolidation of multiple cases filed by many plaintiffs raising similar claims into one mass case—but each plaintiff was indeed a *named party* in the suit, not just a mere absent class member. *Mussat*, 953 F.3d at 445–46. So it made sense that the state trial court should have to satisfy the personal-jurisdiction requirement over each of the claims of each of the named plaintiffs in the mass action. In contrast, the Seventh Circuit observed, "Class actions ... are different from many other types of aggregate litigation, and that difference matters in numerous ways for the unnamed members of the class." *Id.* at 446–47. First and foremost, "absent class members are not full parties to the case for many purposes." *Id.* at 447. Instead, the lead plaintiffs "earn the right" to represent the class members by satisfying the requirements of Civil Rule 23. *Id. Mussat* also pointed out that absent class members are not considered formal parties for purposes of subject matter jurisdiction or venue, so the same should hold true for personal jurisdiction. *Id.* In other words, "the named representatives must be able to

16

demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Id.*[7] That reasoning too applies just as well to Freeman's proposed multi-state class: the absent class members of other States would not be part of the personal-jurisdiction requirement. (Again, it is worth emphasizing that the multi-state nature of the proposed class would warrant scrutiny under Rule 23.)

One more point supports Freeman's position that personal-jurisdiction is not necessarily a barrier to multi-state class actions invoking multiple States' laws: prior Seventh Circuit cases have approved that type of class action without requiring that personal jurisdiction applies to the out-of-state claims. *See Pella Corp.*, 606 F.3d at 393; *Martin v. Reid*, 818 F.3d 302, 307–08 (7th Cir. 2016) (upholding a class settlement in a products-liability case and discussing the general availability of nationwide classes and settlements); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (reversing a denial of certification of a multi-state class of consumers, because the "same legal standards govern every class member's claim"). It is true that the holdings of these cases address the propriety of class certification, rather than directly rejecting a personal-jurisdiction argument. But the very fact that they review

---

[7]After the date of *Bristol-Myers*'s issuance, only one other federal appellate case has addressed a proposed multi-state class with multi-state law claims. *Molock v. Whole Foods Market Group, Inc.*, 952 F.3d 293 (D.C. Cir. 2020). There, the defendant filed a motion to dismiss nonresident proposed class members for lack of personal jurisdiction. *Id.* at 295. In response, the plaintiffs argued that class actions are an exception to the general rule that a federal district court sitting in diversity exercises jurisdiction over the same geographic area as the state courts in its jurisdiction; the plaintiffs also argued, in the alternative, that the dismissal motion was premature because class certification had not yet been decided. *Id.* at 296. The D.C. Circuit agreed that the dismissal motion was premature, "because prior to class certification putative class members are not parties to the action." *Id.*

the class-certification propriety yet do not scrutinize personal jurisdiction is telling. Indeed, in *Pella*, the Seventh Circuit granted interlocutory review of the class-certification decision specifically "in order to address the contention that consumer fraud claims are inappropriate for class treatment." *Pella Corp.*, 606 F.3d at 393. The proposed class members in *Pella* had bought defective windows from the company; the windows had been sold nationwide. *Id.* at 392. The Seventh Circuit affirmed two certified classes: one nationwide class of consumers who had bought the windows but had not yet suffered harm; and one multi-state class of consumers who had already replaced the windows. *Id.* at 392. In affirming the classes, *Pella* rejected the broad proposition that consumer-fraud cases are not suitable for class certification: "While consumer fraud class actions present problems that courts must carefully consider before granting certification, there is not and should not be a rule that they never can be certified." *Id.* at 393. The Seventh Circuit went on to approve the multi-state class certification even though the claims invoked the consumer-protection laws of six different States. *Id.* at 392-93. So *Pella* is a perfect example of the absence of a personal-jurisdiction requirement for out-of-state claims in a proposed multi-state class action that invokes the laws of multiple states. There is no basis in law or past practice to extend *Bristol-Myers* to class actions in federal court, even those based on state law. MAM's request to dismiss the out-of-state claims is denied.

