**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DOMINIQUE FREEMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MAM USA CORPORATION,<br><br>Defendant. | Case No.: 1:20-cv-01834<br><br>Honorable Edmond E. Chang |

**PLAINTIFF'S OMNIBUS REPLY MEMORANDUM OF LAW (1) IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION; (2) IN OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE PLAINTIFF'S EXPERTS; AND (3) IN SUPPORT OF PLAINTIFF'S MOTIONS TO EXCLUDE, IN ITS ENTIRETY, THE OPINIONS OF DEFENDANT'S EXPERT PROFESSOR DAVID GAL, Ph.D., AND, IN PART, THE OPINIONS OF DEFENDANT'S EXPERT ASSISTANT PROFESSOR ISABELLE CHASE, DDS, FRCD(C)**

**[REDACTED VERSION FILED ON PUBLIC DOCKET]**

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The Packaging of MAM Pacifiers is Common to the Class ..... 2

II. There is Common Evidence as to the Interpretation of the Term "Orthodontic" ..... 3

III. Class Members Were Commonly Exposed to the Orthodontic Representations ..... 5

IV. Plaintiff Dominique Freeman ..... 6

LEGAL ARGUMENT ..... 8

V. LEGAL STANDARDS ..... 8

- A. Legal Standard for Class Certification ..... 8
- B. Legal Standard for Expert Opinions ..... 9

VI. THE ELEMENTS OF RULE 23 ARE SATISFIED ..... 9

- A. The Proposed Class is Ascertainable ..... 10
- B. Plaintiff's Claims are Typical ..... 14
  - 1. The Common Evidence Demonstrates Plaintiff is Typical of the Class ..... 15
  - 2. Dr. Jeffrey A. Dean is Qualified, and His Methodology is Scientifically Reliable and Will Assist the Trier of Fact ..... 17
    - (a) Dr. Dean's Opinions and their Applicability in this Case ..... 18
    - (b) Dr. Dean Used Sound Scientific Methodology to Reach His Opinions Regarding the Truth of "Orthodontic" Pacifiers ..... 18
    - (c) Dr. Dean's Conclusions Regarding the Impossibility of an "Orthodontic" Pacifier are Relevant to Determine if the Orthodontic Representations are Misleading to a Reasonable Consumer ..... 20
- C. Plaintiff Meets the Requirements to Establish Predominance Under Rule 23(b)(3) ..... 21
  - 1. Defendant Engaged in a Common Deceptive Practice ..... 23
  - 2. MAM's Packaging is Likely to Mislead a Reasonable Consumer, and is therefore Deceptive Under ICFA ..... 26
  - 3. Plaintiff Has Set Forth a Well-Established and Scientifically Reliable Methodology for Calculating a Price Premium Attributable to the Orthodontic Representations ..... 30
    - (a) Plaintiff's Experts' Proposed Methodologies are Sufficient at the Class Certification Stage ..... 32

(b) Conjoint Analysis Provides the Basis for the Marketplace Simulation, Which has Been Accepted as a Standard and Reliable Methodology Across Cases Nationwide for Measuring a Price Premium ..... 33

(c) Dr. J. Michael Dennis is Qualified, His Methodology is Scientifically Reliable, and Will Assist the Trier of Fact ..... 37

(d) Dr. Verlinda is Qualified, His Methodology is Scientifically Reliable, and Will Assist the Trier of Fact ..... 41

(i) Dr. Verlinda is Qualified ..... 42

(ii) Dr. Verlinda's Methodology is Scientifically Reliable and Based on Academic Standards ..... 42

A) Dr. Verlinda's Proposed Methodology ..... 43

B) Dr. Aron's Criticisms of Dr. Verlinda are Without Merit ..... 44

(iii) Dr. Verlinda's Opinions Will Assist the Trier of Fact ..... 47

VII. THE MULTI-STATE CLASS IS CERTIFIABLE ..... 48

VIII. PLAINTIFF'S AFFIRMATIVE MOTIONS TO EXCLUDE ..... 51

A. The Gal Report Should Be Excluded in its Entirety ..... 52

1. Dr. Gal Lacks the Requisite Qualifications to Opine on Conjoint Survey Analysis ..... 52

(a) By His Own Admission, Dr. Gal Lacks the Requisite Expertise to Offer Opinions as to Conjoint Survey Analysis ..... 53

(b) The Frequent Use of Conjoint Surveys by Defendant is Directly Contradicted by Dr. Gal's Testimony Regarding Their Utility ..... 55

2. Dr. Gal's Opinions Regarding Dr. Dean's Alleged Opinions As To Consumer Perception of the Orthodontic Representations Are Irrelevant and Cannot be Relied Upon to Assist the Trier of Fact ..... 56

3. Dr. Gal Fails to Support His Opinion Regarding Dr. Verlinda's Price Premium Estimate with Any Reliable Scientific Methodology ..... 57

B. Certain Opinions of Dr. Chase Should be Excluded ..... 58

CONCLUSION ..... 60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................21

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
No. 11–CV–01846–LHK, 2014 WL 976898 (N.D. Cal. 2014) ....................36

*Bakalar v. Vavra*,
237 F.R.D. 59 (S.D.N.Y. 2006) ....................10

*Bakov v. Consol. World Travel, Inc.*,
No. 15 C 2980, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019) ....................12

*Bartnett v. Abbott Labs.*,
483 F. Supp. 3d 787 (N.D. Ill. 2020) ....................49

*Beardsall v. CVS Pharmacy, Inc.*,
953 F.3d 969 (7th Cir. 2020) ....................27, 49

*Benson v. Newell Brands, Inc.*,
No. 19 C 6836, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) .................... *passim*

*Bielskis v. Louisville Ladder, Inc.*,
663 F.3d 887 (7th Cir. 2011) ....................9, 42

*Bieniek v. Cent. States, Southeast and Southwest Areas Health and Welfare and Pension Funds*,
No. 22 CV 6498, 2023 WL 4473018 (N.D. Ill. 2023) ....................49

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ....................34

*In re Broiler Chicken Antitrust Litig.*,
No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ....................21, 58

*Broomfield v. Craft Brew All., Inc.*,
No. 17-CV-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ....................22

*Brown v. Hain Celestial Grp., Inc.*,
No. C 11–03082 LB, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ....................34

*Butler v. Sears, Roebuck, and Co.*,
727 F.3d 796 (7th Cir. 2013) .................... *passim*

*Cardenas v. Toyota Motor Corp.*,
No. 18-22798-CIV, 2021 WL 5811741 (S.D. Fla. Dec. 6, 2021)....................................36, 45

*Ciappetta v. Kellogg Sales Co.*,
No. 21-CV-3545, 2022 WL 602505 (N.D. Ill. Mar. 1, 2022)................................................16

*Cole v. Keystone RV Co.*,
Nos. 80357-9 & 80366-8, 2021 WL 3111452 (W.D. Wash. at Tacoma July 22, 2021) .........49

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................................30, 35

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ..........................................................................33

*Custom Vehicles, Inc. v. Forest River, Inc.*,
464 F.3d 725 (7th Cir. 2006) .........................................................................................6

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) .........................................................................................8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)............................................................................................ *passim*

*DeBremaecker v. Short*,
433 F.2d 733 (5th Cir. 1970) .......................................................................................10

*Dunn v. Costco Wholesale Corp.*,
No. CV 21-1751-JFW, 2021 WL 4205620 (C.D. Cal. 2021)................................................36

*Dzielak v. Whirlpool Corp.*,
26 F. Supp. 3d 304 (D.N.J. 2014) ...............................................................................49

*Dzielak v. Whirlpool Corp.*,
No. 2:12–0089 (KM), 2017 WL 1034197 (D.N.J. Mar. 17, 2017)........................................33

*In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*,
No. 4:12-MD-2382 HEA, 2021 WL 5003102 (E.D. Mo. Oct. 28, 2021)...............................35

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
No. 17-MD-2785-DDC, 2020 WL 1180550 (D. Kan. Mar. 10, 2020)..................................32

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018)..................................................................................39

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
No. 14-CV-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017).......................................22, 33

*In re Folgers Coffee*,
No. 21-2984-MD-WBP, 2021 WL 7004991 (W.D. Mo. Western Div. Dec. 28, 2021)..........49

*Fox v. Riverview Realty Partners*,
No. 12-CV-9350, 2014 WL 1613022 (N.D. Ill. Apr. 22, 2014) ............................................21

*In re General Motors LLC Ignition Switch Litig.*,
407 F. Supp. 212 (S.D.N.Y. 2019) ..........................................................................................35

*Guido v. L'Oreal USA, Inc.*,
Nos. 2:11–cv–01067–CAS, 2:11–cv–05465–CAS, 2014 WL 6603730 (C.D. Cal. 2014)......33

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ....................................................................................36

*Hansen Beverage Co. v. Cytosport, Inc.*,
No. CV 09-0031-VBF, 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009)....................................39

*Howard v. Cook Cnty. Sheriff's Office*,
989 F.3d 587 (7th Cir. 2021) ...................................................................................................14

*Icon Enters. Int'l, Inc. v. Am. Prod. Co.*,
No. CV 04-1240 SVW, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ....................................38

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
609 F. Supp. 3d 942 (N.D. Cal. 2022) .....................................................................................35

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ...................................................................................................14

*Khoday v. Symantec Corp.*,
No. 11-180, 2014 WL 1281600 (D. Minn. March 13, 2014) .................................................33

*In re KIND LLC "Healthy and Natural" Litig.*,
627 F. Supp. 3d 269 (S.D.N.Y. 2022).......................................................................................41

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) ...........................................................................................21, 26, 27

*Kleen Prods. LLC v. Int'l Paper*,
No. 10 C 5711, 2017 WL 2362567 (N.D. Ill. May 31, 2017) ................................................43

*Korte v. Pinnacle Food Groups LLC*,
No. 17-CV-199-SMY, 2019 WL 4305464 (S.D. Ill. Sept. 11, 2019)..........................15, 16, 26

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..................................................................................................................53

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017) .......... 32

*Lagenford v. Skinnygirl Cocktails, LLC*,
306 F.R.D. 574 (N.D. Ill. 2014) .......... 13

*Lee v. Conagra Brands, Inc.*,
No. CV 17-11042-NMG, 2021 WL 3131536 (D. Mass. July 23, 2021) .......... 49

*In re: Lenovo Adware Litig.*,
No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. 2016) .......... 33

*Lewis v. Mercedes-Benz USA, LLC*,
530 F. Supp. 3d 1183 (S.D. Fl. 2021) .......... 49

*Lucent Techs., Inc. v. Microsoft Corp.*,
No. 07-CV-2000 H (CAB), 2011 WL 13101230 (S.D. Cal. Feb. 4, 2011) .......... 38

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) .......... 14, 17

*McKenna v. Wells Fargo Bank, N.A.*,
693 F.3d 207 (1st Cir. 2012) .......... 49

*McMorrow v. Mondelez Int'l, Inc.*,
No. 17-CV-2327-BAS, 2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) .......... 38

*Medeva Pharms. Mfg., Inc. v. Morton Grove Pharms., Inc.*,
No. 00 C 1689, 2000 WL 1644305 (N.D. Ill. Oct. 28, 2000) .......... 6

*Medism Ltd. v. BestMed LLC*,
861 F. Supp. 2d 158 (S.D.N.Y.) .......... 39

*Mednick v. Precor*,
320 F.R.D. 140 (N.D. Ill. 2017) .......... 22, 27

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .......... *passim*

*Microsoft Corp. v. Motorola, Inc.*,
904 F. Supp. 2d 1109 (W.D. Wash. 2012) .......... 33

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) .......... 49

*Mullins v. Direct Dig., LLC*,
795 F.3d 654 (7th Cir. 2015) .......... 10, 11, 12, 31

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) ....................35, 37

*Netlist, Inc. v. Diablo Techs., Inc.*,
No. 13-CV-5962, 2015 WL 1887261 (N.D. Cal. Apr. 24, 2015) ....................49

*In re NJOY, Inc. Consumer Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) ....................35

*O'Hara v. Diageo-Guinness, USA, Inc.*,
306 F. Supp. 3d 441 (D. Mass 2018) ....................49

*Oshana v. Coca–Cola Co.*,
472 F.3d 506 (7th Cir. 2006) ....................16

*Passman v. Peloton Interactive, Inc.*,
No. 19-cv-11711 (LJL) 2023 WL 3195941 (S.D.N.Y. May 2, 2023) ....................34, 40, 41

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010) ....................51

*Phillips v. Raymond Corp.*,
364 F. Supp. 2d 730 (N.D. Ill. 2005) ....................20

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*,
244 F. Supp. 3d 716 (N.D. Ill. 2017) ....................20

*Pinder v. 4716 Inc.*,
No. CV-18-02503-RCC, 2020 WL 6081498 (D. Ariz. Oct. 15, 2020) ....................38

*Price v. L'Oreal USA, Inc.*,
No. 17 CIV. 614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) ....................34, 35

*Reitman v. Champion Petfoods USA, Inc.*,
No. CV 18-1736-DOC, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019) ....................25

*Rikos v. Procter & Gamble Co.*,
No. 1:11-CV-226, 2014 WL 11370455 (S.D. Ohio June 19, 2014) ....................17, 26, 30

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) ....................16

*Saavedra v. Eli Lilly & Co.*,
No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ....................35

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ....................32

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009)....12, 51

*Sanchez-Knutson v. Ford Motor Co.*,
310 F.R.D. 529 (S.D. Fl. 2015)....34

*Schmude v. Tricam Indus., Inc.*,
556 F.3d 624 (7th Cir. 2009)....54

*Schultz v. Akzo Nobel Paints, LLC*,
721 F.3d 426 (7th Cir. 2013)....19

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015)....34

*In re Scotts EZ Seed Litig.*,
No. 12-CV-4727, 2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017)....39

*Shapiro v. Berkshire Life Ins. Co.*,
212 F.3d 121 (2d Cir. 2000)....49

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*,
259 F.R.D. 151 (N.D. Ill. 2009)....13

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000)....9, 32, 52, 58

*Song v. Champion Petfoods USA, Inc.*,
27 F.4th 1339 (8th Cir. 2022)....49

*Stevens v. Ford Motor Co.*,
No. 2:18-CV-00456, 2022 WL 19978265 (S.D. Tex. Sept. 29, 2022)....36

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013)....9, 21

*Suchanek v. Sturm Foods, Inc.*,
311 F.R.D. 239, 260 (S.D. Ill. 2015).... *passim*

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014).... *passim*

*In re Sulfuric Acid Antitrust Litig.*,
847 F. Supp. 2d 1079 (N.D. Ill. 2011)....32

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
902 F.3d 735 (C.A.7 (Ill.) 2018)....49

*Takeda Pharms. USA, Inc. v. Spireas*,
No. CV 17-0452, 2019 WL 9596536 (E.D. Pa. Sept. 4, 2019) ....................48

*Taylor v. Trapeze Mgmt., LLC*,
No. 0:17-cv-62262-KMM, 2019 WL 1977514 (S.D. Fla. Feb. 28, 2019)....................36

*In re Testosterone Replacement Therapy Prods*.,
No. 14 C 1748, 2017 WL 1836443 (N.D. Ill. May 8, 2017) ....................9

*Thomas J. Kline, Inc. v. Lorillard, Inc*.,
878 F.2d 791 (4th Cir. 1989) ....................53

*Toney v. Quality Res., Inc*.,
323 F.R.D. 567 (N.D. Ill. 218)....................12, 13

*In re Tropicana Orange Juice Mktg*.,
No. 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019)....................25

*Troutt v. Mondelez Glob. LLC*,
637 F. Supp. 3d 606 (S.D. Ill. 2022)....................17

*TV Interactive Data Corp. v. Sony Corp*.,
929 F. Supp. 2d 1006 (N.D. Cal. 2013) ....................33

*U.S. v. Boros*,
668 F.3d 901 (7th Cir. 2012) ....................21

*U.S. v. Chang*,
207 F.3d 1169 (9th Cir. 2000) ....................53, 54

*U.S. v. Pansier*,
576 F.3d 726 (7th Cir. 2009) ....................18

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn*.,
98 F. Supp. 729 (W.D. Va. 2000) ....................53

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Product Liability Litig*.,
500 F. Supp. 3d 940 (N.D. Cal. 2020) ....................35

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................14

*Weaver v. Champion Petfoods USA, Inc*.,
3 F.4th 927 (7th Cir. 2021) ....................28

*Weiner v. Snapple Beverage Corp*.,
No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ....................26