### C. Adequacy of the Claims

MAM next argues that the Complaint fails to state a valid claim. The Court examines each claim in turn.

18

### 1. The Fraud Act

As pertinent here, the Illinois Consumer Fraud and Deceptive Business Practices Act forbids companies from deceiving consumers, specifically by engaging in:

> unfair or deceptive acts or practices … with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce ….

815 ILCS 505/2. Freeman alleges that MAM fraudulently misrepresented its pacifiers as promoting children's healthy orofacial development, in violation of the Fraud Act. For the Fraud Act claim to survive the dismissal motion, Freeman must allege—with particularity under Civil Rule 9(b)—the following: (1) an unfair or deceptive act or practice by MAM; (2) committed with the intent that she and other consumers rely on it; (3) in trade or commerce; and (4) actual damage to her (5) proximately caused by the deception. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). MAM argues that Freeman has failed to adequately allege any of these elements (except the trade-or-commerce element).

### a. Unfair or Deceptive

Under the Fraud Act, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citing *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991)). Courts should look at the context of the "information made available to the plaintiff" in deciding whether a statement is deceptive. *Muir v. Playtex Prod., LLC*, 983 F. Supp. 2d 980, 987 (N.D. Ill. Nov. 6, 2013). "Courts apply a 'reasonable consumer' standard in evaluating the likelihood of deception." *Stemm v.*

*Tootsie Roll Indus., Inc.*, 374 F. Supp. 3d 734, 740 (N.D. Ill. Mar. 19, 2019) (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015)).

Freeman accuses MAM of false and deceptive advertising across its packaging and its website, with special emphasis on two labels that appear on the packaging of the pacifiers that she bought. First is the term "orthodontic." Freeman says that the term "conveys to reasonable consumers that the Orthodontic Pacifiers improve dental health outcomes by positioning teeth and jaws for proper development." Compl. ¶ 26. Second is the age-based-label "16+," printed on MAM's largest pacifiers, which "falsely convey[s] to consumers that the Orthodontic Pacifiers are safe for use by children 24 months and older." *Id.* ¶ 27. Other descriptions of the pacifiers on MAM's product packaging and website expand on the supposed benefits of MAM products for children's dental health. *Id.* ¶¶ 28-30. Freeman cites studies to support her contention that, in reality, so-called orthodontic pacifiers are no better than regular pacifiers, and indeed are worse for dental health than avoiding pacifiers altogether. *Id.* ¶¶ 26, 35–79.

Against these allegations, MAM first argues that Freeman has failed to adequately allege that MAM's advertising makes false statements about either the "orthodontic" nature of its products or the propriety of their use for children over 24 months of age. Def.'s Mot. at 12. In support, MAM points to its own research, which suggests that the pacifiers are beneficial to dental health; MAM also challenges Freeman's characterization of the studies that she cites. Def.'s Mot. at 13–16. But this kind of factual argument on the *merits* of the studies is premature. In the Complaint,

20

Freeman has pled her claim with particularity—indeed, arguably even excessive particularity. She cites studies, dating back to the 19th century, linking pacifier use to problems with children's jaws and teeth. Compl. ¶¶ 37–40. She cites three clinical studies and one literature review that concluded orthodontic pacifiers are no better than conventional pacifiers for children's development. Compl. ¶¶ 41–49. She presents scientific literature linking pacifier use, especially continued use past early infancy, to various serious "dental malocclusions"[8] and psychosocial challenges. Compl. ¶¶ 50–79. All of this is more than enough to adequately allege that the advertisements were false or deceptive.