*West v. Carr*,
337 F.R.D. 181 (W.D. Wisc. 2020) ....................11

*Williams v. Illinois*,
567 U.S. 50 (2012) ....................36

*Zakaria v. Gerber Products Co*.,
No. LA CV15-00200 JAK, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) ....................35

*Zarinebaf v. Champion Petfoods USA Inc.*,
No. 18 C 6951, 2022 WL 910638 (N.D. Ill. Mar. 29, 2022) ....................36, 38, 39

*Zarinebaf v. Champion Petfoods USA Inc.*,
No. 18 C 6951, 2023 WL 2561613 (N.D. Ill. Mar. 17, 2023) ....................24, 25

*In re Zimmer Knee Implant Prod. Liab. Litig.*,
No. 11 C 5468, 2015 WL 5050214 (N.D. Il. Aug. 25, 2015) ....................20

*In re Zurn Pex Plumbing Prod. Liab. Litig*.,
644 F.3d 604 (8th Cir. 2011) ....................32

**Statutes and Other Authorities**

Mass. Gen. Laws ch. 93A § 9(3) ....................49

NY GBL § 349(h) ....................44

Fed. R. Civ. P. 23 ....................8, 10, 14

Fed. R. Civ. P. 23(a)(1) ....................9

Fed. R. Civ. P. 23(a)(2) ....................9

Fed. R. Civ. P. 23(a)(3) ....................14

Fed. R. Civ. P. 23(a)(4) ....................9

Fed. R. Civ. P. 23(b)(3) ....................9

Fed. R. Evid. 401 ....................20

Fed. R. Evid. 403 ....................56

Fed. R. Evid. 702 ....................20, 54

Fed. R. Evid. 702(a) ....................56

Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:2 (11th ed. 2014) ....................10

Merriam-Webster Dictionary....................................................................................................4

William B. Rubenstein, *Newberg on Class Actions* § 3:3 (5th ed. 2015).....................................10

# GLOSSARY OF TERMS

| TERM | DESCRIPTION |
|---|---|
| Class, Classes | As defined in the Motion for Class Certification, Section III.B. Unless otherwise specified, all references to "Classes" or the "Class" refer collectively to the Multi-State Consumer Protection Class and the Illinois Class. |
| Class Period | As defined in the Motion for Class Certification, Section III.B. |
| Complaint | Plaintiff's Complaint, ECF No. 1 (cited as "Compl. ¶ ___"). |
| Dean Report | Expert Report of Dr. Jeffrey Dean, ECF No. 111-3 (cited as "Dean Report ¶ ___"). |
| Dean Rebuttal Report | Expert Report (Rebuttal) of Dr. Jeffrey Dean, filed concurrently herewith as Weiner Ex. 1 (cited as "Dean Rebuttal Report ¶ ___"). |
| Defendant | Defendant MAM USA Corporation |
| Dennis Report | Expert Report of Dr. J. Michael Dennis, ECF No. 111-4 (cited as "Dennis Report ¶ ___"). |
| Dennis Rebuttal Report | Expert Report (Rebuttal) of Dr. J. Michael Dennis, filed concurrently herewith as Weiner Ex. 2 (cited as "Dennis Rebuttal Report ¶ ___"). |
| Dennis Dep. | Deposition of Dr. J. Michael Dennis, dated April 23, 2023, filed concurrently herewith as Weiner Ex. 4 (cited as "Dennis Dep. Page:Line"). |
| Freeman Dep. | Deposition of Plaintiff Dominique Freeman taken on April 12, 2022, filed concurrently herewith as Weiner Ex. 5 (cited as "Freeman Dep. Page:Line"). |
| ICFA | Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. |
| Motion or Motion for Class Certification | Plaintiff's Motion for Class Certification, ECF No. 110, and Memorandum of Law in support thereof, ECF No. 111 (cited as "Mot. at ___"). |
| Opposition | Defendant MAM USA Corporation's Memorandum in Opposition to Plaintiff's Motion for Class Certification, ECF No. 138 (cited as "Opp. at ___"). |
| Orthodontic Pacifiers or Class Products or Products | All MAM-branded pacifiers listed in Mot. Ex. 3 (ECF No. 111-1 at 30). |
| Orthodontic Representations | "Orthodontic nipple promotes proper oral development," "orthodontically correct pacifiers" and "orthodontic nipple." |
| Plaintiff | Plaintiff Dominique Freeman |
| Rule | Federal Rule(s) of Civil Procedure. |
| Verlinda Report | Expert Report of Dr. Jeremy Verlinda, ECF No. 111-5 (cited as "Verlinda Report ¶ ___"). |
| Verlinda Rebuttal Report | Expert Report (Rebuttal) of Dr. Jeremy Verlinda, filed concurrently herewith as Weiner Ex. 3 (cited as "Verlinda Rebuttal Report ¶ ___"). |

| TERM | DESCRIPTION |
|---|---|
| Kohles Rebuttal Report | Expert Report (Rebuttal) of Dr. Sean S. Kohles, filed concurrently herewith as Weiner Ex. 15 (cited as “Kohles Rebuttal Report ¶ ___”). |
| Weiner Declaration | Declaration of Melissa S. Weiner in Support of Plaintiff’s Motion for Class Certification, filed concurrently herewith (cited as “Weiner Decl. ¶ ___” or “Weiner Ex. #”). |
| Aron Report | Expert Report of Dr. Debra J. Aron, ECF No. 139-20 (cited as “Aron Report ¶ ___”). |
| Aron Dep. | Deposition of Debra Aron, Ph. D., dated July 26, 2023, filed concurrently herewith as Weiner Ex. 6 (cited as “Aron Dep. Page:Line”). |
| Chase Report | Expert Report of Assistant Professor Isabelle Chase, DDS, FRCD(C), ECF No. 139-12 (cited as “Chase Report ¶ ___”). |
| Chase Dep. | Deposition of Dr. Isabelle Chase, dated August 25, 2023, filed concurrently herewith as Weiner Ex. 13 (cited as “Chase Dep. Page:Line”). |
| Gal Report | Expert Report of Dr. David Gal, Ph.D., ECF No. 139-32 (cited as “Gal Report ¶ ___”). |
| Gal Dep. | Deposition of Dr. David Gal, Ph.D., dated July 2, 2023, filed concurrently herewith as Weiner Ex. 7 (cited as “Gal Dep. Page:Line”). |

By Order of the Court (ECF No. 117), Plaintiff, individually and on behalf of all others similarly situated, hereby submits this reply memorandum (1) in support of her Motion (ECF No. 110); (2) in opposition to Defendant's motions to exclude the expert testimony and opinions of Plaintiff's experts (ECF No. 138); and (3) to strike/exclude the expert testimony of Defendant's expert, Dr. Gal, in its entirety, and of Assistant Professor Isabelle Chase, DDS, FRCD(C), in part.[1]

## INTRODUCTION

Defendant has attempted to turn Plaintiff's Motion for Class Certification into a motion on the merits of the case. Plaintiff, however, is not required to prove her case at the class certification stage. Instead, she must merely establish that class treatment is proper. Plaintiff has easily met that burden, and Defendant's premature or cherry-picked arguments to the contrary carry no weight. As demonstrated in Plaintiff's opening brief and below, common evidence supports Plaintiff's claims that reasonable consumers were misled by Defendant's uniform deception on the labels of its Orthodontic Pacifiers. The common evidence further demonstrates Plaintiff and reasonable consumers purchased the Orthodontic Pacifiers—and paid a premium for the Orthodontic Representations—as they (reasonably) believed the Orthodontic Pacifiers would have a positive impact on their children's oral development. Critically, the common evidence also demonstrates that the Orthodontic Pacifiers do not, in fact, promote oral development and-—worse—they cause dental malocclusions.

As a result of Defendant's deceptive conduct, Plaintiff and all those similarly situated have been injured insofar as they purchased the Orthodontic Pacifiers and paid a premium due to the false Orthodontic Representations. As detailed below, class certification is appropriate.

[1] Plaintiff will also oppose the pending motion for summary judgment (ECF No. 142). That opposition is due to be filed on October 24, 2023 (*see* ECF No. 155). To the extent any arguments made in the class certification context are better addressed on summary judgment, Plaintiff will so state and hereby incorporates any such arguments from the forthcoming opposition here.

## BACKGROUND

### I. The Packaging of MAM Pacifiers is Common to the Class

Defendant ignores the objective Class definition and attempts to confuse the record by cherry picking label statements on pacifiers outside of the Class Products to paint a blurry picture of its labeling scheme. *See* Opp. at 8. However, the common evidence supports Plaintiff's claims that, since the company's inception, Defendant set out to create and sell pacifiers "[redacted]," Mot. Ex. 3 (ECF No. 111-1 at 30), and the Class Products' labeling clearly promotes that mission. In fact, Defendant agrees it is "committed to promoting oral health" through its pacifiers. Opp. at 6. And, it conveyed that message uniformly via the Orthodontic Representations during the Class Period. Compl. ¶ 28; Mot. Ex. 3 (ECF No. 111-1 at 30); Aron Report Exs. 4, 5. The only potential nuance is that Defendant removed the Orthodontic Representation from a small number of the Orthodontic Pacifiers for short periods of time. But, this is of no impact as Plaintiff only includes in the Class the Orthodontic Pacifiers **with an Orthodontic Representation** during the Class Period, thereby removing any pacifier that did not contain the Orthodontic Representation.[2]

With respect to the list of Orthodontic Pacifiers, Defendant's expert does not dispute that (1) any MAM Air Pacifier 2-pack sold from 2016 through 2022 contained at least one of the Orthodontic Representations on the front of the packaging; (2) any MAM original pacifier 2-pack sold from 2014 through 2022 contained at least one of the Orthodontic Representations on the front of the packaging; (3) any MAM original pacifier 2-packs + clip packages sold from 2014

[2] However, for the avoidance of doubt, Plaintiff proffers an alternative class definition that only includes orthodontic pacifiers, during the relevant periods, that *always* contained an Orthodontic Representation (which is confirmed by Dr. Aron, *see* Aron Report Ex. 4).The alternative class definition mirrors the proposed class definitions in Plaintiff's Motion, except: (1) the list of Orthodontic Pacifiers would be replaced with the list at Exhibit 8 to the Weiner Declaration; and (2) the Class Period would be defined as follows: from 2016 through 2022 for MAM Air pacifier 2-pack; 2014 through 2022 for MAM original pacifier 2-packs; and from 2014 through 2022 for MAM original pacifier 2-packs + clip packages.

through 2022 contained at least one of the Orthodontic Representations on the front of the packaging; (4) any MAM original Day & Night pacifier 3-packs sold from 2015 through 2018 contained at least one of the Orthodontic Representations on the front of the packaging; (5) any MAM pacifier from the Night, Stripes, Joy, or Clear Collections sold from 2015 through 2018 contained at least one of the Orthodontic Representations on the front of the packaging; (6) any MAM Air Night 6+ month sold from 2016 through 2018 contained at least one of the Orthodontic Representations on the front of the packaging; and (7) any MAM Night and Day 16+ month sold from 2017 and 2018 contained at least one of the Orthodontic Representations on the front of the packaging. Mot. Ex. 3 (ECF No. 111-1 at 30); Aron Report Exs. 4, 5. There are only seven products out of the initial list of 49 Orthodontic Pacifiers that did not always include one of the Orthodontic Representations during the Class Period. That is easily resolved—to the extent necessary—with a slight modification to the class definition as proposed in Exhibit 8 to the Weiner Declaration.

## II. There is Common Evidence as to the Interpretation of the Term "Orthodontic"

Contradicting one of its core business strategies, Defendant argues there is no common understanding of "orthodontic." That argument is contrary to both common sense and Defendant's own internal documents. Indeed, Defendant's own documents confirm that it sought to link the term orthodontic to a child's healthy oral development. Specifically, in a document entitled, "[redacted]"

Weiner Ex. 16, MAMUSA_0058644 (emphasis added). That message is communicated on the Products' labels through the Orthodontic Representations. Mot. Ex. 3 (ECF No. 111-1 at 30). Furthermore, there is other substantial evidence demonstrating the common understanding of "orthodontic" by reasonable consumers because the word itself has one meaning, derived from "ortho," meaning straight or erect, and "dont," meaning teeth. Dean Report ¶ 15. Indeed, the

dictionary defines orthodontics, as a "branch of dentistry dealing with irregularities of the teeth (such as malocclusion) and their correction (as by braces)." *See* Merriam-Webster Dictionary, "orthodontics," (last accessed September 7, 2023).

Having spent decades advertising its pacifiers as "orthodontic" and taking advantage of this common definition, Defendant now cherry-picks incomplete quotations attempting to show that purchasers understand the term "orthodontic" to refer *exclusively* to the *shape* of the baglet of the pacifier. *See* Opp. at 34.[3] Doing so, Defendant ignores common evidence and its own internal marketing studies that demonstrate the claimed orthodontic benefits of Defendant's pacifiers are a motivating factor in consumers' purchasing decisions and, additionally, the term "orthodontic" is widely understood to refer to the promotion of oral health. *See* Mot. Exs. 12 at 9825 (ECF No. 112-4-7); 13 at 16326 (ECF No. 112-8); 14 at 7873 (ECF No. 112-9); 15 at 102315 (ECF No. 112-10-12). Indeed, in 2019, [redacted] Mot. Ex. 16 (ECF No. 112-13, "[redacted]"). The common

[3] Defendant presents a cherry-picked and biased interpretation of the customer contact records. [redacted]" *Id.* at 21, 60, 122. Nevertheless, these customer contacts are in no way conclusive as to the reasonable consumer's understanding of "orthodontic"—a question ultimately for the jury. *See also* Weiner Ex. 10, MAMUSA_0037571 ([redacted]).

evidence more than supports Plaintiff's reasonable—and obvious—proffer of the consumer's understanding of "orthodontic."

Defendant similarly mischaracterizes the record as to Plaintiff's experiences. Plaintiff, like other members of the putative class, made purchasing decisions believing in Defendant's illusory claims of "orthodontic" benefits. As set forth in Section IV, below, the record evidence shows Plaintiff purchased Defendant's Orthodontic Pacifiers because of her mistaken belief that MAM pacifiers were beneficial or less harmful to her child's oral development as compared to other pacifiers. Plaintiff believed, falsely, that the Products provided oral health benefits.

In contrast, the evidence Defendant proffers to refute the common evidence regarding the common understanding of the Orthodontic Representations comes by way of (1) MAM's self-serving expert report of Dr. Chase (*see* Section VIII.B below); (2) the Declaration of MAM's former Chief Executive Officer and current advisory board member of Defendant, Fritz Hirsch (ECF No. 139-3); and (3) an inference drawn through the alleged absence of plaintiff's allegations in customer contacts produced in discovery. Opp. at 9. [redacted]. Chase Report ¶ 24. This non-documentary evidence (unrelated to the common understanding by consumers) stands in stark contradiction to the plethora of common evidence in this case connecting the Orthodontic Representations with the promotion of oral development.

## III. Class Members Were Commonly Exposed to the Orthodontic Representations

Defendant claims that consumers have unique shopping experiences when purchasing the Orthodontic Pacifiers. Not so. To paint this misleading picture, Defendant produced images for: (1) MAM pacifiers that were **never** included in the list of Orthodontic Pacifiers since they did not have the misleading Orthodontic Representations, *see* Becker Decl. Exs. 6, 9, 10, 11, 21, 25, 28,

29; *see also* Aron Report, Exs. 6; (2) a small sample of MAM Night and MAM Air Night pacifiers that for limited time periods did not include the Orthodontic Representations[4], *see* Becker Decl. Exs. 8, 19, 22, 23, 24, 26; and (3) the corresponding shopping experiences for the pacifiers that did not have the Orthodontic Representations. *See* Aron Report, Exs. 6-10. Additionally, even the irrelevant Amazon.com product pages Defendant submits include statements promoting oral development in the "Product Description" page. *See* Opp. at 10-11. Furthermore, Plaintiff's Class Definition specifically limits, objectively, the Orthodontic Products to only those MAM pacifiers that contained one of the three functionally similar Orthodontic Representations promoting oral development on the front of its packaging, statements akin to those found on the Amazon "Product Description" of the MAM pacifiers discussed in Section I above. *See also* Section VI.A below.[5]

## IV. <u>Plaintiff Dominique Freeman</u>

Defendant's recitation of the "Facts Specific to Plaintiff" omits significant details regarding Plaintiff's purchase history and reliance on Defendant's Orthodontic Representations. Plaintiff Dominque Freeman thoughtfully selected Defendant's orthodontic pacifiers for exclusive use for her children from birth due to the Orthodontic Representations on the front of the pacifier packaging. Freeman Dep. 69:15-70:4; 81:8-82:2; 219:11-17; *see also* 19:2-4 (Plaintiff purchased Defendant's pacifiers for her youngest child "for the four years that [her] toddler has been on this

[4] The Class only includes Orthodontic Pacifiers **that include the Orthodontic Representations**, so these pacifiers are likewise not in the Class.