MAM also contends that the label "orthodontic" is not deceptive or misleading because it simply describes the shape of the pacifier, which is allegedly a widely accepted definition of "orthodontic" across the dental industry. Def.'s Mot. at 15. Maybe that is the widely used meaning of the term among dentists, but that is a fact to be proven later in the litigation, not at the pleading stage. And just because a term is widely used in the dental industry does not refute the probability that a reasonable *consumer* would be deceived by it—especially in context. Indeed, Freeman's interpretation of the term tracks the detailed representations on MAM's own packaging. Freeman asserts that MAM wants consumers to believe that its products "promote healthy oral and orofacial development in children" and "would improve dental health

---

[8]A dental malocclusion is a "malposition and contact of the maxillary and mandibular teeth as to interfere with the highest efficiency during the excursive movements of the jaw that are essential for mastication." *Malocclusion*, Dorland's Medical Dictionary Online (2020), available at www.dorlands.com (last visited Mar. 17, 2021). Or as Freeman puts it: "deviations from the ideal occlusion (the relation between the upper jaw and teeth and lower jaw and teeth)." Compl. ¶ 2.

outcomes, including oral and orofacial health and development." Compl. ¶¶ 8, 20. She goes on to quote language from MAM's advertising: "Orthodontic nipple promotes proper oral development" and "only orthodontic soothers support baby's healthy jaw and tooth development." *Id.* ¶¶ 28, 30. Given this context, Freeman has adequately alleged that a reasonable consumer could interpret the term "orthodontic" as promoting dental health, and that is allegedly a false representation.[9]

MAM's challenge to the age-based-label "16+" fares no better. MAM contends that this is simply a *size* label. Def.'s Mot. at 16. According to MAM, when the package is opened, the consumer then sees a "graphic" that shows the three available sizes of pacifiers, each tied to an age range. *Id.* There are a couple of problems with MAM's argument, starting with the fact that it refers to facts (that is, the size-chart graphic) outside the Complaint. Also, if a consumer must actually buy and open a package to learn that 16+ months is allegedly meant only as a measure of size, then MAM's pre-purchase advertising has not conveyed that intention. Indeed, MAM's advertising links the purported size indicator to beneficial dental outcomes: "16+ nipple ensures proper development of baby's palate, teeth and gums as baby grows." Compl. ¶ 29. Most obvious of all, the unit for the 16+ label is *months*—a measurement of *age*, not size. At the pleading stage, the Complaint readily alleges that the "16+" label refers to age, not merely size.

---

[9]It is also plausible that the term "orthodontic" is understood by reasonable consumers as the same label applied to the use of dental braces, which are used by orthodontists to correct children's teeth and jaw misalignment in later childhood and adolescence. This common understanding of the term strengthens Freeman's proposed interpretation, that is, that the term "orthodontic" as applied to a pacifier is a representation that the pacifier will improve the child's dental development.

Along the same line as MAM's challenge to the studies on the term "orthodontic," MAM similarly attacks the studies that Freeman cites in support of her assertion that pacifier use above the age of 24 months is harmful. Def.'s Mot. at 17–18. Again, however, the attack is premature when presented at the pleading stage. Perhaps fact or expert discovery will undermine Freeman's allegation about the harm to children over 24 months, but that is not a pleading-stage debate.

MAM also likens this case to another consumer-fraud case decided by this Court, *Greifenstein v. Estee Lauder Corp.*, 2013 WL 387407 (N.D. Ill. July 26, 2013), but the two cases are different in important ways. In *Greifenstein*, the consumer alleged that cosmetics company Estee Lauder had misrepresented the wrinkle-repairing power of a facial cream, which the company advertised was "clinically proven" to repair wrinkles. *Id.* at *4. The plaintiff alleged that there was no clinical evidence to support the company's claims—but the complaint itself referred to a clinical study that *did* support the claims. *Id.* She further argued that another clinical study disproved the efficacy of the cream at issue, but the study—issued by the advertising industry's self-regulatory body—was overturned in large part in an appeal to the National Advertising Board. *Id.* at *6. And the only remaining concern of falsity expressed by the Advertising Board did not match what the plaintiff had alleged. *Id.* So the complaint in *Greifenstein* did not adequately plead deception. *Id.* at *7.