[5] Defendant's physical evidentiary submissions to the Court (*see* Opp. at p. 6, n.5), which include alleged exemplar pacifier Products, should be disregarded because they are improper. *See Medeva Pharms. Mfg., Inc. v. Morton Grove Pharms., Inc.*, No. 00 C 1689, 2000 WL 1644305, at *1 (N.D. Ill. Oct. 28, 2000); Local Rule 26.3, Discovery Materials Offered in Evidence as Exhibit. Plaintiff recognizes that motions to strike are "strongly disfavored" in this Circuit (*see Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006)) and Court (Local Rule 56.1(e)(2), Response to Statement of Facts), however, Plaintiff believes such a motion is appropriate here due to the improper nature of the submission. Counsel have met and conferred on this issue and Defendant has refused to withdraw the improper evidentiary submissions. Therefore, Plaintiff respectfully requests that the Court disregard the pacifier Products submitted by Defendant and strike any arguments related thereto.

earth."). Plaintiff always purchased the pacifiers according to the age ranges that corresponded to the ages of her children, which are prominently listed on the front of the packaging, *id*. 72:22-73:2; 81:22-82:2; 123:1-15; 226:13-19; 292:2-5, and over the course of her children's use of the pacifiers, she believes she purchased pacifiers from all of the MAM collections. *Id.* 18:18-20:6. She recalls the "orthodontic" claim in conjunction with language regarding "promoting healthy or -- oral health[6]." *Id.* 222:9-15. She explained, clearly, that the "orthodontic benefit" meant "that the MAM pacifier actually promotes good oral health." *Id.* 240:6-9.

While Plaintiff purchased a wide variety of Defendant's pacifier collections, *id*. at 18:21-19:1, she started purchasing the Orthodontic Pacifiers because she thought "they . . . wouldn't cause any damage or harm to [her] child's health." *Id.* 20:22-24, 70:2-4 ("[T]hey also said that they were good for their oral health so they wouldn't mess up their teeth; what I believed to be wouldn't mess up their teeth."); *see also* Compl. ¶¶ 8, 20; Freeman Dep. 20:22-24; 69:15-70:4; 321:2-11; Weiner Ex. 11, Documents from Plaintiff's Document Production, FREEMAN0012, 14 (purchase slips from Target denoting purchase of MAM "Orthodontic" pacifiers).

Given that Plaintiff purchased many pacifiers over the course of many years, it is not surprising she cannot recall exactly which collections she purchased. However, she did provide meaningful real-world information regarding the purchases in her deposition such as (1) specific recollection of orthodontic appearing on the front of the packaging, Freeman Dep. 321:2-4; (2) a small gold seal being on the front of the packaging, *id*. 321:5-11; (3) other characteristics of the box, 221:19-222:5 (noting the packaging was blue and white), 230:21-23 (noting some of the pacifiers listed "soft silicone" on the packaging), 231:10-11 (noting the box said BPA or BPS free); (4) and defining characteristics of the pacifiers purchased, 69:24-70:1 (noting the pacifiers had

[6] Defendant cherry picks testimony at the end of Plaintiff's deposition in boldly concluding that Plaintiff did not understand the meaning of orthodontic. *See* Opp. at 33. The cited testimony demonstrates otherwise.

clips), 232:23-233:3 (noting some of the pacifiers purchased glowed in the dark). Additionally, Plaintiff confirmed she purchased the Air collection during the Class Period,[7] *id.* 228:15-229:3, and her purchases were typically two-packs. *Id.* 237:5-18; Freeman's Supp. Answers to 1st Interrogatories, Weiner Ex. 12. These details provide the requisite reliability for Plaintiff's recall of the orthodontic claim on the packaging of the pacifiers she purchased and confirmation that she purchased the Orthodontic Pacifiers during the Class Period.[8] Had Plaintiff known the truth about Defendant's misrepresentations and deceptive conduct, she would have paid less for the pacifiers. *Id*. 305:6-18; *see also* Compl. ¶¶ 17, 20, 87, 124.

## LEGAL ARGUMENT

## V. LEGAL STANDARDS

### A. Legal Standard for Class Certification

The principal inquiry at class certification is whether evidence common to all class members can be used to <u>prove or disprove</u> Plaintiff's central allegations. Plaintiffs bear the burden of showing by a preponderance of the evidence that their proposed class satisfies the Rule 23 requirements. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "Rule 23 is more than 'a mere pleading standard,' and the court must satisfy itself with a 'rigorous analysis' that the prerequisites of certification are met, even if that analysis has 'some overlap with the merits of the plaintiff's underlying claim.'" *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *1 (N.D. Ill. Nov. 16, 2021).

[7] The Air collection always contained an Orthodontic Representation during the Class Period, and her children used pacifiers from the years 2017 to 2019. *See* Freeman Declaration, Mot. Ex. 4 (ECF No. 111-1), ¶ 3; *see also* Weiner Ex. 8.

[8] It is Plaintiff's practice to wean her children off pacifiers at twenty-four months, *id*. 140:22-24, and she estimates that she purchased her last pacifier from Defendant in October 2019, *id*. 145:22-147:2; *see also id*. 323:6-9 (discussing Plaintiff's youngest child's age).

However, "in conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *See Messner*, 669 F.3d at 811.

### B. <u>Legal Standard for Expert Opinions</u>

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 588 (1993), the Supreme Court stated that a "rigid 'general acceptance' requirement [of opinion testimony] would be at odds with the liberal thrust of the Federal Rules" and their general approach of relaxing the traditional barriers to the admission of opinion testimony. There are three requirements for expert testimony admissibility (1) the expert must be qualified, (2) his or her methodology(ies) must be scientifically reliable, and (3) the proffered testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue,'" an inquiry sometimes referred to as relevance or fit. *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 893 (7th Cir. 2011) (citation omitted).

Ultimately, "it is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith v. Ford Motor Co*., 215 F.3d 713, 719 (7th Cir. 2000); *Stollings v. Ryobi Techs., Inc*., 725 F.3d 753, 768 (7th Cir. 2013) ("[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."). Courts are generally reluctant to exclude expert testimony unless it is critically deficient in some way. *See In re Testosterone Replacement Therapy Prods*., No. 14 C 1748, 2017 WL 1836443, at *13 (N.D. Ill. May 8, 2017) (citing *Daubert*, 509 U.S. at 596).

## VI. <u>THE ELEMENTS OF RULE 23 ARE SATISFIED</u>

Defendant does not challenge Plaintiff's arguments regarding numerosity (Fed. R. Civ. P. 23(a)(1)), commonality (Fed. R. Civ. P. 23(a)(2)), adequacy (Fed. R. Civ. P. 23(a)(4)), or superiority (Fed. R. Civ. P. 23(b)(3)).

### A. <u>The Proposed Class is Ascertainable</u>

Rule 23 requires that "classes be defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015) (citing *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012)); *Bakalar v. Vavra,* 237 F.R.D. 59, 64 (S.D.N.Y. 2006); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (*per curiam*); William B. Rubenstein, *Newberg on Class Actions* § 3:3 (5th ed. 2015); Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:2 (11th ed. 2014)). The ascertainability requirement in the Seventh Circuit is a "weak" criteria that focuses "on the adequacy of the class definition itself" and "not . . . on whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id*. (citing *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 495 (7th Cir. 2012); *Oshana v. Coca–Cola Co*., 472 F.3d 506, 513 (7th Cir. 2006) (stating the class definition "must be definite enough that the class can be ascertained"); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980)).

In *Mullins*, the Seventh Circuit identified three scenarios in which a class definition may fail for lack of ascertainability. *Id*. at 659-60. The first scenario where a proposed class fails is vagueness—"to avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id*. at 660. The second scenario occurs when "classes are defined by subjective criteria, such as by a person's state of mind," this ascertainability issue can be avoided "by defining the class in terms of conduct (an objective fact) rather than state of mind." *Id*. at 660 (citing *Nat'l Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 358-59 (N.D. Ill. 1997), and *Newberg on Class Actions* § 3:5). The third, and final, scenario concerns "classes that are defined in terms of success on the merits" this ascertainability issue can be avoided by defining "the class so that membership does not depend on the liability of the defendant." *Id*.

None of the Class definitions in this case suffer from any of these infirmities. The Class definitions are sufficiently precise, objectively defined (a Class member either purchased an Orthodontic Pacifier or did not) and are limited to purchasers of specific MAM-branded Orthodontic Pacifiers bearing the substantially similar Orthodontic Representations, which Defendant itself acknowledged are top driving attributes for purchase.[9]

Second, the Class definitions do not involve subjective criteria and are defined in terms of conduct. The Classes are defined by the objective actions of both Class members and Defendant. Members of the Class are required to have "purchased" the subject Orthodontic Pacifiers in specific locations. *See* Compl. ¶¶ 95-101. This does not require any subjective determinations—either the Class member purchased the Orthodontic Pacifiers in the enumerated geographic location(s), making them a member of the Class, or they did not, excluding them from the Class. Defendant's conduct is equally straightforward and objective—either the labels included an Orthodontic Representation[10] or they do not. Neither the Class members' nor Defendant's conduct require any subjective determinations and are based on clear objective facts just as the Seventh Circuit in *Mullins* required. *See, e.g.*, *West v. Carr*, 337 F.R.D. 181, 187 (W.D. Wisc. 2020) ("[A]

[9] Nor is the Class overbroad—as Defendant argues—because Dr. Dean has allegedly only opined that pacifiers are not beneficial for oral health "past the age of 24 month." Opp. at 19. This grossly distorts Dr. Dean's expert opinions, which address the central question of whether *any* pacifier can be "orthodontic." *See* Dean Rebuttal Report ¶ 2 ("no pacifier is orthodontic because they do not promote oral development or prevent bite problems . . . use of the term orthodontic wrongly implies they will assist with or promote healthy oral development or prevent dental malocclusions"). The fact that Dr. Dean's conclusions in that regard are based on the proven fact that prolonged use of any pacifier past 18 to 24 months increases the risk of malocclusions (which Defendant does not dispute) does not mean his opinions are limited to that age range (they are not). Rather, that conclusion forms the basis that calling any pacifier "orthodontic" is false and misleading because all pacifiers can and will cause harm, in precisely the same way.

[10] Plaintiff and Defendant agree that the Orthodontic Products all contained the Orthodontic Representations with the exception of the MAM Original Day & Night 0-6, the MAM Day & Night 6+, MAM Pacifiers from the Night, Stripes, Joy or Clear Collection, and the MAM Air Night 6+ (only seven of the 49 total products included on Plaintiff's initial list of Class Products), and the Class Definition includes the clause **with an Orthodontic Representation** in order to ensure that every Orthodontic Product purchased by a Class member contained an Orthodontic Representation. For the avoidance of doubt, Plaintiff offers a revised list of Orthodontic Pacifiers that, indisputably, always contained an Orthodontic Representation during the Class Period. *See* Weiner Ex. 8.

class is ascertainable when defined by objective criteria that are administratively feasible, without a subjective determination." (internal citation omitted)).

Third, the class is not a "fail-safe" class in which class membership is determined by success on merits. As is evident from the extensive briefing herein, there are contestable issues that will determine if the Class members' claims succeed or fail. These determinations have nothing to do with determining if a person would be included in the Classes proposed. *See Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 581 (N.D. Ill. 218) (finding no fail-safe class where "liability and class membership are not coterminous").

The Class definitions are sufficiently precise and are limited to purchasers of specific MAM-branded Orthodontic Pacifiers bearing substantially similar Orthodontic Representations, which Defendant itself acknowledged are top driving attributes for purchase. For these reasons, the Classes are properly defined with reference to objective criteria. *See Saltzman v. Pella Corp.*, 257 F.R.D. 471, 476 (N.D. Ill. 2009).

Defendant contends (1) the Class is overbroad due to differences in the labels of the Products, and (2) there are issues concerning Class members' ability to determine if they are in the Class. Defendant's arguments are both misplaced.[11] At this stage of the case, "[t]he court need not ascertain 'absent class members' actual identities . . . ." *Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659, *18 (N.D. Ill. Mar. 21, 2019) (quoting *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012)); *see also Mullins*, 795 F.3d at 658. Rather, all that is required is that the class not include "a great number of members who for some reason

[11] Since the Seventh Circuit in *Mullins* adopted a "weak" ascertainability requirement, considerations of overbreadth regarding a class are more properly considered in other areas of the Rule 23 analysis. *See Mullins*, 795 F.3d at 672 ("Those concerns are better addressed by a careful and balanced application of the Rule 23(a) and (b)(3) requirements, keeping in mind under Rule 23(b)(3) that the court must compare the available alternatives to class action litigation."). Nevertheless, since Defendant raises it in this section, Plaintiff will respond.

could not have been harmed by the defendant's allegedly unlawful conduct[,]" *Messner*, 669 F.3d at 824, and there be an objective way to eventually identify class members. *See Lagenford v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 579 (N.D. Ill. 2014).

"[M]any courts, including this one, have certified classes under nearly identical circumstances, where the identities of individual class members were not yet ascertained." *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 259 F.R.D. 151, 160 (N.D. Ill. 2009). This is particularly true in cases alleging consumer fraud due to the low-value of individual claims. *See Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 260 (S.D. Ill. 2015) ("[T]he costs of imposing the [heightened ascertainability] requirement are high because it erects a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims, namely low-value consumer class actions . . . .").

Similarly, Defendant's speculative argument that Class members may be unable to identify qualifying purchases is unavailing. At the class certification stage, "the inquiry does not require plaintiff to demonstrate that there is a reliable and administratively feasible way to identify all who fall within the class definition. Instead, for [plaintiff's] class to be ascertainable, it cannot be defined too vaguely, defined by subjective criteria, or defined in terms of success on the merits thereby creating a 'fail-safe class.'" *Toney*, 323 F.R.D. at 581 (multiple internal citations omitted). Thus, this argument is inapplicable as well.[12]

[12] *See Benson*, 2021 WL 5321510, at *8 (noting *Mullins* rejected the reasoning in *Carrera* and *Langendorf* for requiring more than affidavits from putative class members as it "does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements."). Defendant suggests (Mot. at 23 n.8) this Court should not rely upon *Benson*, which the court likened to *Suchanek*, because in *Benson*, like *Suchanek*, all products had the allegedly misleading language. However, that is also true here, where *only* products that contain an Orthodontic Representation are included in the Class.

Since Plaintiff proposes an ascertainable class under Seventh Circuit jurisprudence, Defendant's arguments regarding overbreadth and possible difficulty identifying some Class members are irrelevant and do not set forth a rationale to deny class certification.

### B. Plaintiff's Claims are Typical

Rule 23 requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality 'is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large.'" *Howard v. Cook Cnty. Sheriff's Office*, 989 F.3d 587, 605 (7th Cir. 2021) (quoting *Lacy v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir. 2018)). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)). "'[T]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Wal-Mart Stores*, 564 U.S. at 349 n.5 (quoting *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58 n.3 (1982)).

"When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012). In cases where a class is composed of purchasers of different products that have a common misleading label, "[t]ypicality is satisfied . . . because plaintiffs and the proposed class members are subject to the same alleged practice—defendants' uniform labeling of their pacifiers—and their claims are based on the same legal theory

that the labeling was deceptive." *Benson*, 2021 WL 5321510, at *3; *see also Butler v. Sears, Roebuck, and Co.*, 727 F.3d 796, 798, 800 (7th Cir. 2013); *Suchanek*, 311 F.R.D. at 255.

Here, Plaintiff's claims are typical of the putative Classes' because they are based on the same legal theories and the same course of conduct—namely, Defendant's uniform misrepresentations. Defendant's conduct, as detailed in the Complaint and this Motion, was uniform across all Orthodontic Pacifiers. That a particular Plaintiff or Class member purchased a certain style of Orthodontic Pacifier is of no consequence as all Orthodontic Pacifiers at issue in this Motion displayed the substantially similar Orthodontic Representations.