In contrast, Freeman's allegations of falsity are right on target. The studies that she cites directly evaluate orthodontic pacifiers—including MAM's—and they have not been undermined like the linchpin study in the *Greifenstein* complaint.

MAM tries to downplay their importance in various ways, but none are dispositive at the pleading stage. For example, MAM relies on one study's statement that more study is needed to determine if orthodontic pacifiers convey any dental-health benefit. Def.'s Mot. at 13. But the first sentence of the same paragraph in which that statement appears outright concludes, "There is not sufficient evidence to support [the] concept that there are differences in occurrence of malocclusion traits between children that used orthodontic or conventional pacifiers." Exh. G, Medeiros *et al.*, "Malocclusion prevention through the usage of an orthodontic pacifier compared to a conventional pacifier: a systematic review," 19 *European Archives of Paediatric Dentistry* 287, 294 (2018). The other studies cited by Freeman similarly stand for the proposition for which she cites them. To repeat, the debate over the merits of the studies must await summary judgment or trial; deception is adequately pleaded.

### b. Intent

Next, MAM argues that Freeman has not adequately alleged MAM's intent to deceive. Def.'s Mot. at 19. This argument echoes the one over merits of the studies, so it too is prematurely raised at the pleading stage. Freeman has alleged more than enough to give rise to a plausible inference of intent: first, MAM is an industry leader in pacifiers, a proposition which MAM does not dispute. Compl. ¶ 81. So it is reasonable to expect that MAM would know the state of the science, including the studies that are critical of orthodontic pacifiers. Next, Freeman has cited significant scientific literature concluding that orthodontic pacifiers are not beneficial to dental health. *Id.* ¶¶ 35–79. Again, MAM plausibly is alleged to know about the studies. Also, Freeman

has alleged that MAM seeks to convince consumers to buy its products based on its advertising campaign around their safety and benefits for children. *Id.* ¶¶ 26–31. With reasonable inferences drawn in Freeman's favor, intent to deceive is adequately alleged.[10]

### c. Damages

To plead damages under the Fraud Act, Freeman must allege that she "suffer[ed] actual pecuniary loss." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (cleaned up); *see also Camasta v. Jos. A. Bank Clothiers*, 761 F.3d 731 at 739 (2014) (citing *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196 (Ill. App. Ct. 2008)). As a consumer who actually bought the product, Freeman can (and has) simply allege that she suffered actual pecuniary loss because she allegedly paid more than the product was worth and thus did not receive the "benefit of her bargain." *Kim*, 598 F.3d at 365 (cleaned up); *see also Mulligan*, 888 N.E.2d at 1196–97; *Biffar v. Pinnacle Foods Grp., LLC*, 2016 WL 7429130, at *4 (S.D. Ill. Dec. 22, 2016); *Burton v. Hodgson Mill, Inc.*, 2017 WL 1282882, at *6 (S.D. Ill. Apr. 6, 2017) (both of the latter cases holding that plaintiffs adequately alleged damages because they paid premium prices for muffin

---

[10] It is worth noting too that, under the Fraud Act, Freeman need not allege that MAM intended to deceive consumers (though she has adequately alleged that too), only that MAM intended that she rely on the allegedly false statements. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574–75 (7th Cir. 2012); *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. Ct. 2003) ("A defendant need not have intended to deceive the plaintiff; innocent misrepresentations or omissions intended to induce the plaintiff's reliance are actionable under the statute.").

and pancake mixes, respectively, labeled "all natural" that in fact contained synthetic ingredients).

More specifically, Freeman alleges that "she would not have paid a premium price or purchased the Orthodontic Pacifiers marketed for use by children over the age of 24 months had Defendant made truthful advertising statements and disclosed material information concerning risks associated with prolonged pacifier use." Compl. ¶ 86. Freeman also alleges that she specifically chose MAM products "because she believed, based on the representations made by Defendant, that the 'orthodontic nipple' would improve dental health outcomes, including oral and orofacial health and development." Compl. ¶ 20. Given that the products allegedly do not provide these benefits, Freeman has adequately alleged that she did not receive the benefit of the bargain when she bought the pacifiers. This is enough to allege actual pecuniary loss.