1. The Common Evidence Demonstrates Plaintiff is Typical of the Class

Defendant creates a fantastic burden at the class certification stage that would require Plaintiff to produce additional class members to affirm Plaintiff's allegations. Defendant's concerns regarding Plaintiff's understanding of the Orthodontic Representations and how it may or may not comport exactly with each member of the Classes is irrelevant at class certification stage. Rather, the common evidence supports Plaintiff's understanding of "orthodontic" as used on the Orthodontic Pacifiers, which more than satisfies her burden at this stage. *See* Section II above. Defendant's reliance on *Korte v. Pinnacle Food Groups LLC*, is misplaced. No. 17-CV-199-SMY, 2019 WL 4305464 (S.D. Ill. Sept. 11, 2019); Opp. at 23. *Korte* concerned a defendant's representations that its Wish-Bone branded salad dressing was "E.V.O.O. – Dressing made with extra virgin olive oil," which plaintiff claimed was false and misleading. *Id*. at *1. At the time of purchase, plaintiff alleged he believed the dressing contained EVOO, seasonings, and vinegar, but not any other oils or water. *Id*. at *2. To support his claim that the defendant's label was misleading to other consumers, the plaintiff merely relied upon (1) a list of 5 "complaints" about Wish-Bone's EVOO salad dressing from consumers, and (2) expert opinions lacking any reliable evidence as to

a consumer's belief that the label was deceptive. *Id*. at *5. The evidence—essentially 5 "complaints" was insufficient to meet the typicality requirement. *Id.*

Here, Plaintiff relies upon a litany of evidence establishing the common understanding of the Orthodontic Representations and their deceptive nature given their inability to promote oral development. *See* Section II above. Certainly, this is not a case where Plaintiff appears "to be the only person in million-plus class that believed defendant deceived consumers." *Oshana*, 472 F.3d at 514. To the contrary, as described herein in great detail, Plaintiff and Class members claims "arise[] from the same event or practice or course of conduct that gives rise to the claims [] and ... [the] claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Even if Plaintiff and the Class members have slightly differing perceptions of the Orthodontic Representations or motivations for ultimately purchasing the pacifiers (which they arguably do not), they were all exposed to the same underlying conduct (the labeling) of the Orthodontic Pacifiers. *See Suchanek*, 311 F.R.D. at 255-56 (variations of consumer perceptions of product packaging or their motivation for purchasing the products does not mean their claims are atypical of the class.).

In fact, it is Defendant who attempts to use a negative inference vis-à-vis a snapshot of unhelpful customer complaints to demonstrate the lack of a common definition for "orthodontic." Defendant's attempts to focus on idiosyncratic understandings of the term "orthodontic" or other highly individualized arguments are irrelevant because in an action under the consumer protection statutes at issue, the central question is the understanding of a reasonable consumer. To establish typicality under these statutes, a Plaintiff merely needs to show that she interpreted the subject labels in the way a typical consumer could. *See Ciappetta v. Kellogg Sales Co.*, No. 21-CV-3545, 2022 WL 602505, *3 (N.D. Ill. Mar. 1, 2022) ("[T]he reasonable consumer standard requires a

probability that a significant portion of the general consuming public acting reasonably in the circumstances, could be misled."); *see also Troutt v. Mondelez Glob. LLC*, 637 F. Supp. 3d 606, 614-15 (S.D. Ill. 2022) (collecting cases that show at the motion to dismiss stage an IFCA claim should be dismissed if the subject labels were "unambiguous").

Here, Plaintiff's claims are typical of the Classes' because they are based on the same legal theories and the same course of conduct—namely, Defendant's uniform misrepresentations. *Marcus*, 687 F.3d at 599; *see also Benson*, 2021 WL 5321510, at *3; *Butler*, 727 F.3d at 798, 800; *Suchanek*, 311 F.R.D. at 255 (holding that variations in the product brand purchased by the named plaintiffs and proposed class does not defeat typicality because "the class members were all exposed to the exact same course of conduct by Defendants."). Plaintiff has submitted evidence that "orthodontic" is commonly understood to mean "promotion of oral development." *See* Section II above. Plaintiff has also submitted common evidence that no pacifier can be considered orthodontic as all pacifiers fail to "promote oral development." *See Rikos v. Procter & Gamble Co.*, No. 1:11-CV-226, 2014 WL 11370455, at *3 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015); Section VI.C.2 below. Furthermore, Plaintiff has submitted evidence that Defendant's conduct, as detailed in the Complaint and this Motion, was uniform across all Orthodontic Pacifiers. *See* Section III above. Thus, the typicality requirement is easily met.

2. Dr. Jeffrey A. Dean is Qualified, and His Methodology is Scientifically Reliable and Will Assist the Trier of Fact

Defendant asserts that Dr. Dean's opinions should be excluded because his conclusions "regarding the meaning of the word 'orthodontic' and whether its use by MAM could be deceptive to a reasonable consumer . . . is irrelevant and has no scientific basis." Opp. at 26. Thus, Defendant challenges both (1) Dr. Dean's scientific methodology in reaching his conclusions, and (2) the relevancy of those conclusions. Defendant is wrong on both charges.

(a) Dr. Dean's Opinions and their Applicability in this Case

Despite Defendant's distortion, Dr. Dean does not offer any opinion as to the reasonable consumer's understanding of "orthodontic," but, rather, his opinions go to whether any pacifier (and specifically the Orthodontic Pacifiers) is capable of promoting oral development. Defendant's experts Drs. Chase and Gal grossly mischaracterize Dr. Dean's opinions, which are appropriate and which, as discussed below, he is qualified to make.

Dr. Dean's task was to provide an expert opinion "as to the use of 'orthodontic' pacifiers, and specifically, whether 'orthodontic' pacifiers are known to provide therapeutic or preventative dental bite (occlusal) benefit." Dean Report ¶ 2. Notably, this task does not include any work to determine, nor does the Dean Report include, any information "about the public's perception of the meaning of the words." Opp. at 25. Rather, Dr. Dean opines on pediatric dentistry, pacifiers, and how *all* pacifiers, regardless of how manufacturers choose to label them, detrimentally affect oral health. As detailed below, Dr. Dean's opinions are reliable and will assist the trier of fact as to a common issue in this case: "the effects of pacifiers on oral development." *See Benson*, 2021 WL 5321510, at *2.

(b) Dr. Dean Used Sound Scientific Methodology to Reach His Opinions Regarding the Truth of "Orthodontic" Pacifiers

An examination of Dr. Dean's expertise, methodology, and the connection between the two demonstrates that Dr. Dean is qualified, and his opinions are well supported by a sound methodology as well as impeccable credentials and expertise.

"To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion." *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). "[T]he key to the gate [referring to the "gatekeeping" function under Rule 702] is not the ultimate correctness of the expert's conclusions

. . . it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

Dr. Dean clearly offers opinions regarding the fact that no pacifier can be "orthodontic" and that the weight of the scientific literature that examined the subject has concluded that so-called "orthodontic" pacifiers offer zero benefits as compared to traditional pacifiers or other pacifiers not advertised as "orthodontic." Dean Rebuttal Report ¶¶ 3, 25. Dr. Dean offers no opinions regarding how consumers interpret the Orthodontic Representations, making Defendant's argument entirely inapplicable.[13]

Dr. Dean has the experience and credentials necessary to provide expert testimony on the topics on which he will opine. His impeccable credentials—which include academic, board, and clinical experience as well as relevant publications—are summarized in the Dean Report and indisputably provide the requisite foundation for his opinions as authored, fulfilling the first element of admissibility under Rule 702. *See* Dean Report ¶¶ 7-11.

Dr. Dean relied on his experience and expertise, as well as a comprehensive analysis of the available literature, especially several high-quality policy review statements, such as the American Academy of Pediatric Dentistry's *Policy on Pacifiers*, and systemic reviews of both conventional and "orthodontic" pacifiers, in reaching his opinions. After synthesizing the available scholarly literature, Dr. Dean came to an expert opinion that "[p]acifiers cannot be 'orthodontic' as they are not medical devices and they do not prevent or treat malocclusions or promote oral development." *Id.* ¶ 35. Conversely, Dr. Dean concluded, "pacifiers, including so-called 'orthodontic' pacifiers, have been shown to lead to malocclusions when used frequently and over a prolonged period of time, that is past the age of 18 to 24 months." *Id.* ¶ 18. Dr. Dean does acknowledge there are *some*

[13] Further supporting this point is the fact that the words "consumer," "purchase," "deceived," and "reasonable" are not used in the Dean Report or Dean Rebuttal. *See* Dean Report; Dean Rebuttal Report.

benefits to permitting infants to use a pacifier, however, those "benefits are not orthodontic and *no pacifier functions like an orthodontic appliance*." *Id*. ¶ 23 (emphasis added). Accordingly, Dr. Dean is of the firm opinion that "labeling a pacifier as 'orthodontic' is inappropriate, misleading, and not supported by research." *Id*. ¶ 36.

Dean's opinions are based on accepted and scientifically reliable methods as they are largely based on systematic literature reviews. "[A] systematic literature review uses formal search methods to allow a researcher to obtain a neutral 'snapshot' of the existing research on a particular question." *In re Zimmer Knee Implant Prod. Liab. Litig.*, No. 11 C 5468, 2015 WL 5050214, *3 (N.D. Il. Aug. 25, 2015). The use of systematic reviews in forming an opinion is permitted under Rule 702 and does not diminish the reliability of the opinions rendered. "[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology." *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) (citing *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999)). As such, Dr. Dean fulfills the second element of admissibility under Rule 702—the use of scientifically reliable methods.

(c) Dr. Dean's Conclusions Regarding the Impossibility of an "Orthodontic" Pacifier are Relevant to Determine if the Orthodontic Representations are Misleading to a Reasonable Consumer

When determining if proffered evidence is relevant, "[t]he question is not whether the disputed evidence has great probative weight, but whether it has any." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 244 F. Supp. 3d 716, 719 (N.D. Ill. 2017). Indeed, the Federal Rules of Evidence expressly note that relevancy is a low barrier and that "[e]vidence is relevant if: it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. In fact, "[t]he Supreme

Court has stated that there is a 'low threshold' for establishing that evidence is relevant." *U.S. v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)).

Defendant's relevance argument is essentially an attack on whether a reasonable consumer may be misled by Defendant's use of the Orthodontic Representations. But that is *not* a question for *Daubert*. Given Plaintiff's theory—that a reasonable consumer would likely be misled by Defendant's prominent use of the Orthodontic Representations on its labels because the pacifiers do not promote oral development or prevent bite problems—Dr. Dean's testimony is relevant. The common evidence supports the reasonable consumer's understanding of "orthodontic" and, under that definition, Defendant's pacifiers, according to Dr. Dean, do not meet that definition. As such, Dean's expert opinions and testimony should be found relevant and admitted under Rules 401 and 702. *See generally Stollings*, 725 F.3d at 768 (reversing district court that excluded expert report as irrelevant because it only addressed a portion of the considerations at issue in the case).

### C. **Plaintiff Meets the Requirements to Establish Predominance Under Rule 23(b)(3)**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Predominance is satisfied when 'common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication.'" *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) (citing *Messner*, 669 F.3d at 811); *see also In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *6 (N.D. Ill. May 27, 2022). Every issue in the case need not be common; the question is whether substantial common issues predominate. *Messner*, 669 F.3d at 815; *Butler*, 727 F.3d at 801; *Fox v. Riverview Realty Partners*, No. 12-CV-9350, 2014 WL 1613022, at *5 (N.D. Ill. Apr. 22, 2014).

Objective questions, or questions focusing on Defendant's conduct, are the driving issues for all of Plaintiff's claims here. *See Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2018 WL 4952519, at *12 (N.D. Cal. Sept. 25, 2018) ("The consumer claims require an *objective* test, asking what the reasonable consumer would believe or think upon exposure to the misleading statement.") (emphasis in original); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *55 (N.D. Ill. Mar. 31, 2017) ("Reliance can be presumed, or at least inferred, when the omission is material, which is based on the **objective reasonable consumer standard**.") (citation and quotation marks omitted) (emphasis added); *Mednick v. Precor*, 320 F.R.D. 140, 148 (N.D. Ill. 2017).

The elements of a claim under the ICFA are "(1) a deceptive act by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive act; (3) the deceptive act occurred during a course of conduct involving trade or commerce; and (4) actual damage that was proximately caused by the deceptive act." *Benson*, 2021 WL 5321510, *3 (citing *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018)). These requirements are functionally the same across the at-issue statutes and any small differences do not bear on the predominance review. *See Benson*, 2021 WL 5321510 at *9 ("What is important for class-certification purposes, and what plaintiffs have demonstrated, is that all ten states' statutes require proof (which is common here) that the deceptive conduct at issue was likely to mislead a reasonable consumer.").

Objective questions, or questions focusing on Defendants' conduct, are the driving issues for all of Plaintiff's claims here. *See* Section II above. State consumer protection statutes generally impose liability when the defendants' marketing "is likely to mislead a reasonable consumer, even if the statement is literally true." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014).

"[I]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *See Messner*, 669 F.3d at 815; *Butler*, 727 F.3d at 801.

Here, common questions will predominate. Specifically, the outcome of this case turns on two common questions, the answers to which are driven by common evidence—(1) Are the Orthodontic Representations true and/or misleading, and (2) Did the presence of the Orthodontic Representations mislead reasonable consumers because the Orthodontic Pacifiers do not promote positive oral health? Resolution of those two issues will drive the rest of the litigation and this predominates over any minor issues concerning damages or slight differences in the selected state statutes. This class action satisfies the standard for predominance under Rule 23(b)(3).

1. <u>Defendant Engaged in a Common Deceptive Practice</u>

Plaintiff alleges that Defendant engaged in a common deceptive practice. Specifically, Plaintiff has demonstrated that the labeling is common to all Orthodontic Pacifiers (*see* Section I above), reasonable consumers commonly understood Defendant's Orthodontic Representations (*see* Section II above), and the common evidence demonstrates that the Orthodontic Representations are likely to mislead a reasonable consumer (*see* Sections III and IV above).

Defendant attempts to heighten the Rule 23(b)(3) standard by arguing that due to variations in the labeling during the Class Period, there is "no way" to establish common proof, let alone predominance. *See* Mot. at 30-32. However, as discussed in Sections I, II, and III above, this case solely pertains to the pacifiers with Orthodontic Representations identified in Exhibit 3 to the Motion. *See* Mot. Ex. 3 (ECF No. 111-1 at 30).[14] This greatly reduces the "wide number of different unique products" to a much smaller collection of 49 subject labels.

[14] Plaintiff has proposed an even simplified Class definition to the extent necessary.

Of the 49 labels with Orthodontic Representations, there are only three different representations that were used. The most common is "orthodontic nipple promotes proper oral development" with 43 of the 49 labels having this representation (87.7%). *See* Mot. Ex. 3 (ECF No. 111-1 at 30). The next most common Orthodontic Representation—"orthodontic nipple"—is used on four of the selected class products (8.1%). *Id*. The final common Orthodontic Representation—"orthodontically correct pacifiers"—is used on two products (4%). *Id*. While these are slightly different, they all convey a substantially similar "orthodontic" message. In fact, Defendant's own consumer research surveys confirm that the three Orthodontic Representations have been used interchangeably and traded against each other when determining how to best position its pacifiers vis-à-vis the orthodontic claim. *See, e.g.*, Mot. Ex. 13 (ECF No. 112-8) ([redacted]). To the extent these small variations elicited different responses from consumers, the conjoint design can account for any variation in value. Dennis Report ¶¶ 57-58.

It defies common sense that Defendant's slightly varied language (that it tested to determine which claim allowed it to charge a higher price) leads to drastically different consumer understanding, and Defendant's own documents make clear this is illogical. Defendant's attempt to distance the facts of this case (where orthodontic always appears on the products in the Class) from those in *Benson* (where orthodontic always appeared on the labels) is strained. *See Benson*, 2021 WL 5321510. As explained above, Defendant's products that do not contain the Orthodontic Representations are excluded from the Class. *See* Mot. Ex. 3 (ECF No. 111-1 at 30).