### d. Proximate Cause

Under the Fraud Act, combined with Civil Rule 9(b), Freeman must plead proximate cause with particularity. *De Bouse v. Bayer AG,* 922 N.E.2d 309, 313 (Ill. 2009). Most importantly here, she must adequately allege that she was actually deceived by a representation of the defendant. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002) ("to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act, a plaintiff must allege that he was, in some manner, deceived"). To adequately state a fraud claim, Freeman "must

26

describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (cleaned up).

MAM argues that because Freeman did not specify exactly which pacifier she bought, and what exactly its packaging said, her claims should be dismissed. Def.'s Mot. at 18. In the Complaint, Freeman alleged that, on a specific date in 2019 and at a specific Target store near her home, she bought a two-pack of pacifiers labeled "16+" and that labelled the pacifiers as "orthodontic." Compl. ¶ 17. Those two labels—"orthodontic" and "16+"—are the heart of Freeman's misrepresentation claim. She alleges that she bought the pacifiers because she believed those labels meant they would be beneficial to her child. *Id.* That is enough to adequately allege proximate cause. It appears to be true that MAM sells several lines of pacifiers, but the differences between these product lines do not appear to make any difference on the "orthodontic" or "16+" labels.[11] Indeed, MAM's own exhibits show identical advertising text on the packages for different styles of pacifier. Whether Freeman bought an "original" or a "camo"-model pacifier, the package would have included the text "Orthodontic nipple promotes proper oral development" and "designed with dentists for healthy dental development." Exh. B to Def.'s Mot. at 27 ("Camo" model); *id.* at 31

---

[11]This distinguishes Freeman's case from one cited by MAM, in which the plaintiff could not identify which of six different dietary supplements she had purchased, leading the court to dismiss her claims. *Ibarolla v. Nutrex Research, Inc.*, 2012 WL 5381236, at *3 (N.D. Ill. Oct. 31, 2012). Freeman says that she bought "orthodontic" pacifiers labeled for use by children aged 16+ months, and her inability to remember their color or whether they were for nighttime use does not render the allegations speculative. In another case cited by MAM, *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 2623, 2009 WL 937256, at *6 (N.D. Ill. Apr. 6, 2009), the plaintiffs failed to allege that they even saw any advertisements about the products at issue. In contrast, Freeman specifically alleged that she saw and relied on the labels.

("Original" model). The online listing for a night-time pacifier uses similar language. Def.'s Mot., Exh. C at 37 (MAM Perfect Night 16+ Dream Traveler, stating "Designed to reduce the risk of misaligned teeth" and "Clinically proven: supports healthy tooth and jaw development"). Given the limited number of lines of MAM pacifiers and the shared advertising language, Freeman has provided enough specificity on what she purchased and what the labels were.

### e. Relationship to Breach of Warranty

One final point on the Fraud Act claim: MAM argues that the claim for breach of warranty is duplicative of the Fraud Act claim, so the Fraud Act claim should be dismissed. Def.'s Mot. at 24. But this contention is readily rejected, because Freeman is simply (and appropriately) pleading another cause of action based on overlapping facts. And pleading in the alternative is authorized by Federal Rule of Civil Procedure 8(a)(3). The assertion of the claim for breach of warranty does not preclude the Fraud Act claim. (This Opinion discusses the claim for breach of warranty in more detail below.)

### 2. Deceptive Trade Practices Act

MAM argues that the claim under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, must be dismissed because the only relief available to Freeman under that Act is injunctive relief, 815 ILCS 510/3, and she has no standing to bring a claim for injunctive relief. Freeman does not contend that she seeks any relief under the Act other than injunctive relief, so the lack of standing (as

discussed earlier) dooms any claim under the Act. The claim under the Deceptive Trade Practices Act is dismissed.