Defendant's case law in support of its argument is similarly specious and includes cases where certification was denied due to <u>differing claims that were not closely related</u>, unlike the Orthodontic Representations here. *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2023

WL 2561613, *1-2 (N.D. Ill. Mar. 17, 2023) is entirely distinguishable. There, the court denied class certification for an ICFA claim where the products, labels and formulas varied significantly. *Id.* at *6. Specifically, the court found that the at-issue claims such as "biologically appropriate," "fresh," made from "regional" sources, and "natural," appeared in varied combinations and, therefore, could not be a "common deceptive practice." *See also In re Tropicana Orange Juice Mktg.*, No. 2:11-07382, 2019 WL 2521958, *1 (D.N.J. June 18, 2019) (denying class certification under New York and California statutes relating to the use of marketing claims "100% pure and natural orange juice," "100% pure orange juice," "100% orange juice," "pasteurized orange juice," "pasteurized," "pure," "natural," "fresh," and "grove to glass" where the claims addressed, safety procedures, freshness and composition).

The Orthodontic Representations in this case are merely slight variations of one another, and Defendant conducted conjoint surveys where it traded off between these slightly varied orthodontic statements to evaluate their impact. *See, e.g.*, Mot. Ex. 13 (ECF No. 112-13), MAMUSA_0016304 at 0016326 ([redacted]).

Defendant cites to a number of out-of-district cases for the proposition that "variations in the presence and format of targeted statements" necessarily leads to a denial of certification." Opp. at 31. Each of the cited cases is entirely factually inapposite or certification was denied for reasons not present in this case. *See* Section VI.C.1 (distinguishing *Zarinebaf*, 2023 WL 2561613 and *In re Tropicana*, 2019 WL 2521958); *see also Reitman v. Champion Petfoods USA, Inc.*, No. CV 18-1736-DOC, 2019 WL 7169792, at *9-10 (C.D. Cal. Oct. 30, 2019) (alleged misrepresentations varied dramatically and necessitated context from individualized labels to determine whether they

were deceptive). Class certification was not denied in *Korte* for "variation" in targeted statements. *Korte*, 2019 WL 4305464, at *5. Rather, the court found typicality was not met where the plaintiff failed to proffer adequate evidence to show the alleged deception existed class-wide. *Id.* The court acknowledged that evidence could come by way of, for example, surveys and/or consumer complaints. *See id.* (citing *Suchanek*, 764 F.3d at 758). Unlike *Korte* where there was not sufficient evidence that a reasonable consumer could be misled (or that the plaintiff was not the only one misled), the record here is replete with evidence that the very important—and repeatedly tested—orthodontic claim could be misleading. *Weiner v. Snapple Beverage Corp.* has nothing to do with variations in labeling. No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *6-7 (S.D.N.Y. Aug. 5, 2010). Rather, the court denied certification in an "All Natural" case when the plaintiff's damages expert submitted a "bare-bones report" lacking a discussion of the available economic data or the "standard economic methodologies" he would use to analyze the data. *See id.*

As the Seventh Circuit has cautioned, predominance does not require a showing "that every class member must prove at least some impact." *See Kleen*, 831 F.3d at 927; *see also Suchanek*, 764 F.3d at 757 ("[i]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."). Moreover, district courts should not require a greater showing of common evidence than is contemplated by Rule 23. *See Messner*, 669 F.3d at 808. These common issues easily will be the focus of trial, and accordingly, predominate over any individualized issues.

2. <u>MAM's Packaging is Likely to Mislead a Reasonable Consumer, and is therefore Deceptive Under ICFA</u>

Contrary to Defendant's representations, there is no requirement that a plaintiff in a false advertising case such as this both *define* a reasonable consumer's understanding of a term and then prove the alleged deception. *See, e.g.*, *Rikos*, 2014 WL 11370455, at *3 ("**<u>[i]n determining the</u>**

**<u>propriety of a class action, the question is not whether the … plaintiffs … will prevail on the merits, but rather whether the requirements of Rule 23 are met.</u>**") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, (1974)) (emphasis in original). Instead, the evidence focuses on Defendant's conduct and whether the conduct is common to all Class members. *Benson*, 2021 WL 5321510, at *5 ("The central issue in the case is whether defendants' packaging and marketing was likely to mislead a reasonable consumer."). There is no need for Plaintiff or any Class member to present evidence regarding their individual circumstances to prove any of the claims. *See Kleen*, 831 F.3d at 927; *see also Suchanek*, 764 F.3d at 757 ("If the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.").

Moreover, even if Defendant is correct that Plaintiff must present the existence of disputed evidence on the objective definition of "orthodontic" at class certification, the record contains substantial evidence demonstrating the common understanding of "orthodontic" by reasonable consumers and that Defendant's use of the term "orthodontic" in its marketing of the Products misleads reasonable consumers.

The reasonable consumer question is undeniably for the jury. *Beardsall v. CVS Pharmacy, Inc*., 953 F.3d 969, 973 (7th Cir. 2020) ("This determination of the likelihood of deception "is an impressionistic one more closely akin to a finding of fact than a conclusion of law."") (citing *Suchanek*, 764 F.3d at 762); *see also Mednick*, 320 F.R.D. at 152 (at a minimum, a genuine issue of material fact exists regarding a reasonable consumer's understanding, which must be left to the factfinder.). A jury will only need to determine whether the "Orthodontic Representations" on Defendant's Products[15] were misleading to a "reasonable consumer," which is defined as "a

[15] Defendant wrongly suggests that Plaintiff's exclusion of Defendant's MAM Perfect pacifier from the definition of the Class Products defeats class certification. and somehow renders counsel "inadequate." *See* Opp. at 32, n.13. Regardless of Defendant's classification of the MAM Perfect pacifier as an "orthodontic

significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances …" *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 937 (7th Cir. 2021) (citing *Beardsall*, 953 F.3d at 973; *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). That central question for the jury is virtually identical in the states that comprise the Multi-State Consumer Protection Class, requiring proof that Defendant's conduct could deceive a reasonable consumer. *See Suchanek*, 764 F.3d at 756 (stating that the "same legal standards govern every class member's claim"). This burden of proof has been affirmed and applied by federal courts consistently under each state statute.

When advertising is "clearly misleading on its face[,]" no extrinsic evidence is required to substantiate the allegation. *Weaver*, 3 F.4th at 935. Here, because orthodontic has a facially obvious understanding, calling a pacifier "orthodontic" is false and misleading on its face. Thus, the reasonable consumer purchasing a pacifier could be misled by the Orthodontic Representations on their face given the common evidence that pacifiers cannot, in fact, promote oral development. Even if the Orthodontic Representations are not misleading on their face, the record contains an overwhelming amount of common evidence to establish that the Orthodontic Representations could mislead Plaintiff and other reasonable consumers.

*First*, the common evidence produced by Defendant establishes that MAM uniformly conveyed through the Orthodontic Representations during the class period that the Orthodontic Pacifiers promote proper oral development. As Defendant's own expert, Dr. Aron, confirmed, each

---

pacifier," the product did not consistently contain the "Orthodontic Representations" on the front label of the packaging during the relevant period. *See* Declaration of Fritz Hirsch, ECF No. 139-3, ¶ 13 ([redacted]). The focus here is whether reasonable consumers were misled by Defendant's labeling of the Class Products. The fact that MAM claims all its pacifiers are orthodontic is a red herring and does not defeat the uniformity of the labeling on the Class Products, excluding the MAM Perfect.

Orthodontic Pacifier in the Class prominently included at least one of the Orthodontic Representations during the Class Period. *See* Background Section above.

*Second*, Plaintiff's testimony confirms she understood "orthodontic" to refer to a preventative quality in Defendant's Products that would help her son's "oral health," "would be good for his mouth and teeth," and "not be damaging," and understood that it "was beneficial to my child." Freeman Dep. 56:17-24; 321:20-322:18; 323:18-22. Plaintiff's understanding of the term "orthodontic" is reflected in Defendant's own internal documents that confirm the term "orthodontic" is widely understood to refer to the promotion of oral health. *See, e.g.*, Mot. Exs. 12 at 9825 (ECF No. 112-4-7); 13 at 16326 (ECF No. 112-8); 14 at 7873 (ECF No. 112-9); 15 at 102315 (ECF No. 112-10-12); 16 (ECF No. 112-13).[16]

*Finally*, Defendant's Orthodontic Representations are misleading as Dr. Jeffrey Dean, Plaintiff's expert, has opined that "no pacifier is orthodontic because they do not promote oral development or prevent bite problems, and . . . use of the term orthodontic wrongly implies healthy oral development or treatment or prevention of dental malocclusions." Dean Report ¶ 3.

Thus, Plaintiff presents ample common evidence showing that a reasonable consumer's understanding of the "orthodontic" misrepresentation connotes that the pacifier promotes healthy oral development or prevents dental malocclusions, which is false and misleading. Plaintiff need not prove her case at class certification. Rather, she needs to demonstrate that a reasonable consumer could be misled such that she could prevail on her claims at trial, which she has done.

Defendant's argument also ignores its own internal marketing studies, which demonstrate that the claimed orthodontic benefits of Defendant's pacifiers is a motivating factor in consumers'

---

[16] In fact, the lone study cited by Defendant to justify the "promotes oral development" claim found that complete cessation of pacifier use provided the best results. Thus, a reasonable consumer could be misled given the lack of evidence supporting pacifiers having a positive impact on oral health development based on Defendant's cited study.

purchasing decisions and that the term "orthodontic" is widely understood to refer to the promotion of oral health through use of Defendants' pacifiers. For example, a study by Defendant analyzing consumers decision-making indicates that "[redacted]" Mot. Ex. 15 at 102315 (ECF No. 112-10-12). Similarly, following Defendant's comprehensive study of US consumers, Defendant found that "[redacted]" Mot. Ex. 14 at 7873 (ECF No. 112-9).

In short, Defendant has presented no evidence to rebut the scientific fact (undisputed in the medical literature evidence since the 1870s and confirmed through the present) that Defendant's Orthodontic Pacifiers fail to promote healthy oral development or prevent dental malocclusion. Indeed, the documents identified [redacted].[17] Ex. 16 (ECF No. 112-13). Common evidence can be used to answer the common question of whether Defendant's Orthodontic Pacifiers perform as promised and class certification is appropriate.

3. Plaintiff Has Set Forth a Well-Established and Scientifically Reliable Methodology for Calculating a Price Premium Attributable to the Orthodontic Representations

Dr. Dennis's and Dr. Verlinda's well-reasoned and evidence-based expert opinions, combined with the other evidence presented and relied upon by Plaintiff, provide relevant, probative and common evidence to assess damages on a classwide basis. At class certification, Plaintiff must show that "damages are capable of measurement on a classwide basis." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also Suchanek*, 764 F.3d at 760. Damages must be

[17] While proving the merits of the case is not required at the certification stage, *all or nearly all* the evidence already produced in this case from both Plaintiff *and* Defendant overwhelmingly demonstrates that Defendant knowingly labeled its products falsely and misleadingly. *See, e.g.*, *Rikos*, 2014 WL 11370455, at *3. In this case, ***both*** the Rule 23 requirements are met, ***and*** the likelihood is extremely high that Plaintiff will prevail on the merits in view of ***even*** Defendant's internal evidence showing that orthodontists overwhelmingly believe pacifiers are not orthodontic.

fit to a plaintiff's theory of liability and be sufficiently reliable. *Mullins*, 795 F.3d at 671. The Seventh Circuit has recognized that "the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification." *Mullins*, 795 F.3d at 672.

In her Motion, Plaintiff set forth a sufficient basis of common evidence such that there exists a well-reasoned and scientifically reliable method (1) to measure and quantify the effect of the Orthodontic Representations on the packaging of the Orthodontic Pacifiers, and (2) that there exists a method to compute the price premium[18] stemming from the use of the Orthodontic Representations on the Orthodontic Pacifiers. Dennis Report ¶ 25; Dennis Rebuttal Report ¶ 3; Verlinda Report ¶ 12; Verlinda Rebuttal Report ¶ 3. Both experts have described in detail their experience and qualifications and explained the academic and scientific bases for their proposed methodologies. Verlinda Report ¶¶ 1-7; Verlinda Rebuttal Report ¶ 1; Dennis Report ¶¶ 4-17; Dennis Rebuttal Report ¶¶ 10-15.

Dr. Dennis has submitted the design for a choice-based conjoint survey, which "is typical of, and generally accepted by, experts in the field of consumer market research" for determining the values consumers place on various product attributes. Dennis Rebuttal Report ¶ 2. Dr. Dennis has designed and will conduct the survey using sound research practices and industry standards. *Id*. ¶ 11; *see also* Section VI.C.3(d)(ii) below. As courts nationwide regularly conclude, a conjoint survey can be used in conjunction with an economic analysis to determine class-wide damages.

Next, Dr. Verlinda will utilize a standard model of consumer demand and oligopolistic competition, which has two key components—a demand component and a supply component—to conduct a market simulation (Verlinda Report ¶ 41), resulting in the measurable market price premium paid for the Orthodontic Representations. "The market price premium is the amount that

---

[18] Dr. Verlinda will also calculate the amount of statutory damages under New York law.

class members overpaid for the Challenged Products compared to the prices they would have faced if the alleged Challenged Claims had not been present." Verlinda Report ¶¶ 20, 39. The demand and supply components each employ standard economic models (*see* Verlinda Report ¶¶ 42, 44) and, therefore, the resulting model is capable of calculating but-for prices that will be used to determine the market price premium attributable to the Orthodontic Representations. *See* Verlinda Report ¶ 45.

Together, Dr. Dennis' conjoint survey and Dr. Verlinda's market simulation will produce well-supported results in the form of a price premium that is based on scientific principles and academic theory. This information is directly related to the claims and allegations set forth by Plaintiff and will undoubtedly assist the trier of fact, who must make the final determination in this case. *Smith*, 215 F.3d at 719.

(a) Plaintiff's Experts' Proposed Methodologies are Sufficient at the Class Certification Stage

At class certification, an expert need not put forth a final damages analysis that would be admissible at trial. Rather, the question is whether the expert's testimony is helpful for determining whether the requirements of Rule 23 are met. *See In re Sulfuric Acid Antitrust Litig*., 847 F. Supp. 2d 1079, 1080 (N.D. Ill. 2011) (denying decertification and affirming that "at the class certification stage, Plaintiffs need only establish that they have 'realistic methodologies for establishing damages on a classwide basis.'"); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig*., No. 17-MD-2785-DDC, 2020 WL 1180550, at *24 (D. Kan. Mar. 10, 2020) (certifying class where plaintiffs' experts "proposed a methodology" for determining aggregate damages); *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1004-06 (9th Cir. 2018); *In re Zurn Pex Plumbing Prod. Liab. Litig*., 644 F.3d 604, 614 (8th Cir. 2011); *Kurtz v. Kimberly-Clark Corp*., 321 F.R.D. 482, 551 (E.D.N.Y. 2017); *Benson*, 2021 WL 5321510, at *1.

In this case, Plaintiff presents a damages model capably of reliably and properly calculating class-wide (and individual) damages that tracks her liability theory. This proposed analysis (as more fully set for the below, *see* Sections VI.C.3(c) and VI.C.3(d)(ii) below) readily satisfies the requirements of Rule 23 through qualified experts' use of scientifically reliable, academically supported methodologies to calculate class-wide damages that measures the Class members' injuries incurred as a result of paying for the Orthodontic Pacifiers containing the false representations. Quite simply, the proposed methodologies will demonstrate damages based on Defendant's false representations or they will not—either way, the answer is applicable on a class-wide basis and, therefore, class certification is appropriate.

(b) Conjoint Analysis Provides the Basis for the Marketplace Simulation, Which has Been Accepted as a Standard and Reliable Methodology Across Cases Nationwide for Measuring a Price Premium

Conjoint survey and analysis methodology, coupled with a subsequent marketplace simulation that is based on inputs from the conjoint, has been widely accepted by courts as being capable of measuring the price premium associated with challenged labeling representations in false advertising class actions in accordance with the requirements of *Comcast*. *See, e.g.*, *Benson*, 2021 WL 5321510, at *5; *In re Fluidmaster*, 2017 WL 1196990, at *57.[19] Specifically, here, the

[19] *See also Dzielak v. Whirlpool Corp*., No. 2:12–0089 (KM), 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the Daubert considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); *In re: Lenovo Adware Litig*., No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. 2016) (certifying class where damages model was based on conjoint analysis); *In re ConAgra Foods, Inc*., 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); *Guido v. L'Oreal USA, Inc*., Nos. 2:11–cv–01067–CAS (JCx), 2:11–cv–05465–CAS, 2014 WL 6603730, at *4-8 (C.D. Cal. 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of *Comcast*); *TV Interactive Data Corp. v. Sony Corp*., 929 F. Supp. 2d 1006, 1020-26 (N.D. Cal. 2013) (denying motion to exclude conjoint analysis); *Microsoft Corp. v. Motorola, Inc*., 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012) (conjoint analysis survey was "admissible as relevant under FRE 401 and 402 and . . . sufficiently reliable under FRE 702 and Daubert"); *Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *10 (D.

conjoint survey will provide the inputs for the marketplace simulation such that Dr. Verlinda can reliably calculate the price premium associated with the Orthodontic Representations. Verlinda Rebuttal Report ¶ 2. This is the "causal link" that Defendant argues cannot be established. Verlinda Rebuttal Report ¶ 12(c).