### 3. Breach of Warranty

MAM's attack on the claim for breach of warranty is reminiscent of the arguments targeting the Fraud Act claim. Under Illinois law, a description of goods can create an express warranty: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 810 ILCS 5/2-313. With this statutory overlay, the express warranty is a "creature of contract." *Collins Co. v. Carboline Co.*, 532 N.E.2d 834, 838 (Ill. 1988). To adequately plead a breach of express warranty, a plaintiff must allege: "(1) the terms of the warranty; (2) a breach or failure of the warranty; (3) a demand upon the defendant to perform under the terms of the warranty; (4) a failure by the defendant to do so; (5) compliance with the terms of the warranty by the plaintiff; and (6) damages measured by the terms of the warranty." *Lambert v. Dollar Gen. Corp.*, 2017 WL 2619142, at *2 (N.D. Ill. June 16, 2017). MAM contends that its product descriptions did not set sufficient terms for a warranty (the first element), thus making it impossible to breach a warranty (the second element), and that Freeman has not adequately alleged damages (the sixth element).

In response, Freeman argues that MAM's description of its pacifiers as "orthodontic" created an express warranty based on that term. Compl. ¶ 148. She says that MAM breached the warranty because the pacifiers are not in fact "orthodontic," and indeed actually harm children's development, as evidenced by the cited studies. *Id.*

¶ 151. According to MAM, Freeman cannot build the warranty claim around the term "orthodontic," because there is no accepted definition of that word in the context of pacifiers; MAM says it only guaranteed the size and shape of the nipple on their pacifiers, and MAM delivered on that guarantee. Def.'s Mot. at 21-23. But the pacifiers were not just labeled with a certain size or shape—they are labeled as "orthodontic." As discussed earlier, it is (at the least) plausible that reasonable consumers interpreted the label as promising certain dental-health outcomes, so the term is definite enough, at this stage of the litigation, to form the basis of a warranty—and that MAM breached it.

On damages, MAM argues that, because Freeman has not alleged that her child suffered adverse health consequences, she has not adequately alleged damages arising from the breach of warranty. Def.'s Mot. at 23. This is wrong, because Freeman has alleged monetary damages based on what she paid for the pacifiers, which is enough to adequately allege damages. As the Seventh Circuit has noted, just because "members of the class did not suffer physical injury … does not mean that they were uninjured." *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) (holding that the financial injury from paying for dangerous toys can support a claim even though no physical injury happened).

### 4. Unjust Enrichment

Last (and probably least), Freeman also brings a claim for unjust enrichment. "To state a claim for unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's

retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Stefanski v. City of Chicago*, 28 N.E.3d 967, 980 (Ill. App. Ct. 2015) (cleaned up). Freeman has adequately pleaded that MAM took and kept her purchase money (to her obvious detriment), because of course she paid for MAM pacifiers. Compl. ¶ 17. The allegations based on false advertising serve as the basis for asserting that fundamental principles of justice, equity, and good conscience would be violated, just as the allegations serve as the basis for the Fraud Act claim. The claim for unjust enrichment survives.[12]

## IV. Conclusion

Freeman's claims for injunctive relief (under the Fraud Act and the Deceptive Trade Practices Act) are dismissed for lack of Article III standing. But the claims for money damages under the Fraud Act and other states' consumer-protection statutes, as well as the claims for breach of warranty and unjust enrichment, all survive the motion to dismiss.

The parties shall confer and file a joint initial status report, R. 9, setting forth a proposed discovery schedule, by April 1, 2021. The tracking status hearing of March 26 is reset to April 9, 2021, at 8:30 a.m., but to track the case only (no appearance is

---

[12]MAM also argues that Freeman has not identified which State's law applies to the unjust enrichment claim. Def.'s Mot. at 25. On her individual claim, there is no great mystery given that she is an Illinois citizen who made the purchases at an Illinois store.

required, the case will not be called). Instead, the Court will review the joint status report and set the discovery schedule based on it.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: March 23, 2021