Defendant contends that a growing number of courts have rejected the methodology presented here.[20] Mot. at 44. However, each of the examples presented have unique circumstances that are simply not applicable to the instant case. In *Passman v. Peloton Interactive, Inc.*, No. 19-cv-11711 (LJL) 2023 WL 3195941 (S.D.N.Y. May 2, 2023), the court found fundamental flaws with the methodology utilized by plaintiffs' experts, not nuanced modifications to an otherwise reliable methodology. *Id.* at *20, *25. First, *Passman* is not a directly comparable case because the "challenged claims" were hard to decipher as they do not refer to a feature of a product, but instead refer to a feature of another complementary good. Second, the court in *Passman* was unconvinced that many people actually saw the challenged claim. *Id.* at *20, *22. Comparatively, here, Plaintiff contends that *everyone* saw the Challenged Claims as they are prominently displayed on the packages. *See* Section III above. Finally, unlike the design of the conjoint survey and marketplace simulation here—both of which involve inclusion of competitor products—competitor products were not considered in *Passman*. *Id.* at *29.

*Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2021 WL 4459115, at *4-6 (S.D.N.Y. Sept. 29, 2021), is similarly distinguishable. There, the court decertified a class after finding that

---

Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *Brown v. Hain Celestial Grp., Inc.*, No. C 11–03082 LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

[20] Defendant appears confused, and fails to acknowledge that Plaintiff is not proposing that a conjoint survey be used to calculate the price premium on its own. Instead, Plaintiff proposes a two-step methodology that has been accepted and deemed scientifically reliable by courts across the country. *See* Sections VI.C.3(c) and VI.C.3(d)(ii). Thus, the argument presented in the Opposition (at 38-39) and the cases cited therein are irrelevant. *See* n.22 below.

plaintiffs did not satisfy *Comcast* because their conjoint analysis tested the term "Keratindose Pro-Keratin + Silk" when plaintiffs were *not* challenging the "+ Silk" portion. By contrast, here, the conjoint will test the entirety of the allegedly misleading Orthodontic Representations. Further, the *Price* court held that there was insufficient evidence to support the conjoint survey and connect it to the theory of liability. *Id.* at *5, 6. Here, aside from the indisputable fact that the price premium is directly tied to the theory of liability, there is a mountain of common evidence (which was not present in *Price*). *See* Section II above.

Defendant's reliance on other outlier out-of-circuit district court opinions in an attempt to discredit conjoint survey and analysis based on supply-side factors is unpersuasive.

- *In re General Motors LLC Ignition Switch Litigation*, 407 F. Supp. 212 (S.D.N.Y. 2019), and *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Product Liability Litigation*, 500 F. Supp. 3d 940 (N.D. Cal. 2020),[21] both misinterpret the "willing seller" theory of economics – Defendant would never pay a customer to take a pacifier; they would just dispose of them. Second, they reach the mysterious conclusion that experts must reduce damages (potentially to zero) to account for the fact that a defendant that knew in advance (in a but-for world) it deceived consumers and might have manufactured fewer products in the real (as-is) world. This is simply wrong. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 971 (N.D. Cal. 2018).
- The court in *In re NJOY, Inc. Consumer Litigation*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015), held that the expert's choice-based conjoint analysis measuring consumer willingness-to-pay satisfied reliability requirements of *Daubert*. As discussed, there is no uniform conjoint methodology. Upon closer inspection, the court's ruling does not contradict the majority precedent cited herein and has also been distinguished by other courts. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 970 (N.D. Cal. 2022).
- *Saavedra v. Eli Lilly & Co*., No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014), is inapplicable because of the distinct product differences, which the court there even noted; "Unlike markets for ordinary consumer goods, the prescription drug market is heavily regulated and restricted." That, coupled with the complicating factor of what customers actually paid due to individualized insurance coverage, resulted in a less-than-reliable conjoint analysis. Here, neither of these fatal factors exist.
- In *Zakaria v. Gerber Products Co*., No. LA CV15-00200 JAK, 2017 WL 9512587, at *20-21 (C.D. Cal. Aug. 9, 2017), *aff'd* 755 F. App'x 623 (9th Cir. 2018), plaintiffs' expert failed to establish a reliable market value for the products because he "did not consider the actual

[21] Defendant also cites *In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig*., No. 4:12-MD-2382 HEA, 2021 WL 5003102, at *3 (E.D. Mo. Oct. 28, 2021), which grants exclusion without analysis in reliance on *General Motors*.

> prices paid by consumers for the product, or the preferences that consumers might have had for competing products that were available." Dr. Verlinda considers each of these points and more. *See, e.g.*, Verlinda Rebuttal Report § III.[22]

Although Defendant's supply-side criticisms are without merit, Plaintiff's experts' two-step methodology does account for supply-side factors in calculating the price premium. Defendant challenges Dr. Dennis's and Dr. Verlinda's informed decisions and argues that they somehow render their opinions unreliable and inadmissible. But arguments about supply-side factors are not new, and precedent is well-established on this issue; such arguments go to the weight of the opinion, not admissibility. Indeed, courts across the country have recognized that the trier of fact is entitled to weigh supply-side issues. *See Williams v. Illinois*, 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." ); *see also Taylor v. Trapeze Mgmt., LLC*, No. 0:17-cv-62262-KMM, 2019 WL 1977514, at *3 (S.D. Fla. Feb. 28, 2019) (citing *U.S. v. H & R Block*, 831 F. Supp. 2d 27, 34 (D.D.C. 2011) ("The methodological validity of a survey is necessarily a question of degree . . . [T]echnical deficiencies that can be adequately explored on cross-examination generally go to the weight, rather than the admissibility, of the evidence.")); *Stevens v. Ford Motor Co*., No. 2:18-CV-00456, 2022 WL 19978265, at *12 (S.D. Tex. Sept. 29, 2022) ("Ultimately, the Court finds that the supply-side arguments present in this case go toward the weight, rather than the admissibility…"); *Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV, 2021 WL 5811741, at *5 (S.D. Fla. Dec. 6, 2021); *Hadley v. Kellogg Sales Co*., 324 F. Supp.

[22] Defendant also cites *Apple, Inc. v. Samsung Electronics Co., Ltd*., No. 11–CV–01846–LHK, 2014 WL 976898 (N.D. Cal. 2014), and *Dunn v. Costco Wholesale Corp*., No. CV 21-1751-JFW, 2021 WL 4205620 (C.D. Cal. 2021). Each of these cases involve conjoint surveys that did not account for the supply-side *at all*. Here, Plaintiff's experts do make such considerations and have set forth a well-supported proposed methodology to calculate the price premium in this case. *See Zarinebaf*, 2022 WL 910638, at *4 (denying exclusion where expert "adequately accounted for supply side factors").

3d 1084 (N.D. Cal. 2018).

Here, like the cases cited above, Plaintiff's experts employed a two-step methodology (conjoint analysis and marketplace simulation using the data inputs from the conjoint) to measure how consumers valued the "orthodontic" feature, and any challenges to the design of the methodology is an issue for the trier of fact and should not be for the Court to decide. *MyFord Touch*, 291 F. Supp. 3d at 970, 971 (holding that despite inconsistencies in plaintiffs' expert's analysis "[t]he jury is entitled to weigh the credibility of Mr. Boedeker's assumption, and Ford will have the opportunity to cross-examine him[]" because the impact is not "indisputably wrong." (citing *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996))).

In sum, the analysis proposed by Drs. Dennis and Verlinda is widely accepted and based not only on academic and scientific principles, but also regularly relied upon by courts across the country for applications similar to what is at issue here.

(c) Dr. J. Michael Dennis is Qualified, His Methodology is Scientifically Reliable, and Will Assist the Trier of Fact

Defendant—without a single citation to case law—concludes that it is "commonly accepted" that conjoint analysis alone cannot assess a price premium. Opp. at 37. First, Plaintiff proffered *two* expert opinions, which in conjunction with one another, provide a reliable methodology for calculating class-wide damages. Dr. Dennis has designed the choice-based conjoint ("CBC") survey, and Dr. Verlinda will use the results (*i.e.*, data inputs) from the CBC to conduct his marketplace simulation using a Nash Bertrand model of competition. Verlinda Report. Plaintiff has unequivocally *not* offered CBC as the sole "analysis" to calculate the price premium.

Defendant has three main criticisms of Dr. Dennis' work (1) its claim that there is "no literature" stating that CBC is valid for calculating damages in a class action, (2) it fails to account

for "real-world" conditions"[23] in the survey environment, and (3) his survey suffers from "focalism bias."

Defendant's first criticism—that no literature exists on CBC being used in the litigation context—holds no weight. Dr. Dennis explained precisely why a niche topic of utilizing conjoint analysis for the purpose of determining damages in a class action would not be a topic for publication. Dennis Dep. 66:16-25-67:17. He further explained why a "well-vetted methodology for quantifying consumer preferences" that is utilized regularly for market research and forecasting purposes is a "reliable, proven, well-vetted methodology" for its use here. Dennis Dep. 137:12-18; *see also* Dennis Rebuttal Report ¶¶ 10-15. It therefore follows that literature on CBC generally supports its use here.

Defendant's remaining criticisms of Dr. Dennis' proposed survey design, including selection of products, features, packaging, behavior of purchasers, and/or selection of respondents go to weight and not admissibility. They are, therefore, not appropriate grounds for exclusion of his opinions. *See Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *4 (N.D. Ill. Mar. 29, 2022). Disputes over the strength of control questions likewise go to weight, not admissibility. *See, e.g.*, *Pinder v. 4716 Inc.*, No. CV-18-02503-RCC, 2020 WL 6081498, *5 (D. Ariz. Oct. 15, 2020) (adequacy of control questions "goes to the weight given the survey"); *Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-CV-2000 H (CAB), 2011 WL 13101230, *15 (S.D. Cal. Feb. 4, 2011); *see also McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS, 2020 WL 1157191, at *5 (S.D. Cal. Mar. 9, 2020); *see also Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) (declining to reject the survey evidence as inadmissible because "selection of an inappropriate universe generally affects the

[23] Opp. at 38, 42.

weight of the resulting survey data, not its admissibility").

Even if the Court evaluates the survey design at this stage, Dr. Dennis has proposed a reliable methodology that has been accepted by courts nationwide. Dr. Dennis responds to each and every criticism in his Reply Declaration and explains why conjoint—a tool utilized repeatedly by Defendant for pricing and positioning of the very products at issue in this case—is appropriate here. *See generally* Dennis Rebuttal Report.

Defendant's first design criticism relates to his "failure" to account for factors in the survey environment, including "reality." However, "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Zarinebaf*, 2022 WL 910638, at *3 (citing *MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021)). Dr. Dennis has over 20 years of experience conducting statistical surveys, including the kind of surveys at issue in this litigation. None of Defendant's cited cases considered the results of a highly technical consumer survey. *See Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF, 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) (analyzing the expert's use of the "line-up" methodology); *Medism Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158 (S.D.N.Y.) (analyzing the use of the expert's internet-based survey platform).

Defendant's recycled "focalism bias" argument—the tendency to place too much focus or emphasis on a single factor or piece of information when making judgments or predictions—is meritless and likewise goes to weight and not admissibility. *See In re Scotts EZ Seed Litig.*, No. 12-CV-4727, 2017 WL 3396433, at *9-10 (S.D.N.Y. Aug. 8, 2017); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 603 (N.D. Cal. 2018). While the issue of any survey design flaws is not a basis for exclusion, Dr. Dennis's survey does not suffer from focalism bias.

Dr. Dennis took significant steps to ensure his survey design conforms with best practices to *avoid* focalism bias by (1) placing brand logos in the highest attribute levels, (2) using plain text to display attributes in choice tasks (and not highlighting the Orthodontic Representations in any way), and (3) using meaningful and real-life distractor claims that adequately represent existing products in the marketplace. Dennis Rebuttal Report ¶¶ 29-38.

Defendant's criticisms of Dr. Dennis for allegedly failing to take into account marketplace conditions also go to weight and not admissibility. Dr. Dennis explains he designed the survey to create a credible marketplace through (1) selection of credible marketplace alternatives, (2) use of additional attribute levels, (3) selection of attributes that are essential drivers of consumer choice based upon his experience and expertise as well as review of discovery, market research and Defendant's conjoint surveys, (4) inclusion of brand attribute, and (5) use of cognitive interviews to ensure all necessary attributes are present in the survey. *See* Dennis Rebuttal Report ¶¶ 39-46.

Finally, Defendant criticizes Dr. Dennis for testing all of the Orthodontic Representations at once (which he is not doing[24]) and not providing a conclusion as to the consumer's understanding of orthodontic. But that is not Dr. Dennis' assignment. Rather, Dr. Dennis designed a survey that will reliably quantify the economic value of the Orthodontic Representations.

Defendant's passing reliance on *In re KIND LLC "Healthy and Natural" Litigation* and *Passman v. Peloton Interactive, Inc.*—two entirely factually distinguishable cases—is unhelpful. At issue in the *KIND* survey was the undefined phrase "All Natural," which appeared on snack bar products. Fatal to the claims for the *KIND* plaintiffs[25]—unlike the plethora of evidence here—was the lack of evidence demonstrating that a reasonable consumer could be misled by the "All

[24] *See* Dennis Rebuttal Report ¶ 40 (where Dr. Dennis explains that his conjoint survey will test each of the Orthodontic Representations separately, not "all at once").

[25] Counsel for Plaintiff is counsel in *In re KIND LLC*, and they disagree with the court's decision, which is on appeal to the Second Circuit.

Natural" claim. *In re KIND LLC "Healthy and Natural" Litig.*, 627 F. Supp. 3d 269, 291 (S.D.N.Y. 2022) ("plaintiffs must show that evidence [sic] would allow a trier of fact to determine that a reasonable consumer actually would hold the proposed understanding of the term 'All Natural.'").

*Passman* is similarly inapposite. In *Passman*, the challenged claim ("ever-growing") was only a small subset of defendant's advertising and was not included in the primary advertising medium used to reach consumers. 2023 WL 3195941, at *1. The court denied class certification for several reasons including lack of predominance and issues with the proposed damages model. *See id*. at *19-31. The court rejected Dr. Dennis's consumer survey because it (1) did not address how many class members actually saw the challenged representation, *id*. at *22-24, and (2) because the survey tested the whole phrase the challenged claim was a part of ("every-growing library of classes") instead of the claim at issue ("ever-growing), *id*. at *25. As a result, the conjoint analysis did "not isolate price premium resulting from the Challenged Statement; rather, Dennis's survey measure[d] the value of the Challenged Statement and the fact that Defendant maintains a library of classes." *Id*. at *28. Here, neither of these issues is present where the Orthodontic Representations are printed on the label of each of the Orthodontic Pacifiers and the entire claim will be tested in the survey.

(d) Dr. Verlinda is Qualified, His Methodology is Scientifically Reliable, and Will Assist the Trier of Fact

Defendant argues that Dr. Verlinda's methodology is not grounded in science and is therefore unreliable. Mot. at 44. However, this could not be farther from the truth. Indeed, Dr. Verlinda is a highly qualified academic (*see* Verlinda Report ¶¶ 1-7) and has supported his proposed methodology with detailed reports and specific references to the industry-standard materials on which he relied (*see* Verlinda Report Appendix C (Materials Relied Upon); Verlinda Rebuttal Report Appendix A (same)). This includes his use of the well-accepted—and not at all

"novel"—Nash Bertrand model. *See* Verlinda Rebuttal Report § III. Defendant's challenges to Dr. Verlinda's methodology are premature and should be left for the jury to weigh, based on inapposite case law, and otherwise not suitable for adjudication at class certification.

Dr. Verlinda, an indisputably qualified expert in economics, will offer scientifically reliable opinions that match Plaintiff's theory of liability and will assist the trier of fact. Defendant's challenges to Dr. Verlinda's well-supported methodology all go toward the weight that should be given to the opinions—an issue for the jury—rather than admissibility. However, if the Court examines Dr. Verlinda's opinions, they clearly satisfy the *Daubert* standard. *See Benson*, 2021 WL 5321510, at *9 (citing *Suchanek*, 764 F.3d at 760, and *Comcast*, 569 U.S. at 35).

(i) Dr. Verlinda is Qualified

An examination of Dr. Verlinda's expertise, methodology, and the connection between the two demonstrates that Dr. Verlinda is qualified, and his opinions are well supported by a sound methodology as well as impeccable credentials and expertise. *See* Verlinda Report ¶¶ 1-7, Ex. A (Curriculum Vitae). Accordingly, his opinions will assist the trier of fact and must be admitted.[26]

(ii) Dr. Verlinda's Methodology is Scientifically Reliable and Based on Academic Standards

Defendant's primary *Daubert* argument goes to the reliability of Dr. Verlinda's analyses. A reliable expert opinion is "reasoned and founded on data [and] … utilize[s] the methods of the relevant discipline." *Bielskis*, 663 F.3d at 894. In examining reliability, courts generally consider whether (a) a methodology can be (and has been) tested, (b) that methodology has been subjected to peer review and publication, (c) the techniques are widely accepted within the relevant scientific community, (d) there are "standards controlling the technique's operation," and (e) there is a

[26] In actuality, while Dr. Aron is a qualified economist, she has no experience with Nash Bertrand and is therefore unqualified to opine on Dr. Verlinda's proposed methodology. *See* Verlinda Rebuttal Report ¶ 14; *see also* Aron Dep. 106:2-8; 108:19-20.

"known or potential rate of error" of the method employed. *Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, at *2 (N.D. Ill. May 31, 2017). "[T]he Court need not apply all the factors to all experts or in every case, and it may consider factors other than those listed" (*id*. at *3 (internal citation omitted)), but the court must take care not to "'usurp[] the role of the jury, and therefore abuse[] its discretion, [by] unduly scrutiniz[ing] the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" *Id*. at *4 (citing *Manpower, Inc. v. Ins. Co. of Pa*., 732 F.3d 796, 806 (7th Cir. 2013)).

Dr. Verlinda's scientific methodology is far from the "black box" Defendant imagines. Dr. Verlinda's methodology is "based on standard econometric analysis based on common and non-controversial assumptions about consumer demand, firm behavior, and market clearing mechanisms." Verlinda Rebuttal Report ¶ 5. Even Dr. Aron herself recognizes that all econometric models include a variety of assumptions that serve to simplify a complex world. *Id.* Dr. Verlinda explains that: (1) the Nash Bertrand model is well-tested and relied upon in the academic literature and practical use, (2) why he properly defined the but-for world; and (3) how he appropriately observed retail pricing. *Id.* at ¶ 6. Following the successful implementation of the survey by Dr. Dennis, Dr. Verlinda will begin the economic aspect of the analysis, measuring the price premium alleged by Plaintiff and calculating class-wide damages. As proposed, Dr. Verlinda will use a well-established methodology to calculate the price premium in this case. *See Id.* § II.

A) Dr. Verlinda's Proposed Methodology

Pacifiers are perceived by consumers as differentiated products (*i.e*., not homogenous, with varying features and varying prices), and pacifier sellers, such as Defendant, consider the product features of their own and rival suppliers, including rival supplier prices, as well as consumer preferences about these features, when determining their pricing. Verlinda Rebuttal Report ¶ 13. Dr. Verlinda will estimate consumer valuations for product feature preferences using a "mixed

logit" model. The mixed logit model is a standard approach for measuring consumer preferences for product features based on consumer choice data in both economics and marketing. *See* Verlinda Report ¶ 31. This model allows consumer valuations of different product features (including Challenged Claims) to vary across individuals and provides superior statistical fit compared to models that assume homogeneous preferences. *Id*. This is also referred to as "Nash Bertrand" equilibrium and it incorporates an assumption that MAM and its rivals compete on price. Verlinda Rebuttal Report ¶ 13. Next, Dr. Verlinda will utilize a standard model of consumer demand and oligopolistic competition to calculate but-for prices for the Products *Id.* ¶ 5. The price premium for the Challenged Products is the difference between their actual price and the predicted but-for price. *Id*. Finally, Dr. Verlinda will arrive at the measure of class-wide damages by applying the price premium to the volume of commerce (revenues and units) MAM generated from sales of the Challenged Products during their relevant periods of sale. Verlinda Report ¶ 46-48.[27]

Although Dr. Verlinda has not conducted his analysis yet (nor is required to do so, *see* Section VI.C.3(a) above), based on his experience and academic background as an economist, he is confident he will be able to do so. Verlinda Report ¶ 50. This is sufficient for class certification.

B) Dr. Aron's Criticisms of Dr. Verlinda are Without Merit

First, Dr. Aron attempts to criticize Dr. Verlinda regarding his use of Nash Bertrand. Dr. Aron claims that Dr. Verlinda's modeling choices (including, but not limited to, Nash Bertrand) are not supported by academic literation. *See, e.g.*, Aron Report ¶ 139. But this is plainly wrong.

[27] In addition to the above damage calculations for the Class, Dr. Verlinda is able to calculate statutory damages for New York consumers pursuant to New York GBL § 349(h) using simple arithmetic: if the dollar price premium is less than the available statutory damages ($50), Plaintiff can choose the latter. *See* Verlinda Report ¶ 48. That amount may also be increased to an amount not to exceed three times the actual damages up to $1,000. *See* NY GBL § 349(h). Total statutory class-wide damages in New York can be determined by assigning $50 to each unit of each Challenged Product sold in New York during the class period. The number of such units sold can be determined from the same scanner and retailer data as will be used for damages calculations based on the price premium, as described above.

Dr. Verlinda has extensive experience with such modeling (*see* Section VI.C.3(d)(i) above), and has cited to numerous academic and economic resources in each of his reports supporting its use here. *See* Verlinda Rebuttal Report ¶¶ 23-25 (citing various authorities); *see also* Appendices to the Verlinda Report and Rebuttal Report. Dr. Aron's lack of knowledge regarding the model proposed by Dr. Verlinda does not mean it is unscientific or unreliable, but rather that she is unqualified in this specific area of economics or there is a battle of the experts for a jury to consider. *See* Verlinda Rebuttal Report ¶ 14; *see also* Aron Dep. 106:2-8; 108:19-20. Dr. Aron's lack of experience with Nash Bertrand shows in her analysis. Her claim that the model is incorrect is based on (1) a hypothetical scenario where competition in the pacifier market differs, and (2) an unsupported analogy to dissimilar industries, including the beer industry (where tacit collusion was present). Verlinda Rebuttal Report ¶¶ 14-15. Further, Dr. Aron attempts to apply forward-looking merger studies to the backward-looking case at issue. Aron Report ¶¶ 118-122. Such a comparison is irrelevant as nearly all variables and economic conditions are different. Verlinda Rebuttal Report ¶ 16. Each of these attempts to disqualify are insufficient and at best create a "battle of the experts" for a jury to consider and weigh. *See Cardenas*, 2021 WL 5811741, at *5 ("A difference in opinion is not a basis for exclusion of an expert opinion under Daubert standards.").

Second, Dr. Aron claims that in order to determine the but-for prices that would arise from the removal of the Challenged Claims, the construction of the but-for world would need to consider <u>all</u> of the possible products, or changes to existing products, that pacifier suppliers <u>may</u> have introduced in the absence of representing the Challenged Claims. Verlinda Rebuttal Report ¶¶ 18-20. As an initial matter, such a standard would be impossible to meet. Next, this convoluted argument distorts the scope of Dr. Verlinda's assignment, "which is to measure the price premium

associated with the Challenged Claims that appeared on products that were actually purchased." *Id.* ¶ 19. Here, Dr. Verlinda will determine what the prices would have been if the claim had not been on the Products. *Id.* It is not necessary to consider what products might have alternatively been in the market, or what alternative claims would have been on them, if the Orthodontic Representations had not been on the Class Products. And the reason for this is clear and logical, by assuming infinite alternative hypothetical scenarios those products would need to be included in any survey or simulation, and then it would be impossible to calculate any value of any feature. *Id.* ¶ 20. Dr. Aron's overcomplication of the issue at hand is unnecessary. In reality, the Class members purchased the Products, with the Orthodontic Representations, at prices that reflected the Orthodontic Representations, and Dr. Verlinda's assignment is to determine how much Class members overpaid as a result. *Id.* And his proposed methodology does just that.

Unable to challenge Dr. Verlinda's overall methodology, Dr. Aron turns to nit picking assumptions and inputs, none of which provide a basis for denying class certification. Dr. Aron attempts to attack the amount of price premium by proposing an alternative model. Not only does this model not work (it would actually yield a *higher* price premium, *see id.* ¶ 30), but such a presentation only supports Plaintiff's argument that this is an issue for the jury to weigh and is not ripe for the Court to decide at class certification. Dr. Aron also challenges the demand component of Dr. Verlinda's analysis. However, Dr. Aron's challenge ignores a key economic principle:

> Importantly, because market prices are common across consumers, even purchasers of the Challenged Products who place little value on the Challenged Claims still suffer economic harm from the elevated market prices associated with the Challenged Claims. This is because all purchasers pay the same inflated price irrespective of whether an individual purchases values the Challenged Claim a little or a lot.

Verlinda Rebuttal Report ¶ 37 (citing authority).

Finally, Dr. Aron's unscientific review of "average" retail prices for certain pacifiers is incomplete and should be ignored. To be clear, Dr. Aron did not conduct a survey in conjunction

with her work in this litigation. Aron Dep. 135:11-13 ([redacted]). [redacted] As more fully set forth in the Verlinda Rebuttal Report, minimum necessary conditions are not met for such an analysis to calculate price premiums for the challenged claims and, therefore, the alternative methodology proposed by Dr. Aron is fundamentally flawed.[28] *See* Verlinda Rebuttal Report § VII.

Based on the foregoing, and as more fully set forth in the Verlinda Rebuttal Report, Dr. Aron's challenges[29] to Dr. Verlinda's methodology fail to render it inadmissible at this stage.

(iii) Dr. Verlinda's Opinions Will Assist the Trier of Fact

[28] Dr. Aron also challenges Dr. Verlinda for allegedly failing to account for wholesale competition. Aron Report § VII. However, Dr. Aron fails to explain any impact such a consideration would have on Class members, who are retail purchasers. *See* Verlinda Rebuttal Report ¶¶ 21-22.

[29] Dr. Aron also presents a number of allegedly "real-world" examples from retailers such as Amazon, Target, and Walmart to suggest that not all consumers would be exposed to the challenged claims. However, as Dr. Verlinda explains, "information about the various product attributes is easily accessible to customers online." *See* Verlinda Rebuttal Report ¶¶ 46-49. What's more, because the information as presented on retail websites oftentimes mimics the way information is presented to participants in a conjoint survey, this supposed criticisms of Dr. Verlinda's methodology will have no impact on his analysis. *Id*.

Dr. Verlinda's opinions will undoubtedly assist the trier of fact in determining the outcome of this litigation. At its core, this case is about whether a reasonable consumer would be misled by Defendant's "orthodontic" representation, and the value that it carries. Dr. Verlinda's analyses are helpful because he has calculated the basic measure of damages—the difference in value between what Plaintiff and the proposed Class were promised by Defendant and what they received from Defendant. But whether Dr. Verlinda's or Defendant's Experts are correct is a common issue that can be answered by a trier of fact for the proposed Class as a whole and is a matter outside of Dr. Verlinda's purview as an expert witness. "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Takeda Pharms. USA, Inc. v. Spireas*, No. CV 17-0452, 2019 WL 9596536, at *1 (E.D. Pa. Sept. 4, 2019) (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citations omitted)). "As the Supreme Court in *Daubert* stated: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (citing *Daubert*, 509 U.S. at 595).

Dr. Verlinda is qualified and has presented a scientifically reliable methodology—it is now up to a jury to weigh the evidence and expert opinions and determine the outcome of this litigation.

## VII. THE MULTI-STATE CLASS IS CERTIFIABLE

Each of the ten state statutes require proof (which is common here) that the deceptive conduct at issue was likely to mislead a reasonable consumer. *See Suchanek*, 764 F.3d at 756 (stating that the "same legal standards govern every class member's claim" where each of the applicable consumer-protection laws could be satisfied by proof that a statement was literally false

or likely to mislead a reasonable consumer).[30]

Plaintiff has identified—and will present at trial—common evidence, including the Dennis and Dean Reports, Defendant's own documents, deposition testimony and expert scientific evidence to answer the common questions presented by this litigation. *See* Sections I, II, and III above. Specifically, Plaintiff will show, through common proof, that Defendant's labeling of the Orthodontic Pacifiers violated the consumer protection statutes of California,[31] Florida, Illinois, Massachusetts,[32] Michigan, Minnesota, Missouri, New Jersey, New York, and Washington.

---

[30] *See also Benson*, 2021 WL 5321510, at *9. This burden of proof has been affirmed and applied by federal courts consistently under each state statute. *See Song v. Champion Petfoods USA, Inc.*, 27 F.4th 1339, 1343 (8th Cir. 2022) (analyzing Minnesota law); *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021) (analyzing California law); *Beardsall*, 953 F.3d at 972-73 (analyzing Michigan law); *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) (analyzing New York law); *In re Folgers Coffee*, No. 21-2984-MD-WBP, 2021 WL 7004991, at *9 (W.D. Mo. Western Div. Dec. 28, 2021) (applying Missouri law); *Cole v. Keystone RV Co.*, Nos. 80357-9 & 80366-8, 2021 WL 3111452, at *5 (W.D. Wash. at Tacoma July 22, 2021) (applying Washington law); *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1233 (S.D. Fl. 2021) (applying Florida law); *Bartnett v. Abbott Labs.*, 483 F. Supp. 3d 787, 800 (N.D. Ill. 2020) (applying Illinois law); *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 452 (D. Mass 2018) *reconsidered on other grounds* 370 F. Supp. 3d 204 (D. Mass. 2019) (applying Massachusetts law); *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 335 (D.N.J. 2014) (applying New Jersey law).

[31] Defendant's argument regarding the specific inclusion of California in the Complaint does not warrant its exclusion. When listing the "other states with similar consumer fraud laws," Plaintiff specifically reserved her rights by stating that the states "include, but are not limited to..." Compl. p. 33, n.23. Even so, the law is clear that a class definition can change over the life of a case. *See, e.g.*, *Bieniek v. Cent. States, Southeast and Southwest Areas Health and Welfare and Pension Funds*, No. 22 CV 6498, 2023 WL 4473018, at *5 (N.D. Ill. 2023). "Even "significant" changes to a complaint or to a class definition can relate back so long as the defendant had fair notice of the substance of the new allegations from the outset." *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 741 (C.A.7 (Ill.) 2018) (citing *Knudsen v. Liberty Mut. Ins. Co.*, 411 F.3d 805, 806 (7th Cir. 2005)). Here, Defendant was put on notice prior to the filing of the Complaint. *See* Compl. ¶ 154. Separately, because the California "UCL claim is equitable in nature, the Court, rather than a jury, must decide whether there was a UCL violation." *Netlist, Inc. v. Diablo Techs., Inc.*, No. 13-CV-5962, 2015 WL 1887261, at *3 (N.D. Cal. Apr. 24, 2015).

[32] Plaintiff was not required to provide notice to Defendant under Mass. Gen. Laws ch. 93A § 9(3). Pursuant to its clear statutory language, the 30-day demand letter requirement "shall not apply if the claim is asserted by way of counterclaim or cross-claim, <u>or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth</u> . . . . " Mass. Gen. Laws ch. 93A § 9(3) (emphasis added); *McKenna v. Wells Fargo Bank, N.A.*, 693 F.3d 207, 218 (1st Cir. 2012). Defendant makes no argument and presents no evidence that it maintains a place of business or keeps assets within the commonwealth. *See, e.g.*, *Lee v. Conagra Brands, Inc.*, No. CV 17-11042-NMG, 2021 WL 3131536 (D. Mass. July 23, 2021) (recognizing that the demand letter requirement does not apply if the prospective defendant does not maintain a place of business or keep assets within the commonwealth; denying summary judgment).

As demonstrated in Weiner Exhibit 9 (Common Elements Chart), there is significant and meaningful overlap between the ten consumer protection statutes. Each statute requires proof of the Common Elements (*see id.*), and any slight variation in the statutes can be addressed in jury instructions and the verdict form.[33] The Common Elements, constitute all necessary elements for the causes of action under the states' consumer protection statutes.

Each of the Common Elements, coupled with the "reasonable consumer" standard employed in each state will enable the Court and jury to address liability under each consumer protection statute. The proof needed to resolve each element required to establish liability under the laws of each relevant state—survey evidence, expert testimony, and parties' testimony—is common to all Class members. The Seventh Circuit addressed a similar consumer fraud, multi-state class action in *Suchanek*, 764 F.3d 750. In reversing the district court's denial of class certification, the Seventh Circuit provided thoughtful analysis of why class certification of the class under the laws of multiple states is appropriate—"[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Id*. at 756. This is particularly true where "the plaintiffs' claims and those of the class they would represent all derive from a single course of conduct by Strum [defendant]: the marketing and packaging of GSC [product]." *Id*. This is because "[t]he question [of] whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member. (Note that this is an objective question, not one that depends on each Purchaser's subjective understanding of the package.)" *Id*. at 758.

On remand, the trial court noted:

[33] Defendant raises a number of "differences" in the elements of the ten consumer protection statutes. Opp. at 48-50. However, they are all "distinctions without a difference." *Benson*, 2021 WL 5321510, at *9; *see* Common Elements Chart, Weiner Ex. 9.

> The named Plaintiffs all claim that the overall GSC packaging was deceptive in that it created, and/or failed to correct, the misimpression that the product was premium, ground coffee. The named Plaintiffs also claim they would not have purchased the product (or paid as much as they did) had they known it was actually instant coffee. They are not alone in their claims. The evidence in the record illustrates that hundreds, if not thousands, of other consumers held the same mistaken belief and were equally disappointed upon learning the true nature of the product.

*Suchanek*, 311 F.R.D. at 256.

The trial court certified the class stating,

> the common, class-wide issue in this case is liability which turns on whether the GSC packaging was likely to deceive a reasonable consumer. This question is particularly appropriate for class-wide resolution. It is identical across every class member because all of the applicable consumer protection statutes require proof that Defendants' statement was likely to mislead a reasonable consumer.

*Id*. at 259 (citing *Suchanek*, 764 F.3d at 760, and *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)). Similarly in this case, Plaintiff seeks to represent a class of consumers under multiple state laws for a common violation due to Defendant's common labeling of the Orthodontic Pacifiers. Further, just as in *Suchanek*, this violation is judged on an objective, "reasonable consumer" standard.

It would be wholly inefficient and a waste of this and other court resources to litigate this common issue in individual cases. *See Pella Corp*., 606 F.3d at 393-94. The Seventh Circuit reiterated this view in *Suchanek* stating, "a 'class action is the efficient procedure for litigation of . . . a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any of them large enough to justify the expense of an individual suit.' The same can be said about a deceptive practice." *Suchanek*, 764 F.3d at 759 (quoting *Butler*, 727 F.3d at 798).

This Court should follow the lead of the Seventh Circuit in *Pella Corp*., *Suchanek*, and *Butler* and certify the proposed Class to protect both Plaintiff's legal rights and the judicial economy of the Federal Courts.

## VIII. <u>PLAINTIFF'S AFFIRMATIVE MOTIONS TO EXCLUDE</u>

### A. The Gal Report Should Be Excluded in its Entirety

The Court should exercise its gatekeeping powers to exclude the Gal Report because Dr. Gal's opinions are unreliable, unlikely to assist the trier of fact, and prejudicial if presented to a jury. Given his lack of expertise in conjoint survey analysis, Dr. Gal misunderstands the basis behind the use of such a highly technical statistical technique—a tool utilized by Defendant on multiple occasions. Indeed, Dr. Gal lacks the requisite expertise to offer *any* opinion regarding the manner in which Dr. Dennis designed his conjoint survey analysis. Furthermore, Dr. Gal inappropriately critiques the expert report of Dr. Dean with irrelevant considerations about how *consumers* understand the challenged representations. This sort of immaterial and misleading review of Dr. Dean's work will only serve to confuse the jury because Dr. Dean never offered the allegedly improper opinions. Lastly, Dr. Gal improperly disputes the validity of Dr. Verlinda's market price premium estimate and fails to buttress his contentions with any sort of scientifically reliable support. The Court should exclude Dr. Gal's Expert Report, as detailed below, under *Daubert* and Federal Rules of Evidence 104, 401, 402, 403, and 702.[34]

Plaintiff seeks to exclude the Gal Report in its entirety. Dr. Gal's opinions can be generally categorized as criticisms of (1) Dr. J. Michael Dennis' conjoint survey, (2) Dr. Jeffrey A. Dean's alleged opinions related to consumer perception of the Orthodontic Representations, and (3) the market price premiums to be computed by Dr. Verlinda.

#### 1. Dr. Gal Lacks the Requisite Qualifications to Opine on Conjoint Survey Analysis

"[T]he role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching [his] conclusions." *Smith*, 215

[34] Plaintiff reserves their right to further object to this testimony under Federal Rule of Evidence 403 and other applicable rules of evidence on *in limine* motions or at trial.

F.3d at 718 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "To qualify as an expert, a witness must have 'knowledge, skill, experience, training, or education' relevant to such evidence or fact in issue." *U.S. v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000). The inquiry is a flexible one and the importance of any factor depends on the expert's area of expertise and the subject of their testimony. *Kumho Tire*, 526 U.S. at 150. An expert qualified in one field is not allowed to offer opinions outside his or her area of expertise. *Chang*, 207 F.3d at 1172 (affirming exclusion of expert who, while experienced in international finance, had no experience in identifying the counterfeit foreign securities at issue); *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989); *Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 729 (W.D. Va. 2000).

Here, Dr. Gal does not possess the requisite qualifications or expertise to offer reliable expert opinions on conjoint survey methodology.

(a) By His Own Admission, Dr. Gal Lacks the Requisite Expertise to Offer Opinions as to Conjoint Survey Analysis

Dr. Gal's qualifications do not provide the requisite foundation for opinions related to the conjoint survey analysis conducted by Plaintiff's highly qualified expert.

Dr. Gal's opinions on the subject of conjoint survey analysis are without justification or a reliable basis. By his own admission, [redacted] *See* [redacted]

[redacted]

[redacted]). As demonstrated by Plaintiff's expert, a scientific methodology exists by which opinions can be tested: by *actually* conducting a survey and analyzing the results. *See Schmude v. Tricam Indus., Inc.*, 556 F.3d 624, 626 (7th Cir. 2009) ("The defendant has never explained what kind of test could be performed … except to remove the same rivet from an identical ladder, have a 350-pound man climb halfway up and start poking with his hands in the ceiling, and see what happens.").

Dr. Gal conducted no such survey and has no basis for his conclusory opinions, however, it is not the Court's function to connect the dots for Defendant. As a basis for whether expert testimony can be deemed reliable, and one of the core aspects of the *Daubert* opinion, there is "an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 509 U.S. at 592. Dr. Gal simply does not have any reliable knowledge or experience on the subject of conjoint surveys to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Therefore, Plaintiff respectfully submits that Dr. Gal lacks the requisite expertise to opine regarding conjoint survey analysis and that the aforementioned opinions should be excluded. *See Chang*, 207 F.3d at 1172.

(b) The Frequent Use of Conjoint Surveys by Defendant is Directly Contradicted by Dr. Gal's Testimony Regarding Their Utility

[redacted]. *See* Verlinda Rebuttal Report ¶¶ 33-34 (noting that Defendant utilized similar conjoint studies to inform pricing decisions). Thus, given the clear utility found in these surveys by Defendant—and [redacted]—Dr. Gal's contradictory opinions render his testimony unreliable and unhelpful.

[redacted]

[redacted]

2. <u>Dr. Gal's Opinions Regarding Dr. Dean's Alleged Opinions As To Consumer Perception of the Orthodontic Representations Are Irrelevant and Cannot be Relied Upon to Assist the Trier of Fact</u>

Dr. Gal mischaracterizes the opinions in the Dean Report. [redacted]. This misdirection in his report serves no purpose but to confuse the trier of fact and, thus, cannot be relied upon. Fed. R. Evid. 702(a). Moreover, its probative value is substantially outweighed by the danger of confusion of the issues and misleading the jury. Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595.

As discussed in Section VI.B.2 above, Dr. Dean explicitly explained, "The use of the term 'orthodontic' is commonly understood ***in the dental, orthodontic, and medical community*** as a method or device to prevent or treat malocclusion." Dean Report ¶ 34 (emphasis added). He further concluded, "Pacifiers cannot be 'orthodontic' as they are not medical devices and they do not prevent or treat malocclusions or promote oral development." *Id*. ¶ 35. Based on his extensive experience and comprehensive review of literature in the dental, orthodontic, and medical community, Dr. Dean believes that "labeling a pacifier as 'orthodontic' is inappropriate, misleading, and not supported." *Id*. ¶ 36.

Contrary to Dr. Gal's misguided critique, Dr. Dean in no way attempts to assess *consumer* perception of the challenged representations. Because this mischaracterization of Dr. Dean's opinion serves no purpose other than to confuse the trier of fact, Dr. Gal's opinions must be excluded.

3. <u>Dr. Gal Fails to Support His Opinion Regarding Dr. Verlinda's Price Premium Estimate with Any Reliable Scientific Methodology</u>

In seeking to find reliable testimony on highly technical matters, it is not coincidence that *Daubert* listed the criteria of an expert's qualifications as the first requirement. It follows that an expert must be qualified in the area in which they are offering an opinion in order for it to be reliable. *See* Gal Dep. 26:4-6 ("[redacted]"). [redacted]

[redacted] This backhanded criticism of Dr. Dennis' conjoint analysis forms the basis of Dr. Gal's opinion with regard to the price premium estimations computed by Dr. Verlinda. Given Dr. Gal's commitment to criticizing the results of Dr. Dennis' conjoint analysis, his qualifications in this area should once again be considered. As discussed herein, Dr. Gal does not possess the requisite expertise to opine on the results of Dr. Dennis' conjoint analysis. Therefore, his discussion regarding these inputs, as it pertains to the validity of Dr. Verlinda's

price premium estimate (for which he likewise lacks qualifications), should be disregarded.

More importantly though, Dr. Gal is not an expert in marketplace simulations and his opinions lack any "scientific" basis, which is required in order for opinions to be relied upon by the Court (or presented to a jury). *In re Broiler Chicken*, 2022 WL 1720468, at *7 (citing *Smith*, 215 F.3d at 718, and *Daubert*, 509 U.S. 579). Under *Daubert*, for an expert opinion to be admissible, the expert must apply a scientifically reliable methodology. *Smith*, 215 F.3d at 718. Dr. Gal is unable to substantiate his claims with scientifically reliable contentions when it comes to Dr. Verlinda's price premium estimates. Instead, he resorts to inconsequential attacks regarding Dr. Verlinda's experience (for which he has no experience to critique) rather than offering credible, scientific work that contradicts his price premium findings.

Therefore, Plaintiff respectfully requests that the Court exclude Dr. Gal's Report in its entirety.

### B. <u>Certain Opinions of Dr. Chase Should be Excluded</u>

Defendant's dental health expert, Dr. Chase, offers opinions based on the use of Finite Element Analysis ("FEA") that are outside of her area of expertise, and thus, must be excluded. *See* Chase Report ¶¶ 45-47. While Dr. Chase may be credentialed to opine regarding pediatric dentistry and oral development, she—by her own admission—is not an expert in FEA modeling. *See Id*. ¶¶ 45-47. Dr. Chase admitted she is not an expert in FEA modeling, has never published a paper or done research involving FEA modeling, and does not have a background sufficient to determine the quality of the engineering inputs in an FEA model. *See* Chase Dep. 23:13-24:7.

Despite not having expertise in FEA, Dr. Chase criticizes Dr. Dean, a similarly credentialed expert, for not accounting for FEA in his Report. *See* Chase Report § D. Dr. Chase then goes on to cite and opine regarding three FEA studies. *See id* ¶¶ 45-47 n.48-53. However, Dr. Chase did not, and could not even if she attempted to, verify the underlying models in the papers she relied

on. Dr. Chase readily admitted in her deposition that it was “beyond [her] expertise” to determine the accuracy or appropriateness of the CAD models used in the studies, that she could not analyze or provide an expert opinion regarding the accuracy or quality of the underlying FEA model the study’s conclusions were based on, nor provide an expert opinion regarding the material models used in the studies. Chase Dep. 89:3-91:4.

Dr. Chase attempts to circumvent this lack of understanding by stating that the American Academy of Pediatric Dentistry (“AAPD”) *Policy on Pacifiers* recommends “that this is an area of research that we need to go in.” *Id*. 91:12-14. However, the AAPD’s Policy on Pacifiers merely states that “[t]he use of biometrics to aid pacifier selection has shown promise in recent research.” Weiner Ex. 14, American Academy of Pediatric Dentistry (2022) *Policy on Pacifiers* 87, 87. Further damning of Chase’s reliance on the AAPD guidance is the fact that the very articles she cites in support of her opinions were considered in shaping the *Policy on Pacifiers* and their conclusions were not implemented into the final policy statement. *Compare id*. 89 n.45, 47, 48 *with* Chase Report ¶¶ 45-47 n.48 (and 50), 51 (and 53), 52. Thus it is clear that a panel of Dr. Chase’s peers examined the same articles she did and found them lacking.

Plaintiff’s proffered FEA expert, Dr. Sean S. Kohles, examined the FEA studies Dr. Chase relied on in the Chase Report. *See* Kohles Rebuttal Report. After reviewing the underlying FEA models from the studies, Dr. Kohles concluded that “[a]ll of the models inconsistently simulate infant oral suckling mechanics,” “multiple input assumptions for each model development compromised the accuracy of modeling construction and their eventual application,” “[n]one of the published model results have been validated in any manner,” and “[n]one of the modeling results incorporate mechanotransductive or tissue adaption theories and thus cannot foretell any positive or negative oral health responses due to pacifier use.” *Id*. ¶ 6.

Specifically, Dr. Kohles notes a lack of validity in "the reconstruction of any of the computational models from real, physical objects," *id*. ¶ 23, inconsistent translation of intraoral pressurizations into the functionality of the models, *id*. ¶ 27, "drastic over-simplification" of the tissues involved, *id*. ¶ 29, "confusion amongst the three papers as to the application of positive [] and/or negative [] applied pressures," *id*. ¶ 31, and a clear conflict of interest in two of the studies because the holder of intellectual property patents over the subject pacifiers was an author, *id*. ¶ 39. All of this lead Dr. Kohles to conclude that Dr. Chase has a "lack of education, training, and experience necessary to understand and critically interpret the papers she cites [and] represents a significant disconnect in support those papers as having any substantive value of bolstering an opinion on accurate oral biomechanics modeling." *Id*. ¶ 42.

Since Dr. Chase lacks the expertise and qualifications to be an FEA expert and the FEA studies she relies on are flawed and unverified, the portions of the Chase Report concerning FEA should be excluded. *See* Chase Report ¶¶ 45-47.

**CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that the Court:

1. Grant Plaintiff's Motion for Class Certification and (1) certify the Multi-State Class; (2) appoint Plaintiff Dominique Freeman as Class Representative; and (3) appoint Pearson Warshaw, LLP and Lynch Carpenter, LLP as Co-Lead Class Counsel.

2. Deny Defendant's motions to exclude (1) Dr. J. Michael Dennis; (2) Dr. Jeremy Verlinda; and (3) Dr. Jeffrey A. Dean.

3. Grant Plaintiff's motion to strike the improper physical evidence submitted to the Court.

4. Grant Plaintiff's motions to exclude (1) Dr. David Gal, Ph.D. (entirely); and (2) Assistant Professor Isabelle Chase, DDS, FRCD(C) (in part).

Respectfully submitted,

Dated: September 14, 2023 By: */s/ Melissa S. Weiner*

MELISSA S. WEINER
mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

EDWIN J. KILPELA
ekilpela@lcllp.com
JAMES M. LAMARCA
james@lcllp.com
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 253-4996
Facsimile: (412) 231-0346

KATRINA CARROLL
kcarroll@lcllp.com
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 750-1265
Facsimile: (312) 750-1591

DANIEL L. WARSHAW
dwarshaw@pwfirm.com
MICHAEL H. PEARSON
mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*Attorneys for Plaintiff*